1
2
3
4

Jeff Dominic Price JDP PC  |  SBN 165534
730 Arizona Avenue, Suite 200
Santa Monica, California 90401
jdp@jdpfirm.com
310.451.2222

Attorney for the Plaintiffs

5
6
7
8

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**

9
10
11
12
13
14

ESTATE OF LUKE M. LADUCER, by and
through the Executor, DIANA DECOTEAU,
BROOKLYN LADUCER, BETTY
LADUCER, MELVIN LADUCER, and R. A.
L., a minor, L. G. L., a minor, and P. A. L., a
minor, by and through their next friend and
guardian ad litem, PAULETTE SCHELLER,

15

Plaintiffs,

16

vs.

17
18
19
20
21

ESSENTIA HEALTH, COUNTY OF CASS,
JESSE JAHNER, CASS COUNTY SHERIFF,
KURT A. KACZANDER, D.O., NATHANIEL
G. SWANSON, R.N., CAPTAIN ANDREW
FROBIG, CONRAD BINSFIELD, R.N.,
JOHN DOE, and 10 UNKNOWN NAMED
DEFENDANTS, inclusive,

Defendants.

No.

COMPLAINT

1.  Denial of Medical Care in violation of the
    Fourteenth Amendment, 42 U.S.C. § 1983
2.  Deprivation of Due Process — State Created
    Danger — in violation of the Fourteenth
    Amendment, 42 U.S.C. § 1983
3.  Deprivation of Freedom of Association and
    Substantive Due Process in violation of the
    First and Fourteenth Amendments, 42
    U.S.C. § 1983
4.  Municipal and Supervisory Liability, 42
    U.S.C. § 1983
5.  Negligence and Wrongful Death

DEMAND FOR JURY TRIAL

22
23

To:     THE CLERK OF THE COURT:

24

        This action resulted from the acts of the Defendants on December 18, 2020, in Fargo,

25

North Dakota, which caused the untimely death of Luke Laducer, 41 years of age, who was a U.S.

26

Army veteran and father of four children and son of two parents, and who sought the assistance of

27

the government by calling 911 but bled to death in Cell #109 in Cass County Jail 17 hours later.

28

1 — **Complaint**

## Jurisdiction and Venue

1.      This civil rights, wrongful death, and survival action arising from Defendants' failure both to provide for Decedent's serious medical needs and to provide competent medical care, treatment, and failure to comply with legal obligations concerning Decedent's serious medical and mental health needs, which occurred while in the custody of the police and in a jail facility in the County of Cass and resulted in the death of Luke Laducer on December 18, 2020. This action is brought pursuant to 42 U.S.C. § § 1983 and 1988; the First, Fourth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343 (a) (3) and (4), and the above-mentioned statutory and constitutional provisions. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law.

2.      Venue is proper in the United States District Court for the District of North Dakota, pursuant to 28 U.S.C. § 1391(b), in that a defendant resides in this district and the events that gave rise to this action occurred within this district.

## Parties and Procedure

3.      Plaintiff Estate of Luke M. Laducer is a legal entity formed for the purpose of distributing the assets of the decedent, including any assets that are derived from this action. Diana DeCoteau, the sister of Luke Michael Laducer, is the duly appointed Executor of the estate. *See* Exhibit 0.

4.      Plaintiff Brooklyn Laducer is the daughter of Luke M. Laducer.

5.      Plaintiff Betty Laducer is the mother of Luke M. Laducer.

6.      Plaintiff Melvin Laducer is the father of Luke M. Laducer.

7.      Plaintiff R. A. L. is the minor son of Luke M. Laducer and sues by and through his guardian ad litem and next friend, Paulette Scheller, the sister of Luke M. Laducer.

8.      Plaintiff L. G. L. is the minor son of Luke M. Laducer and sues by and through his guardian ad litem and next friend, Paulette Scheller.

9.     Plaintiff P. A. L. is the minor daughter of Luke M. Laducer and sues by and through her guardian ad litem and next friend, Paulette Scheller.

10.     Plaintiffs bring these claims pursuant to North Dakota Century Code §§ 32-21-01 et seq. which provide for survival and wrongful death actions; Plaintiffs also bring the claims individually and on behalf of Decedent Luke M. Laducer on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and federal and state civil rights law, and as Private Attorneys General, to vindicate not only their rights, but others' civil rights of great importance.

11.     Defendant Essentia Health ("Essentia") was, at all material times, a Minnesota Nonprofit Corporation licensed to and doing business in North Dakota, with corporate headquarters located in Duluth, Minnesota. On information and belief, Defendant County of Cass and the City of Fargo contracted with Defendant Essentia Health for the provision of medical and mental health care for inmates in the custody of the County of Cass and for persons taken into custody by the police. Defendant Essentia Health is liable for all acts and conduct of its employees, including Kaczander and Swanson, under Respondeat Superior principles.

12.     Defendant County of Cass ("the County") is a public entity established by the laws and Constitution of the State of North Dakota, and owns, operates, manages, directs and controls the Cass County Sheriff's Office and jails situated within the county, and employs other defendants in this action.

13.     Defendant Sheriff Jesse Jahner, at all times material, was employed by Defendant County of Cass as the Cass County Sheriff ("Sheriff"), and was acting within the course and scope of that employment; as Sheriff, Defendant Jahner was a final policy-making official for the County of Cass jails, ultimately responsible for all policies, procedures, and training pertaining to the operation of the jails. As Sheriff, Defendant Jahner is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all Cass County Sheriff's Office custodial employees and agents including Defendant Binsfield. Defendant Jahner is and was charged by law with the administration of the Cass County Jail ("CCJ"), with the assistance of other executive officers. Defendant Jahner is and was responsible for assuring the

prompt transfer of mentally or medically ill prisoners to appropriate out-of-facility placements. Defendant Jahner also is and was responsible for the promulgation of the policies and procedures and allowance of the practices and customs pursuant to which the acts of the Cass County Sheriff's Office ("CCSO") alleged herein were committed. Defendant Jahner is being sued in his official capacity and in his individual capacity as a supervisory official for his own culpable action or inaction in the training, supervision, or control of his subordinates, or for his acquiescence in the constitutional deprivations which this Complaint alleges, or for conduct that showed a reckless or callous indifference to the rights of prisoners with medical or mental health issues or that set in motion a series of acts that led to the deprivation of Decedent's constitutional rights. Sheriff Jahner's affirmative conduct involves his failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which he knew or reasonably should have known, would cause others to inflict the constitutional injury. Defendant Jahner failed to adequately monitor the provision of health care and mental health care to inmates of the Cass County Jail. Defendant Jahner also was aware of the conduct of the individual defendants described in this case and specifically approved of and ratified that conduct and the bases for it.

14.     Defendant CCSO Captain Andrew Frobig was at all relevant times the administrator of the Cass County Jail, where Decedent bled to death. Defendant Frobig at all material times, was a policy-making official for Defendant County of Cass as to jail operations. He is being sued in his individual, supervisory, and official capacities. Defendant Frobig also was aware of the conduct of the individual defendants described in this case and specifically approved of and ratified that conduct and the basis for it.

15.     Defendant Kurt A. Kaczander, D.O., was at all times herein mentioned a licensed physician, and employee and agent of Defendant Essentia Health. Defendant was responsible for overseeing and providing medical and mental health care to persons brought into the Emergency Room at Essential Health, located at 3000 32nd Avenue South, Fargo, N.D., 58103 ("ER"), including prisoners like Luke Laducer brought into the hospital in police custody and was acting within the course and scope of that employment and acting under color of state law as a state

4 — **Complaint**

actor.

16.     Defendant Nathaniel G. Swanson, at all times mentioned herein, was an employee and agent of Defendant Essentia Health, working at Essential Health, as a Registered Nurse, responsible for providing medical and mental health care to persons brought into the ER, including prisoners like Luke Laducer brought into the hospital in police custody, and responsible for performing intake and receiving screening on prisoners, and he was acting within the course and scope of that employment and under color of state law as a state actor; on December 18, 2020, Defendant Swanson was the triage nurse at approximately 0251 hours, when Luke Laducer was brought in to the ER by the Fargo Police Department. Defendant Swanson's notes are attached as part of the ER report, marked Exhibit 1.

17.     Defendant Conrad Binsfield, at all times mentioned herein, was an employee and agent of Defendant County of Cass, working at the Cass County Jail, as a Registered Nurse, and he was acting within the course and scope of that employment and under color of state law; on December 18, 2020, Defendant Binsfield was the nurse working in jail booking at approximately 0313 hours, when Luke Laducer was brought in to the jail, responsible for providing medical and mental health care to persons brought into the jail and for performing intake and receiving screening on persons brought into the jail for booking.

18.     Defendant John Doe was the watch commander or overall supervisor of the Cass County Jail on site on December 18, 2020, during the time Luke Laducer was an inmate in the jail on December 18, 2020, was the supervisor of Defendant Binsfield and the subordinate of Defendant Jahner.

19.     Each of the Defendants was at all times an agent, servant, employee, partner, joint venturer, co-conspirator, and or alter ego of the remaining defendants, and in doing the things here alleged, was acting within the course and scope of that relationship. Plaintiffs are informed and believes and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining defendants, and ratified and or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged. At all material

times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiffs' constitutional rights and other harm.

20.     At all material times each Defendants acted under color of the laws, statutes, ordinances, and regulations of the State of North Dakota and the United States.

21.     This complaint may be pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d); pursuant to Fed. R. Civ. P. 9(b) "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.".

<u>Facts</u>

22.     On December 18, 2020, at approximately 0223 hours, Luke M. Laducer, the decedent, who resided at 1750 40th Street, S., in Fargo, North Dakota, called 911 and reported that he was suicidal.

23.     Luke Laducer was 41 years old, a U.S. Army veteran, 5'8" tall, and weighed approximately 165 lbs.

24.     Fargo Police Department officers Schmidt and Iverson responded to Mr. Laducer's residence and took Mr. Laducer into custody at his residence at approximately 0240 hours on December 18, 2020, and thereafter he was transported to the Emergency Room at Essentia Health, located at 3000 32nd Avenue South, Fargo, N.D. 58103-6132, because of, *inter alia*, his mental state and state of intoxication and because there was an outstanding warrant for his arrest.

25.     At 0241 hours Decedent was transported by Fargo police officers Schmidt and Maahs from his residence to Essentia Health ER so that he could be medically cleared to be booked into jail on the warrant.

26.     Officers Schmidt and Maahs and Decedent arrived at the ER at 0246 hours.

27.     Mr. Laducer arrived inside the ER at 0250 hours and was "admitted" at 0251 hours; he was so intoxicated that he was unable to talk.

28.     At Essentia Health West ER Officer Iverson informed Essentia staff, including Defendant Swanson, that Luke Laducer was suicidal and of his suicidal comments.

29.   At the Essentia Health ER Defendant Nathaniel G. Swanson, R.N. saw Mr. Laducer at approximately 0251 hours.

30.   Defendant Swanson ignored the fact that Luke Laducer was suicidal and that he made suicidal comments.

31.   Defendant Swanson failed and refused to take any vital signs of Mr. Laducer.

32.   Defendant Swanson failed and refused to conduct any intake or receiving screening of Mr. Laducer.

33.   At the Essentia Health ER Defendant Kurt A. Kaczander, D.O. saw Mr. Laducer at approximately 0256 hours.

34.   Defendant Kaczander was or should have been aware that at the time Mr. Laducer's blood alcohol content was at least 0.35, and that he was in extreme danger.

35.   Defendant Kaczander ignored the fact that Luke Laducer was suicidal and that he made suicidal comments.

36.   Defendant Swanson was or should have been aware that at the time Mr. Laducer's blood alcohol content was at least 0.35, and that he was in extreme danger.

37.   Defendant Kaczander failed to perform an intake or receiving screening or evaluation of Decedent, and failed to take vital signs of Decedent.

38.   Defendant Swanson failed to take Decedent's blood pressure.

39.   Defendant Kaczander failed to take Decedent's blood pressure.

40.   Defendant Swanson failed to determine Decedent's blood-alcohol level.

41.   Defendant Kaczander failed to determine Decedent's blood-alcohol level.

42.   Defendant Swanson failed to take Decedent's temperature.

43.   Defendant Kaczander failed to take Decedent's temperature.

44.   Defendant Swanson failed to take Decedent's pulse.

45.   Defendant Kaczander failed to take Decedent's pulse.

46.   Defendant Swanson failed to take Decedent's blood count.

47.   Defendant Kaczander failed to take Decedent's blood count.

48.    Defendant Swanson failed to take Decedent's respiratory rate.

49.    Defendant Kaczander failed to take Decedent's respiratory rate.

50.    Defendant Swanson failed to take Decedent's SpO2 level.

51.    Defendant Kaczander failed to take Decedent's SpO2 level.

52.    Defendant Swanson failed to take Decedent's weight.

53.    Defendant Kaczander failed to take Decedent's weight.

54.    Defendant Swanson failed to interview Officers Iverson, Maahs or Schmidt to obtain information about Luke Laducer's condition while at his apartment.

55.    Defendant Kaczander failed to interview Officers Iverson, Maahs or Schmidt to obtain information about Luke Laducer's condition while at his apartment.

56.    Defendant Swanson failed to review Luke Laducer's medical records and Mr. Laducer's medical records were readily available to him.

57.    Defendant Kaczander failed to review Luke Laducer's medical records and Mr. Laducer's medical records were readily available to him.

58.    Defendant Swanson failed to order any labs for Luke Laducer.

59.    Defendant Kaczander failed to order any labs for Luke Laducer.

60.    At 0256 hours, on December 18, 2020, after being in the hospital for less than 5 minutes, Decedent was medically cleared to be booked into jail by Defendant Kaczander.

61.    Mr. Laducer was thereafter taken from Essentia Health and lodged in the Cass County Jail, located at 450 34th Street South, Fargo, N.D., arriving at approximately 0308 hours on December 18, 2020.

62.    At 0310 hours Decedent entered the booking vestibule of the Cass County Jail, after which he walked to a bench and sat down.

63.    At approximately 0311 hours a preliminary breath test was taken of Decedent.

64.    Decedent's blood alcohol content was 0.345.

65.    At approximately 0314 hours Decedent was escorted into the booking area of the jail.

66.    At 0315 hours Decedent entered Cell #109.

67.    Defendant Binsfield failed and refused to take any vital signs of Mr. Laducer, reportedly because of his fear of contracting COVID-19.

68.    Defendant Binsfield failed and refused to examine Luke Laducer and failed to perform a receiving screening of Luke Laducer.

69.    Defendant Binsfield failed to take Decedent's blood pressure.

70.    Defendant Binsfield failed to determine Decedent's blood-alcohol level.

71.    Defendant Binsfield failed to take Decedent's temperature.

72.    Defendant Binsfield failed to take Decedent's blood count.

73.    Defendant Binsfield failed to take Decedent's pulse.

74.    Defendant Binsfield failed to take Decedent's respiratory rate.

75.    Defendant Binsfield failed to take Decedent's SpO2 level.

76.    Defendant Binsfield failed to take Decedent's weight.

77.    Defendant Binsfield failed to review Luke Laducer's medical records.

78.    Defendant Binsfield failed to order any labs for Luke Laducer.

79.    From 2:02 p.m. until 5:14 p.m., on December 18, 2020, Cass County Sheriff's deputies checked on Luke Laducer periodically, but no medical personnel ever examined him or took any vital signs at any time from his entrance into the jail at approximately 0308 hours until his death at approximately 5:30 p.m. on December 18, 2020.

80.    Because Luke Laducer had been (1) spitting up blood or (2) coughing up blood or (3) sneezing blood or all three when he was still at his apartment immediately before being taken into custody at his residence by Officers Schmidt and Iverson, Defendants, including, but not limited to Kaczander, Swanson and Binsfield, could have learned that Mr. Laducer was hemorrhaging when he was at his apartment had they interviewed Officers Schmidt, Iverson or Maahs, but they did not do so or did not do so adequately.

81.     On December 18, 2020, soon after Luke Laducer died, an investigator from the State of North Dakota found blood and bloody feces in the toilet, on the floor, and on the wall of Cell #109, indicative of internal bleeding.

82.     Had the defendants conducted any of the basic tests, i.e., checking Luke Laducer's blood count, checking his pulse, checking his blood pressure (and waiting at least 30 minutes to determine whether the blood pressure was declining), and, *inter alia*, checking his respiratory rate, they would have discovered immediately that Luke Laducer could not be cleared to be booked into jail.

83.     Had any of the defendants taken vital signs from Luke Laducer, Luke Laducer's life would have been saved.

84.     In the case of Defendant Binsfield, who refused to see Mr. Laducer, had he conducted any of these tests he would have known that, in order to save Luke Laducer life, it was imperative that Luke Laducer be returned to the hospital immediately.

85.     Luke Laducer died from hemorrhagic gastritis and colitis, i.e., bleeding to death. Exhibit 2.

86.     At all times relevant Luke Laducer was a pretrial detainee.

87.     County of Cass jail personnel and the defendants knew or must have known that Luke Laducer posed a suicide risk when he was booked into jail on December 18, 2020.

88.     The Defendants did not carefully or adequately consult Luke Laducer's medical records from his earlier incarcerations in County of Cass jail or his Essentia medical records.

89.     The County of Cass and its employees and agents failed to provide safe and adequate housing for Luke Laducer, including placing him on suicide watch in a safe room or safety cell.

90.     As a result of the County of Cass's employees' and agents' deliberate indifference to his serious medical needs, Luke Laducer was left alone and without adequate observation in his cell and died of diffuse hemorrhagic  gastritis and colitis, with hepatic steatosis.

91.     Decedent Luke Laducer's death was the result of all Defendants' wrongful conduct, deliberately indifferent denial of necessary and appropriate medical and mental health care, failure to provide competent medical and mental health care and treatment, failure to provide competent medical and mental health assessments, failure to transfer Luke Laducer for inpatient hospitalization, failure to house him in a safety cell and under constant observation, and their other conduct that under these circumstances was contrary to generally accepted reasonable jail and medical procedures and standards.

92.     Alternatively or concurrently, Decedent's death was the proximate result of Defendants Essentia Health, County of Cass and Jahner's failing to reasonably train their custody, medical, and mental healthcare staff in the proper and reasonable care of seriously ill, mentally ill, and or emotionally disturbed inmates, failure to implement and enforce generally accepted, lawful policies and procedures at the jail, failure to institute appropriate training, policies and procedures to prevent the death of inmates, and their deliberate indifference to the serious medical and mental health needs of inmates. These substantial failures reflect Defendants Essentia Health, County of Cass and Jahner's policies implicitly ratifying and or authorizing the deliberate indifference to serious medical needs by their custody, medical, and mental healthcare staff and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline custody, medical, and mental healthcare staff employed by these Defendants in the handling of seriously ill, mentally ill, and or emotionally disturbed inmates.

93.     The National Commission on Correctional Health Care ("NCCHC") Jail Standard J-A-01 states that it is "essential" that "[i]nmates have access to care for their serious medical, dental, and mental health needs." The standard provides that "[a]ccess to care means that, in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered." The standard notes that "[i]nmates must have access to care to meet their serious health needs. This is the fundamental principle on which all National Commission on Correctional Health Care standards are based and is the basic principle established by the U.S. Supreme Court in the 1976 landmark case *Estelle v. Gamble.*" The standard gives

several examples of "[u]nreasonable barriers to inmates' access to health services," including

"[h]aving an understaffed, underfunded, or poorly organized system with the result that it is not

able to provide appropriate and timely access to care."

94.     NCCHC Jail Standard J-A-02 states that it is essential that the jail have a

responsible health authority that "ensures that the facility maintains a coordinated system for

health care delivery." The RHA's responsibilities are documented in a written agreement, contract,

or job description. When the RHA is a state, regional, national, or corporate entity, there is also a

designated individual at the local level who is on-site at least weekly to ensure that coordinated

system for health care delivery policies are carried out. At the time Luke Laducer was admitted to

CCJ on December 18, 2020, Defendant Essentia Health functioned as the de facto RHA.

95.     NCCHC Jail Standard J-C-01 states that the facility's qualified health care

professionals are legally eligible to perform their clinical duties and that qualified health care

professionals to not perform tasks beyond those permitted by their credentials. A provider is

defined as a nurse practitioner, physician assistant, or physician. The Cass County Jail did not

have a qualified health care provider available to examine Luke Laducer on December 18, 2020,

and relied upon the clearance provided by Defendant Essentia Health as its intake screening.

Additionally, the Cass County Jail failed to have a qualified health care professional or liaison on

duty when Luke Laducer was admitted to the jail on December 18, 2020, and the correctional

officers on duty lacked the knowledge and training to recognize that the Essentia Health clearance

was fatally deficient because, *inter alia*, no vital signs were taken, there was no review of Luke

Laducer's medical records, and there was no history taken from Luke Laducer, making the

clearance inadequate. The Essentia Health clearance was the result of deliberate indifference to

Luke Laducer's serious medical needs, as it was the result of a conscious choice by Defendants

Essentia, Swanson and Kaczander to disregard the consequences of their failure to conduct any

actual exam of Luke Laducer before clearing him for admission to CCJ.

96.     NCCHC Jail Standard J-C-04 states that correctional officers are trained to

recognize the need to refer an inmate to a qualified health care professional. Cass County failed to

implement adequate training of correctional officers working at Cass County Jail ("CCJ"); thus, Cass County Jail officers failed to recognize the need to refer Luke Laducer to a qualified health care professional. Additionally, Defendant Binsfield failed and refused to provide any care to Luke Laducer. Cass County failed to adequately train CCJ jail officers to recognize signs and symptoms of serious illness and the risk of serious harm to inmates, resulting in their failure to refer Luke Laducer to a qualified health care professional on December 18, 2020.

97.    NCCHC Jail Standard J-E-02 states that it is "essential" that "[s]creening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met." The standard provides that "[r]eception personnel ensure that persons who are . . . semi-conscious, bleeding, mentally unstable, severely intoxicated . . . or otherwise urgently in need of medical attention are referred immediately for care and *medical clearance* into the facility." (emphasis in original). The term "medical clearance" is defined as "a documented clinical assessment of medical, dental, and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to the hospital emergency room." The standard notes that '[i]nmates with mental disorders are often unable to give complete or accurate information in response to health status inquiries. Therefore, it is good practice for mental health staff to be involved in training staff who do the intake screening." A *receiving screening* "takes place as soon as possible upon acceptance into custody." In this case Defendants Cass County, Jahner and Frobig delegated this function to Essentia Health, which was engaging in state action in performing this function, relied upon the defective and nonexistent screening that was performed by Defendants Essentia Health, Kaczander and Swanson at Essentia Health at approximately 0252 hours on December 18, 2020, and failed to perform any receiving screening at CCJ; Defendant Binsfield failed and refused to perform any receiving screening of Luke Laducer at any time on December 18, 2020, and failed to review his medical records at any time on December 18, 2020.

98.    NCCHC Jail Standard J-F-01 states that it is "essential" that "[p]atients with chronic disease, other significant health conditions, and disabilities receive ongoing

multidisciplinary care aligned with evidence-based standards." Luke Laducer was an inmate with significant health conditions, evident by his Essentia Health medical records, which were accessible electronically to all defendants. Defendants did not provide this care to Decedent on December 18, 2020.

99.    NCCHC Jail Standard J-F-02 states that Infirmary-level care is care provided to patients with an illness or diagnosis that requires daily monitoring, medication . . . or assistance with activities of daily living at a level needing skilled nursing intervention." Luke Laducer needed Infirmary-level care at a minimum but was deprived of it by the Defendants.

100.    The American Psychiatric Association (APA) publishes *Psychiatric Services in Correctional Facilities* (APA Psychiatric Services Standards) "to provide leadership in addressing the needs of this often disenfranchised group and guidance to psychiatric and mental health professionals working in correctional settings." These standards "are intended as a foundational framework to guide the delivery of psychiatric services in correctional facilities. These principles are necessary elements of constitutionally acceptable provision of care."

101.    The APA Psychiatric Services Standards discusses the Reception Mental Health Screening and Referral in Part 2:

"All newly admitted inmates have a reception (or receiving) mental health screening within 4 hours of arrival at a facility. Most facilities follow written protocols and procedures and use a standardized form to document information and observations. In smaller facilities this information may be gathered by a correctional officer with additional health training. Larger facilities may use registered nurses or other health professionals with additional mental health training. All health encounters other than general rounds should be conducted in private settings. Mental health professionals who have safety concerns can request a correctional officer to stand at a reasonable distance outside of a partially open door or, if necessary, to be present in the room during the examination. Facilities can require that all custody staff sign confidentiality agreements at the time of their employment and that initial and annual mental health training of all staff include reviews of guidelines on confidentiality of inmate health information. Inmates with abnormal behaviors or positive findings on the reception mental health screening need triaged referrals for further evaluation, on either an emergent or urgent basis, with time frames defined by policy." Essential components of the reception mental health screening are as follows:

"The screening occurs within 4 hours of the inmate's arrival. Screening includes observation and structured inquiry into mental health history and symptoms, including questions about suicide history, ideation, and potential; prior psychiatric

hospitalizations and treatment; and current and past medications, both prescribed and actually taken. Screening may be conducted by the booking officer, other custody personnel, supervisors, or medical intake nurse. The screener must have training in mental health screening and referral. For jails, lockups, and detention centers, information about the inmate's behavior leading up to and during the arrest should be obtained from the arresting officer if available. Referrals should be made for emergent or urgent evaluations for inmates with findings. Referral to nursing staff should be made for inquiry about reported active prescriptions. Correctional facilities can verify prescriptions by calling the prescribing agency, pharmacy, or sending facility and obtain bridging medication orders for inmates until they can be seen and assessed by an authorized prescriber. A standardized procedure should be used, with observations and responses documented on a standard form in the permanent health record. Policies and procedures should specify required actions and time frames after positive screening findings. Psychiatrists may have limited roles in direct provision of this service and may participate in the following activities:

a.  Development of screening forms and procedures

b.  Training officers and health care personnel to use the screening instrument and to make appropriate referrals

c.  Development of written referral procedures for inmates identified during the screening as being at high risk

d.  Monitoring the quality of the intake process, including efficacy of identification of inmates needing referral and timeliness of referrals

e.  Prescribing appropriate verified medications, or reasonable formulary substitutions, and monitoring laboratory studies until the patient can be seen, customarily within 10 business days for nonacute issues and sooner if clinically indicated."

102.    The APA Psychiatric Services Standards discusses Suicide Prevention in Part 1:

"The risk of suicide is higher among correctional inmates than among the population at large. Suicide is the leading cause of death in jails and the fifth leading cause of death in prisons (Noonan and Ginder 2013). Suicide risk is also increased in individuals with mental illness, a growing percentage of whom are found in correctional facilities. All nationally recognized correctional mental health standards, including these guidelines, require that each facility have a suicide prevention program for identifying and responding to suicidal inmates. An inmate may become suicidal at any point during incarceration. High-risk periods include the time of admission, following new legal problems (e.g., new charges, additional sentences, institutional proceedings, denial of parole), following the receipt of bad news (e.g., a serious illness in the family or the loss of a loved one), after a traumatic event (e.g., sexual assault), after experiencing rejection (e.g., by a significant other), or during worsening symptoms of mental illness. Increased suicide risk may also occur during the early phases of recovery from depression or psychotic illness and while the inmate is housed in administrative segregation or other specialized single-cell settings. Although there are many more suicide attempts and incidents of non-lethal self-harm than completed suicides, any threats of self-harm or self-injurious behavior must be taken seriously. Self-harm behaviors, regardless of motivation, can result in significant morbidity and mortality. For this reason, even behaviors that do not lead to injury should be taken seriously and not dismissed as merely "suicidal gestures." An adequate suicide prevention

program must include the following components, which should be available in a written policy and procedure manual that all staff can easily access:

- Training for all staff who interact directly with inmates to recognize warning signs and intervene appropriately with individuals at risk for suicide
- A formal and detailed suicide risk assessment process
- Identification of inmates at increased risk of suicide through screening at or near the time of admission to the facility and through referral at any time during an individual's incarceration
- An effective and well-understood referral system that allows staff and inmates to bring a suicidal inmate to the prompt attention of a mental health clinician
- Timely evaluation by a mental health clinician to determine the level of risk posed by a referred inmate
- Timely implementation of monitoring interventions such as close observation (at least every 15 minutes), continuous monitoring, alternative housing, or referral to a higher level of care (e.g., infirmary or hospital). When indicated, a psychiatrist—either via phone call or in person—should assist in the decision about interventions. Any mental health clinician may order an increase in monitoring level, but a decrease in level may be ordered only by a psychiatrist or doctoral-level mental health clinician after an in-person evaluation.
- Housing options that allow for adequate monitoring of suicidal inmates by staff. Suicidal inmates should not be placed in isolation settings without continuous monitoring. Continuous monitoring for active suicidality should occur regardless of housing location. Supervision aids such as video monitoring may be used as a supplement to, but not as a replacement for, active staff monitoring.
- Communication among mental health, correctional, medical, and other staff of the specific needs and risks presented by a suicidal inmate
- Timely provision of mental health services, including medication, individual and group therapies, and crisis intervention, for chronically or acutely suicidal inmates
- Accurate, behaviorally specific, and highlighted documentation in the medical record of behaviors or statements that indicate suicide risk
- Quality improvement reviews with psychiatric staff participation of suicide attempts and completed suicides to help prevent future occurrences
- Critical incident support, opportunities for peer-to-peer discussion, and availability of Employee Assistance Program support for completed suicides to assist staff and inmates in dealing with feelings of guilt, and fear, grief, and anger."

103.    Part 1 of the APA publication states that "Timely and effective access to screening, evaluation, and mental health treatment is the hallmark of adequate mental health care." The *Monell* and Supervisorial Defendants and the individual defendants, including Defendants Frobig, Kaczander, Swanson and Binsfield, deprived Luke Laducer of due process of the law and subjected him to punishment by, knowing that Luke Laducer faced a substantial risk of serious harm and a serious medical need and that he reported to the police that he was suicidal, making a

conscious choice to disregard the consequences of their failure to perform a reception mental health screening, failure to perform an intake mental health screening, failure to inquire into Luke Laducer's (1) mental health history, (2) chronic alcohol abuse, (3) prior hospitalization and treatment for alcohol abuse, failure to inquire into Luke Laducer's suicide ideation and potential, failure to inquire into current and past medications taken by Luke Laducer, failure to perform a suicide risk assessment at any time, failure to recommend or perform a comprehensive mental health evaluation of Luke Laducer by a QMHP, failure to prescribe medications for Luke Laducer, and their failure to take reasonable measures to address the risks, resulting in Luke Laducer being left with no treatment for a treatable condition that led directly to his death; had any of the defendants performed the required reception mental health screening they would have determined that Luke Laducer was not fit to be incarcerated in Cass County Jail, and would have returned him to the hospital, where he would have received the medical care and treatment necessary to save his life.

104.    As a direct and proximate result of the acts and or omissions of Defendants as set forth above, Luke Laducer suffered the following injuries and damages:

a.    Wrongful death, attributable to the deliberate indifference, negligence and or gross negligence of Defendants;

b.    Violation of his due process rights, including his right to be free from punishment, under the Fourteenth Amendment to the United States Constitution;

c.    Conscious, egregious and needless physical pain and suffering, mental anguish, fear, and severe mental and emotional distress, pursuant to federal civil rights law; and

d.    Violation of his right to life, the value of the loss of life, and the loss of enjoyment of life.

105.    As a direct and proximate result of the acts and or omissions of Defendants, Plaintiffs suffered the following injuries and damages:

a.    Violation of their right to freedom of association under the First and Fourteenth Amendments to the United States Constitution;

b.       Violation of their substantive due process right to be free from unwarranted interference with the parent-child relationship under the Fourteenth Amendment to the United States Constitution;

c.       Needless physical pain and suffering, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness, trauma, suffering, and the loss of the services, society, care, and protection of Decedent;

d.       Loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

e.       Loss of society, companionship, comfort, and protection;

f.       Loss of care, attention, advice, and counsel;

g.       Emotional trauma and suffering, including fear, extreme emotional distress, and horror; and

h.       Burial and funeral expenses for Decedent.

106. The acts and or omissions of the Defendants were willful, wanton, malicious and oppressive, fraudulent and perpetrated with reckless disregard for the rights of the decedent, the plaintiffs, and others, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Claim for Relief No. 1**

Deprivation of Constitutional Rights – Failure to Protect from Serious Harm and from Punishment and Deliberate Indifference to Serious Medical Needs and in violation of the Fourteenth Amendment - 42 U.S.C. § 1983 – Survival Action – Against Defendants Essentia Health, Kaczander, Swanson, Binsfield and Frobig

107.     Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs in this pleading as though fully set forth here.

108.     At the time of the incident set forth in the averments above, the rights of persons within the jurisdiction of the United States of America under Amendments IV and XIV to the United States Constitution to freedom from unreasonable seizure and to due process of law and the

equal protection of the laws were in force and effect, and it was clearly established that pretrial detainees had the right to be free from punishment under the Fourteenth Amendment, and the individual defendants who engaged in conduct, as set forth above, who deprived Luke Laducer of the right to be free from unreasonable seizure, his right to due process and equal protection, and exposed him to a deprivation of medical care for his serious medical needs by failing to provide medical care, with deliberate indifference, deprived plaintiffs individually and as the successors in interest of Luke Laducer constitutional rights, violated those rights, and violated Amendment XIV to the United States Constitution. The decedent was at all relevant times a pretrial detainee. Decedent was protected under the pretrial detainee objective standard set forth in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) and its progeny.

109.   Defendants, acting under color of state law in their individual and personal capacities, deprived Luke Laducer of the rights, privileges, and immunities secured by the Fourteenth Amendment to the Constitution of the United States of America by subjecting him to – or through deliberate indifference, allowing others to subject him to – unreasonable seizure and delay and denial of access to medical and mental health care for a serious but treatable medical condition, and denying him proper and necessary care for his risk of serious harm.

110.   Defendants knew or must have known that Luke Laducer required immediate intervention, urgently needed medical care, or hospitalization, and a higher level of care than was offered at County of Cass jail; Defendants knew or must have known that Luke Laducer urgently required treatment and monitoring for his serious but treatable health condition, or they were deliberately blind to his condition, and Defendants knew or must have known that Luke Laducer could not care for himself nor advocate for his urgently needed medical care, and that he was suicidal.

111.   The Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, the inference was obvious to the defendants and the defendants drew the inference that Luke Laducer required immediate intervention, urgently needed medical care, or hospitalization, and a higher level of care than was offered at County of

Cass Jail to avoid serious harm, or they were deliberately blind to his condition.

112.    As described in this pleading, each Defendant made at least one intentional decision with respect to the conditions under which Luke Laducer was confined, those conditions put him at substantial risk of suffering serious harm, the Defendants did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of their conduct obvious; by not taking such measures the defendants caused Decedent's injuries.

113.    Defendants, acting under color of law in their individual and personal capacities, deprived Luke Laducer of the rights, privileges, and immunities secured by the Fourth Amendment to be free from unreasonable seizure and the Fourteenth Amendment right to due process of law by, through their conduct and through their deliberate indifference denying and refusing him necessary medical and mental health care and treatment, and or causing others to deny and or delay medical and mental health care and treatment.

114.    By the actions and omissions described in this pleading, Defendants violated the Decedent's and the plaintiffs' constitutional rights, including, but not limited to the following clearly established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the Constitution of the United States of America:

114.1   The right to be free from an unreasonable ongoing seizure of Luke Laducer as a pretrial detainee as secured by the Fourth and Fourteenth Amendments;

114.2   The right to be free from deliberate indifference to Luke Laducer's serious medical and mental health needs while in custody as a pretrial detainee as secured by the Fourth and Fourteenth Amendments;

114.3 The right to be free from the Defendants making an intentional decision with respect to the conditions under which Decedent was confined, which conditions put Decedent at substantial risk of suffering serious harm, and, with respect to which, Defendants failed to take reasonable available measures to abate the risk presented, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved, and, in which

circumstances, by the defendants' failing to take such measures, the defendants caused the injuries, harm and the death of Luke Laducer.

114.4   The right to be free from wrongful governmental interference with familial relationships, as well as the right to companionship, society, and support of each other as secured by the First and Fourteenth Amendments.

115.   Essentia Health is liable under Respondeat Superior principles for the acts and conduct of its employees, Kaczander and Swanson.

116.   Defendants subjected Decedent and Plaintiffs to their wrongful conduct, depriving Decedent and Plaintiffs of the rights described herein, knowingly, maliciously, wantonly, oppressively, and with reckless disregard for the rights and safety of Decedent and Plaintiffs (individually and on behalf of Luke Laducer) and others, entitling Plaintiffs to an award of exemplary and punitive damages.

117.   As a direct and proximate result of Defendants' acts and omissions Decedent and Plaintiffs sustained injuries and damages as set forth herein, including physical injury, physical pain and suffering, emotional pain and suffering, emotional distress, anxiety, depression, confusion, anguish, fear, despair, grief, loss of relationships, loss of life, loss of the enjoyment of life, and deprivation of constitutional rights.

## Claim for Relief No. 2

Deprivation of Due Process Rights in Violation of the First and Fourteenth Amendments to the Constitution of the United States of America – State Created Danger (42 U.S.C. § 1983) – Against Defendants Essentia Health, Kaczander, Swanson and Binsfield

118.   Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs in this pleading as though fully set forth here.

119.   The aforementioned acts and or omissions of Defendants in violating Luke Laducer's rights under the Fourth Amendment and under the Fourteenth Amendment in being deliberately indifferent to Luke Laducer's serious medical needs, health and safety, violating his constitutional rights, and their failure to train, supervise, and or take other appropriate measures to

prevent the acts and or omissions that caused the untimely and wrongful death of Luke Laducer deprived Plaintiffs of their liberty interests in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

120.    Under the Fourteenth Amendment Defendants Kaczander, Swanson and Binsfield are liable for placing Decedent in danger by medically clearing him to be booked into jail without performing a basic intake evaluation of Decedent, without taking his blood pressure, without determining his blood alcohol level and without taking other vital signs that would have led to the knowledge that Decedent could not be medically cleared to be booked into jail.

121.    The affirmative acts and omissions of Defendant Kaczander described in this pleading placed Luke Laducer in a position of actual, particularized danger by creating or exposing him to a danger that he would not have otherwise faced: i.e., Luke Laducer was in the hospital (Essentia Health) where he was to be thoroughly examined so that a determination could be made whether he could be booked into CCJ, and in the hospital Mr. Laducer would have received treatment for his serious medical needs, in the event that the defendant had taken vital signs as described here — i.e., his hemorrhagic gastritis and colitis — by being given a blood transfusion or by being placed on an IV with salt water, or both, and by being reassessed after at least every 30 minutes to determine whether it was safe for him to be booked into jail, but Defendant Kaczander took no vital signs and after less than 5 minutes, discharged Mr. Laducer from the hospital knowing that he would be booked into jail and this placed Luke Laducer in extreme danger — a danger that he would not have otherwise faced.

122.    In doing the acts and omissions set forth here Defendant Kaczander acted with deliberate indifference to a known or obvious danger — i.e., he acted while disregarding a known or obvious consequence of his actions.

123.    In doing the acts and omissions set forth here Defendant Kaczander acted with deliberate indifference to a known or obvious danger — i.e., he acted while he must have known of the risk of serious harm to Mr. Laducer but ignored the risk and still engaged in the conduct he

engaged in.

124.    The affirmative acts and omissions by Defendant Kaczander that created the actual, particularized danger, caused injury to Luke Laducer that was foreseeable.

125.    The affirmative acts and omissions of Defendant Swanson described in this pleading placed Luke Laducer in a position of actual, particularized danger by creating or exposing him to a danger that he would not have otherwise faced: i.e., Luke Laducer was in the hospital (Essentia Health) where he was to be thoroughly examined so that a determination could be made whether he could be booked into the Cass County Jail, and in the hospital Mr. Laducer would have received treatment for his serious medical needs, in the event that the defendant had taken vital signs as described here — i.e., his hemorrhagic gastritis and colitis — by being given a blood transfusion or by being placed on an IV with salt water, or both, and by being reassessed after at least every 30 minutes to determine whether it was safe for him to be booked into jail, but Defendant Swanson took no vital signs and after less than 5 minutes, discharged Mr. Laducer from the hospital knowing that he would be booked into jail and this placed Luke Laducer in extreme danger — a danger that he would not have otherwise faced.

126.    In doing the acts and omissions set forth here Defendant Swanson acted with deliberate indifference to a known or obvious danger — i.e., he acted while disregarding a known or obvious consequence of his actions.

127.    In doing the acts and omissions set forth here Defendant Swanson acted with deliberate indifference to a known or obvious danger — i.e., he acted while he must have known of the risk of serious harm to Mr. Laducer but ignored the risk and still engaged in the conduct he engaged in.

128.    The affirmative acts and omissions by Defendant Swanson that created the actual, particularized danger, caused injury to Luke Laducer that was foreseeable.

129.    Under the Fourteenth Amendment Defendant Binsfield is liable for placing Decedent in danger by failing and refusing to examine him when he was incarcerated in a single cell in CCJ on December 18, 2020.

130.     The affirmative acts and omissions of Defendant Binsfield described here placed Luke Laducer in a position of actual, particularized danger by creating or exposing him to a danger that he would not have otherwise faced: i.e., Luke Laducer was brought to the Cass County Jail and had Defendant Binsfield examined Mr. Laducer he would have rejected Luke Laducer and sent him back to the hospital (Essentia Health) where he could have received treatment for his serious medical needs, in the event that the defendant had taken vital signs as described here — i.e., his hemorrhagic gastritis and colitis — by being given a blood transfusion or by being placed on an IV with salt water, or both, and by being reassessed after at least every 30 minutes to determine whether it was safe for him to be booked into jail, but Defendant Binsfield took no vital signs and after less than 5 minutes, let Mr. Laducer bleed to death in Cell #109 knowing that he was in extreme danger — a danger that he would not have otherwise faced.

131.     In doing the acts and omissions set forth here Defendant Binsfield acted with deliberate indifference to a known or obvious danger — i.e., he acted while disregarding a known or obvious consequence of his actions.

132.     In doing the acts and omissions set forth here Defendant Binsfield acted with deliberate indifference to a known or obvious danger — i.e., he acted while he must have known of the risk of serious harm to Mr. Laducer but ignored the risk and still engaged in the conduct he engaged in.

133.     The affirmative acts and omissions by Defendant Binsfield that created the actual, particularized danger, caused injury to Luke Laducer that was foreseeable.

134.     Defendants subjected Plaintiffs to their wrongful conduct, depriving Plaintiffs of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and Plaintiffs (individually and on behalf of Luke Laducer) and others would be violated by their acts and omissions.

135.     As a direct and proximate result of the aforementioned acts and or omissions of Defendants, Decedent died in jail and Plaintiffs suffered injuries and damages as alleged herein, including punitive damages.

## Claim for Relief No. 3

### Deprivation of Freedom of Association and Substantive Due Process Rights in Violation of the First and Fourteenth Amendments to the Constitution of the United States of America – Loss of Parent-Child Relationship (42 U.S.C. § 1983) – Against All Defendants

136.    Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs in this pleading as though fully set forth here.

137.    The aforementioned acts and omissions of Defendants in violating Luke Laducer's rights under the Fourth Amendment and under the Fourteenth Amendment, in, *inter alia*, being deliberately indifferent to Luke Laducer's serious medical needs, health and safety, violating his constitutional rights, and their policies, practices and customs and failure to train, supervise, and or take other appropriate measures to prevent the acts and or omissions that caused the untimely and wrongful death of Luke Laducer deprived Plaintiffs of their liberty interests in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

138.    The acts of the individual defendants, described in this pleading, which deprived plaintiffs of their First Amendment rights and liberty interest in the companionship and society of their child and parent, respectively, shock the conscience; the defendants' acts were done in circumstances where actual deliberation was practical, and, thus, the Defendants' deliberate indifference to Luke Laducer's serious medical needs violated the Plaintiffs' rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

139.    The First and Fourteenth Amendments protect certain intimate relationships of people that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Luke Laducer was one such individual for his mother, father, and children and as a result of the wrongful conduct of the Defendants, his children and parents suffered physical and emotional pain, and mental distress and pain, including

emotional trauma, fear, extreme emotional distress, grief, anxiety, shock, heartbrokenness, worry, sleeplessness, depression, loss of enjoyment of life, loss of services, society, care and protection of the decedent, and loss of economic security.

140.    Defendants subjected Plaintiffs to their wrongful conduct, depriving Plaintiffs of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and Plaintiffs (individually and on behalf of Luke Laducer) and others would be violated by their acts and omissions.

141.    As a direct and proximate result of the aforementioned acts and or omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein, including punitive damages.

**Claim for Relief No. 4**

Municipal and Supervisory Liability (*Monell* – 42 U.S.C. § 1983) – Against Defendants Essentia Health, County of Cass, Jahner, and Frobig (the *Monell* and Supervisory Defendants)

142.    Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs in this pleading as though fully set forth herein.

143.    The unconstitutional actions and or omissions of the individual Defendants, including Jahner, Frobig, as well as other officers employed by or acting on behalf of the Defendants County of Cass and Essentia Health, on information and belief, were perpetrated pursuant to the following customs, policies, practices, and or procedures of Defendants County of Cass and Essentia Health, which were the moving force behind the violations of the constitutional rights of Luke Laducer and the Plaintiffs, and which were directed, encouraged, allowed, and or ratified by policymaking officers for the County of Cass and Essentia Health:

143.1   To deny inmates access to appropriate, competent, and necessary care for serious medical needs, including the requirement of proper and complete receiving screening of inmates at both Essentia Health and CCJ prior to acceptance of inmates into CCJ, which resulted in both Essentia Health and Cass County failing to perform even a minimally adequate receiving screening of Luke Laducer, which led to his avoidable death;

143.2   To fail to institute, require, and enforce proper and adequate training and supervision of both medical personnel and custody personnel at CCJ concerning the handling chronically ill and mentally ill inmates such as Luke Laducer, which resulted in Defendant Binsfield failing and refusing to perform any receiving screening or monitoring of Luke Laducer on December 18, 2020, which, in turn, resulted in the failure of custody staff to properly monitor Luke Laducer until it was too late to save his life;

143.3   To fail to institute, require, and enforce policies and procedures concerning the handling chronically ill and mentally ill inmates, which resulted in CCJ management to unreasonably rely on the obviously inadequate screening of Luke Laducer performed at Essentia Health and to fail to perform a receiving screening of Luke Laducer at CCJ, and to Defendant Binsfield failing and refusing to perform any receiving screening or monitoring of Luke Laducer on December 18, 2020, which, in turn, resulted in the failure of custody staff to properly monitor Luke Laducer until it was too late to save his life;

143.4   To fail to transfer chronically ill inmates to appropriate medical facilities for treatment;

143.5   To fail to properly classify, house and monitor inmates suffering from chronic illness;

143.6   To allow, encourage, and require unlicensed, inadequately trained and or inadequately supervised staff to decide whether or not to provide inmates infirmary-level medical care;

143.7   To fail to use appropriate and generally accepted jail procedures for handling and housing chronically ill, suicidal, mentally ill and emotionally disturbed persons, including, but not limited to, the standards of the National Commission on Correctional Health Care Standards for Health Services in Jails;

143.8   To cover-up violations of constitutional rights by any or all of the following: (i.) by failing to properly investigate and or evaluate complaints or incidents related to the claimed unconstitutional customs, polices, practices, and procedures described in this pleading; (ii.) by

ignoring and or failing to properly and adequately investigate and discipline unconstitutional or unlawful activity by CCSO personnel at the County of Cass jails as described herein;

143.9   To allow, tolerate, and or encourage a "code of silence" among Essentia and County employees and Sheriff's Office personnel, whereby an employee or member of the department does not provide adverse or truthful information against a fellow employee or member of the department;

143.10 To fail to create and implement adequate policies requiring medical and mental health staff to undertake a meaningful and adequate review of the prior medical records of persons like Luke Laducer, which resulted in Defendant Binsfield failing and refusing to perform any receiving screening or monitoring of Luke Laducer on December 18, 2020, and failing to review Luke Laducer's medical records, which were readily available electronically;

143.11 To fail to create and implement adequate policies requiring medical and mental health staff to undertake an intake screening of inmates brought into CCJ, including inmates cleared for booking into the jail by Essentia Health or outside medical personnel, which resulted in Defendant Binsfield failing and refusing to perform any receiving screening or monitoring of Luke Laducer on December 18, 2020, and failing to review Luke Laducer's medical records, which were readily available electronically; and

143.12 To fail to create and implement adequate policies and training requiring medical staff, including Binsfield, Kaczander and Swanson, to thoroughly interview arresting officers like Officers Iverson, Schmidt and Maahs regarding the circumstances of the arrest of inmates such as Luke Laducer to determine facts pertaining to the health conditions of the inmate, especially in the case of inmates like Luke Laducer, who was so intoxicated that he could not or would not provide screening information to medical personnel, and who was suicidal, which resulted in the failure of Defendants Kaczander, Swanson and Binsfield to determine that Luke Laducer was spitting up and coughing up blood at his apartment at the time of his arrest by the police, which would have alerted competent medical staff to the fact that Luke Laducer was bleeding internally and that he was unfit to be incarcerated at CCJ on December 18, 2020, which would have saved his life, and

this lack of policies and training was the moving force behind the deprivation of Luke Laducer's constitutional rights.

144.    Defendants Jahner, Frobig and Doe (the "Supervisorial Defendants") acted under color of state law and the acts and omissions of their subordinate officers, including Binsfield, deprived the Decedent of his constitutional rights; the Supervisorial Defendants set in motion a series of acts by their subordinates, or knowingly refused to terminate a series of acts by their subordinates, that they knew or reasonably should have known would cause the subordinates to deprive the Decedent of his constitutional rights.

145.    The Supervisorial Defendants knew that Defendant Binsfield (and other subordinates) refused to see Luke Laducer and was disregarding the consequences of his acts and omissions and knew or reasonably should have known that Defendant Binsfield's and other subordinates' acts and omissions would deprive Luke Laducer of his constitutional rights and to be protected from substantial harm, and the Supervisorial Defendants failed to act to prevent Defendant Binsfield and other subordinates from engaging in such conduct.

146.    The Supervisorial Defendants showed a reckless or callous indifference to the deprivation of Decedent's constitutional rights by Defendant Binsfield and other subordinates.

147.    The Supervisorial Defendants disregarded the known or obvious consequences that the Cass County training deficiency — e.g., the failure of the CCSO to train medical personnel and custody personnel (1) that taking vital signs of inmates was necessary to protect inmates from serious harm, (2) that medical conditions of inmates change over time and that a prior clearance from a doctor or a hospital cannot be relied on indefinitely and that the inmate's symptoms must be monitored throughout the day, (3) that suicidal inmates cannot be relied on to report danger to their own health, and (4) that bleeding from the nose or the mouth can signal a serious medical condition that requires hospitalization — and this training deficiency led to the death of Luke Laducer.

148.    Defendants County of Cass and Jahner – through their administrators and policy makers – failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, manage,

and discipline jail correctional officers and other County of Cass personnel, with deliberate indifference to Plaintiffs' constitutional rights, which were thereby violated as described in this pleading.

149.    Defendant Essentia Health failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, manage, and discipline hospital employees, with deliberate indifference to Plaintiffs' constitutional rights, which were thereby violated as described in this pleading.

150.    The unconstitutional actions and or omissions of Defendants and other County of Cass personnel, as described in this pleading, were known to and approved, tolerated and or ratified by policy-making officers for the County of Cass and Essentia Health, including Defendants Jahner and Frobig, who knowing of the facts and events leading to the death of Luke Laducer, specifically approved of the acts and decisions of the Defendants and the basis for those acts, and made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of Luke Laducer. By so doing, the authorized policy makers within the County of Cass and Essentia Health have ratified the unconstitutional acts of the individual defendants.

151.    The inadequate policies, customs, and practices of Defendants Essentia Health and the County of Cass include but are not limited to an ongoing pattern of deliberate indifference to the health needs and safety of County of Cass Jail inmates; the failure to conduct appropriate intake screenings of inmates and psychiatric assessments of inmates to identify inmates with medical or mental health needs and or who pose a heightened risk of suffering harm.

152.    The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline, as well as the unconstitutional orders, approvals, ratification and tolerance of wrongful conduct of Defendants County of Cass and Essentia Health were a moving force and or a proximate cause of the deprivations of Decedent's and Plaintiffs' clearly established and well-settled constitutional rights in violation of 42 USC §1983, as more fully set forth in this pleading.

153.     The acts and omissions of the Supervisorial Defendants were so closely related to the deprivation of the Decedent's constitutional rights as to be the moving force that caused the ultimate injury.

154.     Defendants subjected Decedent and Plaintiffs to their wrongful conduct, depriving Plaintiffs and Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs and others would be violated by their acts and or omissions.

155.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants County of Cass and Jahner, as described in this pleading, Decedent and Plaintiffs sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set forth above, and punitive damages against the individual Defendants, in their individual capacities.

**Claim for Relief No. 5**

Negligence and Wrongful Death (Survival Actions – North Dakota State Law) – Against All Defendants – N.D.C.C. §§ 32-21-01 et seq.

156.     Plaintiffs reallege and incorporate by reference each allegation set forth in this pleading as though fully set forth here.

157.     Defendants failed to comply with the standard of care and the professional standards in the provision of medical care to Luke Laducer by failing to appropriately assess and evaluate his medical needs, failing to provide timely and emergency medical attention, failing to provide appropriate medical treatment, and failing to adopt the minimum policies, procedures, and training necessary to ensure identification of and response to of medical emergencies.

158.     These Defendants also failed to appropriately supervise, review, and ensure the competence of medical staff's and custody staff's provision of treatment to Luke Laducer, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

159.   Together, these Defendants, who owed a duty of care to Luke Laducer, acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Plaintiffs suffered injuries and damages as alleged herein.

160.   The negligent conduct of Defendants was committed within the course and scope of their employment.

161.   All defendants were subject to a duty of care to protect Luke Laducer and other persons in their custody and to avoid causing unnecessary physical harm and death to such persons; the wrongful conduct of the defendants, as alleged herein, did not comply with the standard of care to be exercised by reasonable persons and as such breached Defendants' duty, causing the death of Luke Laducer and causing the Decedent and the Plaintiffs to suffer harm. Luke Laducer's death was a direct and proximate result of the aforementioned wrongful and negligent acts and omissions of Defendants and Defendants' acts and omissions thus were also a direct and proximate cause of the Decedent's and the Plaintiffs' injuries and damages, as alleged herein.

162.   As a direct and proximate result of Defendants' wrongful and negligent acts and omissions, Plaintiffs incurred expenses for funeral and burial expenses in an amount to be proven.

163.   As a direct and proximate result of Defendants' wrongful and or negligent acts and or omissions, Plaintiffs suffered the loss of services, society, care, and protection of the decedent, as well as the loss of the present value of his future services to them. Plaintiffs are further entitled to recover prejudgment interest.

### Prayer

Plaintiffs seek judgment as follows:

1.   General, special and compensatory damages against each defendant, jointly and severally, in accordance with proof at trial;

2.   An award of punitive damages against each individual defendant to be determined according to proof at trial and in an amount sufficient to make an example of those defendants and to deter future misconduct;

---

3.      Costs, and reasonable attorney's fees and expenses of litigation pursuant to 42 U.S.C. § 1988;

4.      All damages, penalties, costs, interest, and attorney's fees as allowed by statute;

5.      Damages for the value of the loss of decedent Luke Laducer's life and loss of enjoyment of life;

6.      Prejudgment and post-judgment interest as permitted by law; and

7.      Injunctive, declaratory and such further relief as the Court deems just and proper.

DATED: December _2_, 2022                JDP PC, Jeff Dominic Price

By _____

Jeff Dominic Price, Esq.
Attorney for the Plaintiffs

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all claims for relief.

DATED: December _2_, 2022                Jeff Dominic Price

By      _/s/ Jeff Dominic Price_

Jeff Dominic Price, Esq.
Attorney for the Plaintiffs