IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil No. 3:22-CV-00208

| | | |
|---|---|---|
| Estate of Luke M. Laducer, by and through the Executor, Diana Decoteau, Brooklyn Laducer, Betty Laducer, Melvin Laducer, and R.A.L., a minor, L.G.L., a minor, and P.A.L., a minor, by and through their next friend and guardian ad litem, Paulette Scheller, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | **MEMORANDUM OF LAW IN SUPPORT OF CASS COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) ) ) | |
| Essentia Health, County of Cass, Jesse Jahner, Cass County Sheriff, Kurt A. Kaczander, D.O., Nathaniel G. Swanson, R.N., Captain Andrew Frobig, Conrad Binsfield, R.N., John Doe, and 10 Unknown Named Defendants, inclusive, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |

***                    ***                    ***

## I.      INTRODUCTION

The Court should dismiss Plaintiffs' Section 1983 claims because there are no facts to support any deliberate indifference to then-inmate Luke Laducer's serious medical needs while he was incarcerated at the Cass County Jail on December 18, 2020. Rather, the undisputed facts show none of the correctional officers or Jail staff who had numerous interactions with the highly intoxicated Luke Laducer during his brief incarceration at the Cass County Jail observed or was informed Laducer was having a medical emergency of any kind. Although tragic, Luke Laducer's sudden death from a gastrointestinal bleed brought on by years of chronic alcohol abuse does not

raise any Constitutional violations by the Cass County Defendants,[1] which is a requirement to support Plaintiffs' Section 1983 claims. Absent any Constitutional violation and absent any notice that their conduct violated the Constitution, the individual Defendants (Sheriff Jahner, Captain Frobig, and Conrad Binsfeld, RN) are entitled to Qualified Immunity from suit.

Because there are no individual violations of Laducer's Constitutional rights by any individual Cass County Defendant, there can likewise be no *Monell* liability by any County policymakers, including Cass County or the Cass County Sheriff Jesse Jahner (in his official capacity), subjecting those *Monell* claims to dismissal as a matter of law as well. Lastly, Plaintiffs' State law wrongful death claims should be dismissed pursuant to the Court's authority to abstain from exercising pendent jurisdiction against Plaintiffs' State law claims due to the lack of any merit to the federal question claims. Alternatively, the State law claims should be dismissed as there is a total lack of any clear and convincing evidence from which a reasonable jury could determine one or more of the Cass County Defendants' conduct was grossly negligent, willful, wanton or reckless, which is the legal standard set forth under North Dakota law.

For these reasons and as more fully discussed below, Cass County Defendants respectfully request the Court grant them complete summary judgment, dismissing with prejudice all of Plaintiffs' lawsuit claims against them.

## II.   LEGAL STANDARD – SUMMARY JUDGMENT

The applicable summary judgment standard of review is as follows:

> Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Such a showing shifts to the non-movant the

---

[1] "Cass County Defendants" refers herein collectively to Defendants Cass County, Cass County Sheriff Jesse Jahner, Captain Andrew Frobig and Conrad Binsfeld, RN.

burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. The non-movant must show there is sufficient evidence to support a jury verdict in his favor. Factual disputes that are irrelevant or unnecessary will not be counted, and a mere scintilla of evidence supporting the non-movant's position will not fulfill the non-movant's burden.

*Uhiren v. Bristol-Meyers Squibb Company, Inc.*, 346 F.3d 824, 827 (8th Cir. 2003) (citations and quotations omitted). "The basic inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376 (8th Cir. 1996) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251-52 (1986)). "Mere arguments or allegations are insufficient to defeat a properly supported motion for summary judgment; a nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997) (citation omitted). A nonmoving party has the burden of demonstrating to the district court that at trial it may be able to put on admissible evidence proving its allegations. *JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)). Under Federal Rule of Civil Procedure 56, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48 (emphasis in original).

## III.   PROCEDURAL POSTURE

In their Complaint dated December 2, 2022, Plaintiffs' bring various claims against the Defendants (including an unnamed "John Doe" and "10 Unknown Named Defendants") asserting liability and entitlement to damages for the death of Luke Laducer on December 18, 2020. *See*

*generally* Complaint (Doc. 1).  Amongst those claims are federal question claims arising under the United States Constitution and federal statutes (Sections 1983 & 1988) for deliberate indifference to serious medical need (Count I), "state created danger" (Count II), loss of "parent-child relationship" (Count III), and municipal and supervisory liability (Count IV).  *Id.*  The final claim is a State law claim for negligence and wrongful death pursuant to N.D.C.C. § 32-21-01 (Count V).  *Id.*  Plaintiffs' Complaint asserts the Court's jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3)&(4) (civil rights and elective franchise), and further invokes "the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law."  *Id.* at ¶ 1.

Cass County Defendants timely filed their Answer (Doc. 30) in which they denied any of the Plaintiffs' lawsuit claims had merit or validity and specifically denied any deliberate indifference, denied any Constitutional violations, denied any negligence or wrongful death, and denied Plaintiffs many allegations of wrongdoing. Cass County Defendants furthermore asserted entitlement to Qualified Immunity from suit (*id.* at ¶¶ 67-70) and also raised numerous State law defenses to the North Dakota negligence and wrongful death claim.  (*Id.* at ¶¶ 87-93).

Since the case was initiated, the parties have conducted a considerable amount of written discovery[2] and have taken numerous fact depositions.  This spring, Plaintiffs filed a motion seeking an order [] *Deeming NDCC § 28-01-46 Preempted by the Federal Rules of Civil Procedure and, in the Alternative, to Deem Plaintiffs' Expert Reports Timely Served* (Doc. 74) ("preemption motion").  All of the Defendants opposed the preemption motion (Docs. 78, 80 & 82), and all of the Defendants subsequently moved the Court for awards of partial summary judgment (Docs. 77,

---

[2] Plaintiffs themselves served on the Cass County Defendants a total of 416 discrete interrogatories, requests for production of documents and requests for admissions.  Wiederholt Affidavit, ¶4.

79 & 85) due to Plaintiffs' failure to comply with the expert affidavit requirement of North Dakota law in relation to Plaintiffs' State law professional negligence/wrongful death claims.

Prior to the partial summary judgment motions being fully briefed, Defendants Essentia Health, Kurt Kaczander, D.O., and Nathaniel G. Swanson, R.N. ("Healthcare Defendants") were dismissed by the Plaintiffs pursuant to voluntary stipulation.  (Docs. 98 & 100).  The Healthcare Defendants were thereafter dismissed from the lawsuit by order of the Court on February 29, 2024. (Doc. 101).  The voluntary dismissal of the Healthcare Defendants resulted in the Court determining those dismissed parties' partial summary judgment motions were moot.  (Doc. 102). Defendant Conrad Binsfeld, RN's partial summary judgment motion concerning North Dakota's expert affidavit requirement (Doc. 85) has been fully briefed by the parties (Docs. 82, 113 & 115), and together with the preemption motion, remains pending and to be decided by the Court. Because the expert affidavit issue is subject to its own motion for partial summary judgment, that issue is not addressed herein by the Cass County Defendants in relation to the instant motion for summary judgment.

In April of 2024, Cass County Defendants conducted the expert depositions of the Plaintiffs' experts:  Dr. Pietruszka, Dr. Chenevert, Edith Wright and Suzanne Ward.  Plaintiffs for their part took the expert deposition in April of one of three of the defense experts, Jeff Eiser.  The expert discovery deadline has expired.  (Doc. 103).  The dispositive motion deadline is May 30, 2024.  (Doc. 112).  Trial of this matter is scheduled for October 29 – November 11, 2024.

IV.     STATEMENT OF THE UNDISPUTED MATERIAL FACTS

Luke Laducer ("Laducer" or "Luke"), deceased, was a chronic alcoholic in December of 2020 when he was transported by Fargo Police Department officers from Essentia Hospital, where he was first medically cleared by Doctor Kurt Kaczander, and then taken to be booked into the

Cass County Jail on a warrant.  Essentia Medical Clearance (Depo. Exhibit 131) ( *Exh. A*);[3] Deputy Gary McCaul Depo. Tr. (Doc 114-3) at 11, l. 25 – 12, l. 24.; Fargo PD Officer Jacob Maahs Depo. Tr. (*Exh. B*) at 19, ll. 1-24; 27, ll. 5-24; 28, ll. 12-25; 29, ll. 1-11; 31, ll. 15-25; 32, ll. 1-5; 34, ll. 21-25; 35, ll. 1-5; Timeline (Depo. Exh. 508)( *Exh. C*); Paulette Scheller Depo. Tr. (*Exh. D*) at 67, ll. 4-13; 77, ll. 3-20.

Laducer – at that time highly intoxicated after drinking an excessive amount of vodka and then registering a 0.354 breath alcohol content when he entered the Jail – was placed in a sobering cell at about 3:15 am, which was mere feet away from the booking desk where he was routinely observed by the Jail's correctional staff about every half hour for the next approximately 14 hours. Maahs Depo. Tr. (*Exh. B*) at 36, l. 25 – 37, l. 9; Fargo PD Records (Depo. Exh. 61)(*Exh. E*); Cpl. Samantha Fetting Depo. Tr. (*Exh. F*) at 54, ll. 15-22; 60, ll. 14-21; Photo of booking desk and cells (Depo. Exh. 18) (*Exh. G*).  Correctional staff and Jail nursing staff[4] delayed parts of the intake process and associated paperwork for Laducer, as allowed by the Jail's policies and procedures, because highly intoxicated individuals such as Laducer oftentimes do not give accurate or valid health and other information.  McCaul Depo. Tr. at 23, l. 25 – 26, l. 16 (Doc. 114-3); Fetting Depo. Tr. (*Exh. F*) at 49, ll. 3-9; Captain Andrew Frobig Depo. Tr. (Volume II) (*Exh. J*) at 169, l. 19 – 170, l. 8; Custody Manual (Depo. Exh. 109) (*Exh. K*) at Policy 711.3 (CC-001260) and Policy 708.3 (CC-001255).  It was routine for highly intoxicated individuals such as Laducer to be booked into the Jail, sobered up, potentially treated for withdrawal, and then safely placed

---

[3] Documents, videos, audio recordings, deposition exhibits ("Depo. Exh.") and deposition transcripts ("Depo. Tr.") referenced in this summary judgment briefing that are not already on file in the Court's Docket ("Doc.___") are attached to the Affidavit of Bradley N. Wiederholt ("Exh. ___"), filed herewith.

[4] Jail nursing staff were employed at the Jail by Fargo Cass Public Health (a separate and distinct legal entity from Cass County) under a services contract.  Cass County Rule 30(b)(6) Depo. Tr. (*Exh. H*) at 10, l. 16 – 11, l. 10.

into the Jail's population; in other words, simply being intoxicated in and of itself did not constitute a serious medical concern for intoxicated inmates who booked into the Jail.  Cass County Rule 30(b)(6) Depo. Tr. (***Exh. H***) at 18, l. 11 – 19, l. 2; Binsfeld Depo. Tr. (Doc. 99) at 67, l. 23 – 24, l. 7; 125, l. 9-24; Dr. Napoleon Espejo Depo. Tr. (Volume II) (***Exh. M***) at 102, ll. 7-19; 126, ll. 1-22.

Jail nurse Conrad Binsfeld, who came on shift the morning of December 18, 2020, observed Laducer in his cell sleeping and beginning to wake up at about 11:00 am.  Conrad Binsfeld Depo. Tr. (Doc. 99) at 74, l. 3 – 77, l. 3.  At that time, Nurse Binsfeld deferred doing the initial health assessment as allowed for by the Jail's policies, ordered an updated BAC (breath alcohol content) on Laducer (which was completed and showed a .175), asked correctional staff to fill out the medical screening form in the afternoon and to keep any eye on Laducer.  *Id.*; Covid Screening Form with Handwritten Notes (Depo. Exh. 13) (Doc. 114-4); BCI Report, Binsfeld Interview Recording Tr. (Doc. 92-1). The medical screening questionnaire Nurse Binsfeld used to conduct his initial health assessment had not been completed for Laducer, and Nurse Binsfeld was waiting for that to happen before seeing Laducer during the afternoon of December 18th.  Binsfeld Depo. Tr. (Doc. 99) at 84, ll. 11-14; [Blank] Medical Screening Questionnaire (Depo. Exh. 102) (***Exh. N***). Nurse Binsfeld wanted to wait until Laducer was closer to a 0.10 BAC before doing his initial health assessment as he tended to get more accurate information after highly intoxicated individuals like Laducer had sobered up somewhat ("A. Yes. Typically, when somebody is closer to that sober mark, they do give more accurate answers."), and he testified that if an inmate had a history of suffering from alcohol withdrawals, as the inmate's blood alcohol content dropped closer to the point of sobriety, symptoms of alcohol withdrawal might begin to manifest.  *Id.* at 72, l. 25 – 74, l. 1; 75, l. 22 – 78, l. 2; 84, ll. 6-20.  Nurse Binsfeld did not observe, see any indications

of, and was not told by anyone that Laducer was having any kind of medical emergency, including any symptoms of alcohol withdrawal or any other indicia of trauma.  Binsfeld Depo. (Doc. 99) at 134, l. 8 – 135, l. 18.

Because he had not done the initial health assessment and was not advised of any medical need by Laducer (nor was there an obvious need), Nurse Binsfeld did not check Laducer's prior jail medical record at any time on December 18th; nor did he know Laducer had suffered from alcohol withdrawal, or that Laducer self-reported DTs and alcoholic induced seizures.  *Id.* at 91, ll. 9-15; Binsfeld [Redacted] Clinical Activity Audit Report (Depo. Exh. 537) (***Exh. O***).  Nor did Nurse Binsfeld even know Laducer from past incarcerations at the Cass County Jail.  *Id.* at 136, ll. 9-17. Neither the medical screening form nor the initial health assessment were performed on Laducer prior to Nurse Binsfeld leaving his shift at about 3:30 pm or before Laducer suffered a medical emergency later that day.  *Id.* at 113, ll. 6-24.  Deputy McCaul intended to complete the medical questionnaire on Laducer on December 18th before his shift ended but because his intoxication level was still high, it was determined they "would [not] get complete answers from him."  McCaul Depo. Tr. (Doc. 114-3) at 24, ll. 3-8.  Nurse Binsfeld testified the initial health appraisal would have been done later that day once the medial screening form had been completed by correctional staff and nursing staff would have checked the medical drawer routinely to see when Laducer would be ready to be seen by a nurse.  Binsfeld Depo. Tr. (Doc. 99) at 76, l. 15 – 77, l. 3.  Although Binsfeld left his shift at 3:30 pm that day, another nurse would have been working the "late shift" that day and thus the other nurse could have performed the initial health appraisal on Laducer.  *Id.* at 113, ll. 3-17.

No one at the Jail, including Nurse Binsfeld, ever suspected on December 18, 2020 that Laducer was experiencing a medical emergency while he was in cell #109 where he was observed

dozens of times and had numerous interactions with correctional staff.  McCaul Depo. Tr. (Doc. 114-3) at 26, ll. 12-24; 28; ll. 7-25; 41, ll. 4-10; Officer Activity Log (Depo. Exh. 109) (**Exh. K**); Fetting Depo. Tr. (**Exh. F**) at 97, ll. 6-25; BCI Investigation Materials (Depo. Exh. 505) (**Exh. P**), at CC-000014-16 (timeline) & CC-000018-22 (summaries); Deputy Michael George Depo. Tr. (**Exh. Q)** at 19, l. 2 – 23, l. 9; Officer Incident Reports (Depo. Exh. 140) (**Exh. R**); Binsfeld Depo. Tr. (Doc. 99) at 134, l. 2 – 135, l. 18.  Plaintiff's jail nursing expert Edith Wright issued an expert report in this matter dated December 14, 2023, in which she carefully documents what she observes in the Jail's video footage and in other Jail documents relating to correctional staff's observations of and interactions with Laducer on December 18, 2020.[5]  Her report observations are as follows:

> At approximately 03:10 hours, Mr. Laducer entered the booking vestibule, walked with the Deputies' assistance, proceeded to a bench, and sat down. A preliminary breath test at 03:11 hours revealed a blood alcohol content of 0.354. At approximately 0315, Mr. Laducer walked to the holding cells, with the assistance of Deputies and was placed in cell #109.
>
> [. . . .]
>
> An Officer Activity log documents well-being checks done approximately every 30 minutes; however, there are no entries regarding activity specific to Mr. Laducer on the log except for the medical emergency.
>
> The following timeline indicates activity regarding Mr. Laducer from 2 pm to 10 pm on 12/18/2020 and is based on the review of video footage of cell #109 and areas in proximity: 11
>
> 2:02 p.m. - Deputy Keith Anderson briefly entered cell #109 and obtained a piece of paper from Luke Laducer. The contact was around one minute long.
>
> 2:14 p.m. - Deputy Anderson stopped in front of cell #109 and picked up an item up from the floor in front of the cell. Deputy Anderson did not enter the cell.
>
> 2:49 p.m. - Deputy Anderson entered cell #109 and gave Luke Laducer an iPad to appear in court virtually. The contact was brief, but Deputy Anderson stayed at the cell door with the door ajar.
>
> 2:56 p.m. - Deputy Anderson entered the cell and retrieved the iPad. He remained in the cell and appeared to be speaking to Mr. Laducer until 3:01 pm when he exits the cell.

---

[5] Portions of Plaintiffs' experts' reports and depositions transcripts are cited herein in order to illustrate undisputed materials facts.  This should not be construed as an admission that Cass County Defendants agree those experts' opinions are valid or will assist the jury to understand issues in dispute.

3:11 p.m. - Deputy Michael George talked to Luke Laducer through the glass of cell #109. The contact was less than one minute.

3:13 p.m. - Deputy George returned to cell #109 and placed a bottle of water through the food port.

3:26 p.m. - Deputy Anderson entered cell #109 and gave Luke Laducer paperwork. The contact was about 30 seconds.

3:51 p.m. - Deputy George walked past cells #110 and #105 in booking and appeared to check on those inside.

3:57 - Deputy Miguel Tolentino walked past cells #105 to #110 in booking and appeared to check on those inside.

4:02 p.m. - Deputy Tolentino entered cell #108 and quickly exited. As Deputy Tolentino was walking back to the booking counter, Deputy Tolentino could be seen interacting with Luke Laducer in cell #109. It appeared Deputy Tolentino was pointing at something in cell #109 and made a motion with his hand, as if to tell Luke Laducer to drink something in his cell. The interaction lasted about a minute. At the conclusion of the interaction, Deputy Tolentino gave Luke Laducer a thumbs up.

4:17 p.m. - Deputy Sarah Larson stopped outside of cell #109 and appeared to talk to Luke Laducer. The interaction lasted a short time.

4:27 p.m. - Deputy George again walked past cells #110 to #105, appearing to conduct welfare checks.

4:33 p.m. - Deputy Brady Butcher walked past cell #109 and could be seen motioning to Luke Laducer with his hand.

4:34 p.m. - Deputy Tolentino walked past cell #109 and could be seen motioning to Luke Laducer with his hand.

4:57 p.m. - Deputy George walked past cells #109 and #105, appearing to check on those inside.

4:58 p.m. - Corporal Blake Fidler walked up to cell #109 and appeared to talk to Luke Laducer. Corporal Fidler could be seen nodding his head. The contact lasted several seconds.

5:00 p.m. - Deputy George walked by cell #109. Deputy George could be seen turning Deputy George's head as Deputy George walked past and acknowledged Luke Laducer by motioning his hand.

5:06 p.m. - Luke Laducer could be seen walking to the rear of the cell.

5:12 p.m. -A red shirt could be briefly seen in the window of cell #109. It appeared that Luke Laducer was standing, as the red shirt was about waist height. Movement in cell #109 could be seen until about 5:14:30 p.m.

5:13 p.m. - A piece of paper was pushed under the cell door from the inside and was partially sticking out from under the cell door (later found to be a Cass County District. Court scheduling order).

5:14 p.m. - Deputy Samantha Vigstol walked behind the booking counter and stopped for a few seconds. It appeared Deputy Vigstol was looking in the direction of cell #109.

5:15 p.m. - Deputy Vigstol went to the cell door of cell #109. Deputy Vigstol briefly looked into cell #109, and then walked back behind the booking counter and talked with Corporal Samantha Fetting.

5:16 p.m. - Corporal Fetting went to the door to cell #109. Shortly thereafter, the cell door was opened, and deputies entered the cell. It is unknown what occurred in the cell, as the camera angle did not allow a view into the cell.

5:17 p.m. – Corporal Sean Brekke arrived with the AMBU bag and life-saving efforts began.

5:17 p.m. - Deputy Tolentino arrived with the AED

5:21 p.m. - Deputy Jasmyne Hatlestad arrived with the handheld video camera.

5:23 p.m. – Fire Rescue arrived on the scene and entered cell #109

5:28 p.m. - EMS arrived at cell #109.

5:29 p.m. - Luke Laducer was moved from the cell floor to the floor of the booking area just in front of cell #109, and life-saving efforts commenced.

5:50 p.m. -Life-saving efforts were ended. Luke Laducer's body was left in the position it was in when lifesaving measures were ended.

Report of Edith Wright, R.N. BSN, MBA, CCHP (Depo Exhibit 534) (***Exh. S***) at pages 10-13.

Out of all the correctional staff that had involvement with Laducer on December 18th, only Cpl. Fetting remembered him from a prior Jail stay, but she wrongly remembered that he had to be taken out on a prior occasion for "DTs." Fetting BCI Interview Recording and Tr. (***Exh. T*** and ***Exh. U***).[6] Cpl. Fetting had several interactions with Laducer and she specifically reported to the BCI she was observing him for signs of alcohol withdrawal.  BCI Report (Depo. Exh. 505) (***Exh. P***) at CC-000018-19; Fetting Report (Depo. Exh. 16) (***Exh. X***). Deputy McCaul likewise testified he was specifically checking all inmates, including Laducer, for any safety concerns or signs of alcohol intoxication and he identified some of the withdrawal symptoms and other concerns he

---

[6] Laducer's Cass County Jail Medical Record – which were not reviewed by anyone at the Jail on December 18, 2020 – shows him at times self-reporting "DTs" and "seizures" and at other times denying having previously suffered such acute withdrawal symptoms.  Jail Medical Record (Depo. Exh. 130) (***Exh. V***) at CC-008968 & 008970.  Those records do not record Laducer being taken out of the Jail in the past for DTs as Cpl. Fetting mistakenly reported to the BCI.  *See id.*  Plaintiffs' rebuttal Expert Suzanne Ward agrees correctional officers oftentimes use the slang term "DTs" to mean "tremors" which are a much less serious withdrawal symptom than the oftentimes fatal, if not promptly treated, delirium tremens.  Suzanne Ward Depo. Tr. (***Exh. W***) at 81, ll. 1-13.  Ms. Ward further acknowledged that "what [Cpl. Fettig] stated and what was in the medical record is not necessarily consistent" (*id.* at ll. 14-20) and she conceded that no one at the Jail, including Binsfeld, accessed Laducer's prior jail medical record, and only Cpl. Fetting knew Laducer from a prior stay.  *Id.* at 81, l. 21 – 83 l. 12.

was trained to look for, including signs of life, seizures, excessive sweating, bleeding, vomiting, and complaints of injuries.  McCaul Depo. Tr. (Doc. 114-3) at 47, l. 19 – 48, l. 3.  He never observed any such symptoms or concerns with respect to Laducer or he would have reported it. McCaul BCI Interview Recording and Tr. (***Exhs. Y, Z***); BCI Report at CC-000021 ***(Exh. P)***.

Many of the Jail's correctional staff on duty during the time Laducer was in booking had previously taken Alcohol Withdrawal Management training at the Jail in March of 2018.  Post Assignments (Depo. Exh. 10)(***Exh. AA***); Withdrawal Management Training (Depo. Exh. 114)(***Exh. BB***); Training Records (Depo. Exh. 110) (***Exh. CC***); Defendant Cass County's Answers to Plaintiffs' Requests For Admission, Set 5 (***Exh. DD***); Frobig Depo. Tr. (***Exh. J***) at 178, l. 5 – 184, l. 10.[7]  All of the correctional officers on duty that night/day had undergone Correctional Officer Basic or had successfully passed FTO (Field Training Officer) training, a component of which training was to review and demonstrate proficiency with the Jail's withdrawal management policy that discusses signs and symptoms of alcohol withdrawal.  Frobig Depo. Tr. (***Exh. I***) at 49, ll. 3-19; 178, l. 5 – 184, l. 10.  Correctional staff were looking for such signs and symptoms, not only in relation to Laducer, but also in relation to another inmate housed in booking on December 18, 2020 who was identified by officers as undergoing alcohol withdrawal symptoms, and was taken to the hospital that same day.  Binsfeld Depo. Tr. (Doc. 99) at 101, l. 23 – 102, l. 16; Allen Depo. Tr. (***Exh. EE***) at 117, ll. 2-15.

For his part, in addition to his schooling and yearly CE requirements, Nurse Binsfeld received withdrawal management training through Fargo Cass Public Health and would have used

---

[7] As set forth in the aforementioned materials and in Captain Frobig's deposition transcript, Fetting, Fidler, Drechsel, Allen, Swenson, Brekke, Pestel, and Tschida attended the Alcohol Withdrawal Management Training in March of 2018.

the CIWA-AR[8] form with Laducer had he been informed Laducer was showing signs or symptoms of alcohol withdrawal.  Nurse Binsfeld Depo. Tr. (Doc. 99) at 42, l. 20 –44, l. 4; CIWA-AR (Depo. Exh. 199) (**Exh. FF**).  Notably, feeling lightheaded or dizzy is not a withdrawal symptom as the CIWA-AR states, "Do not rate for dizziness or lightheadedness."  *Id.*  The Jail's "Responsible Physician" Dr. Napoleon Espejo[9] helped to implement the CIWA-AR as well as the Medical Screening Questionnaire, both of which were in use in December of 2020.   Dr. Espejo Depo. Tr. (**Exh. M**) at 111, l. 18 – 112, l. 5; 123, ll. 2-12; 126, l. 16 – 127, l. 16; Cass County Rule 30(b)(6) Depo. Tr. (**Exh. H**) at 103, ll. 8-12; Frobig Depo. Tr. (**Exh. J**) at 131, ll. 9-15.

In addition to the Jail's correctional staff, as indicated in the timeline in Ms. Wright's report **(Exh. S)**, Laducer also interacted on December 18th with two separate Cass County Sheriff's Department Court Transport deputies, Deputy Katherine Allen and Cpl. Keith Anderson; Deputy Allen went into Laducer's cell for five to ten minutes to make sure he was fit to attend court remotely, at which time he answered her questions and signed paperwork, and she assessed him as being able to attend court later that day.  Deputy Katherine Allen Depo. Tr. (**Exh. EE**) at 93, ll. 4-11; 94, ll; Allen Report (**Exh. R**).  Cpl. Anderson – who did not know Luke Laducer at all – also went into Laducer's cell at least a few times on December 18, 2020 in relation to assisting him with his remote attendance at his initial appearance with State District Court Judge McCullough.  Anderson Depo. Tr. (**Exh. HH**) at 21, l. 10 – 22, l. 3; 23, l. 9 – 25, l. 13; Anderson BCI Interview Recording and Tr. (**Exhs. II, JJ**); BCI Report (Depo. Exh. 505) (**Exh. P**) at CC-000018.  Laducer

---

[8] CIWA stands for Clinical Institute Withdrawal Assessment for Alcohol, which is an industry standard method of diagnosing the severity of alcohol withdrawal symptoms.  Edith Wright Depo. Tr. (**Exh. GG**) at 78, l. 20 – 79, l. 10.

[9] Dr. Espejo was a physician working for Family Healthcare (a legal entity separate from Cass County), which provided in person and on-call medical provider services to the Jail pursuant to a written agreement.

successfully attended the initial appearance but requested to lay down while appearing as he indicated to the Judge that he felt like he might pass out.  Audio Recording Tr. (***Exh. KK***); Audio Recording (***Exh. LL***).  Cpl. Anderson did not stay in the cell during the entire hearing, but he observed that Laducer appeared not to be feeling well, looked unsteady or might throw up, and appeared intoxicated, which he did not think was unusual as he knew Laducer was booked into the Jail during the night shift, he was still quite intoxicated, and would be hungover.  Anderson Depo.Tr. (***Exh. HH***) at 26, ll. 11-25.  He also reported Laducer asked him about moving out of booking and into a housing unit and he let booking staff know he wanted water.  BCI Report (Depo. Exh. 505) (***Exh. P***) at CC-000018.

Both Deputy McCaul and Cpl. Blake Fidler reported hearing Laducer yell periodically throughout the day on December 18th, but both testified yelling was a common occurrence in booking, that yelling in and of itself rarely meant there was an emergency, and neither believed Laducer's yelling was the type of yelling that would raise concerns.  McCaul Depo. Tr. (Doc. 114-3)  at 52, l. 24 – 54, l. 4; Fidler Depo. Tr. (***Exh. MM***) at 34, l. 14 – 36, l. 23. McCaul testified that a well-being check would have been conducted by another correctional officer close in time to Laducer yelling.  McCaul Depo. Tr. (Doc. 114-3) at 54, ll. 15-18.  And Fidler testified Laducer yelled for a breathalyzer, and he believed the yelling is often indicative of an inmate asking for a breathalyzer test so he could move out of booking and into the general population where it was more comfortable.  Fidler Depo. Tr. (***Exh. MM***) at 19, ll. 18-21; 36, ll. 10-19.

Also, as indicated in Wright's timeline, Deputy George did a well-being check of Laducer just prior to 5:00 pm and motioned to him with his hand, and Cpl. Fidler went up to Laducer's cell door and appeared to converse with him just prior to 5:00 pm.  Cpl. Fidler Depo. (***Exh. MM***) at 19, ll. 10-13; Videos CC-000258 (***Exh. NN***) and Video CC-000255 (***Exh. OO***) at timestamps

16:57:45 & 16:58:50.  Neither George nor Fidler were told by Laducer he was having any kind of medical emergency and neither reported seeing such an emergency.  George Depo. Tr. (***Exh. Q***) at 23, ll. 4-9; Fidler Depo. Tr. (***Exh. MM***) at 38, l. 7 – 40, l. 15.  In fact, George reported to the BCI that he had several verbal interactions with Laducer where he would ask him if he was okay, and Laducer was not in distress and said he was okay.  George BCI Interview Recording and Tr. (***Exhs. PP, QQ***). Had either Deputy George or Cpl. Fidler seen a medical need, both would have contacted medical staff.  *Id.*; Fidler Depo. (***Exh. MM***) at 40, ll. 3-10.  Laducer's cell was close to the booking desk, the glass did not impede conversation with the inmate, and the cell was equipped with an emergency call button Laducer easily could have activated, which would have alerted Jail staff to any emergency.  4 Videos of Cell and 6 photos by Captain Frobig, Frobig Aff., Boll Aff., Fidler Aff., and Informational Report by Frobig (***Exhs. RR-WW***).  Tragically, Laducer never reported to anyone or showed any signs that he was in need of medical help.

Suddenly and unexpectedly, Laducer experienced a medical emergency at approximately 5:15 pm, mere minutes after being observed by and conversing with correctional staff members, including Deputy George and Cpl. Fidler.  Video CC-000258 (***Exh. NN***) at timestamp 17:15:25.[10] Laducer's medical emergency was a latent gastrointestinal bleed that developed because of years' of chronic alcohol abuse.  Dr. Martin Chenevert Depo. Tr. (***Exh. XX***) at 43, ll. 1-15; Dr. Marvin Pietruszka Depo. Tr.(***Exh. YY***) at 59, ll. 7-25; Dr. Gordon Leingang Rebuttal Report (***Exh. ZZ***) at 5.  None of the correctional staff observed any bleeding or other indicia of such a medical emergency at any time after Laducer booked into the Jail, until he was discovered when dinner

---

[10] As discussed herein below, following Laducer's death, the North Dakota BCI began its investigation of the in-custody death.  As part of that investigation, it gathered and reviewed video evidence from the Jail on December 18, 2020.

was being passed out at about 5:15 pm, and he was at that time clearly in medical distress.  Fetting Depo. (**Exh. F**) at 85, l. 8 – 86, l. 7.

Despite their best efforts to save his life, correctional staff and then emergency responders lost the battle, and Laducer was declared dead at approximately 5:50 pm due to conditions brought on by chronic alcohol abuse.  Fetting Depo. (**Exh. F**) at 86, l. 8 – 90, l. 12; BCI Report at CC-000016 (**Exh. P**).  Laducer's autopsy report indicates his cause of death as "natural" and as "diffuse hemorrhagic gastritis and colitis", which is known colloquially as a gastrointestinal ("GI") bleed.  Autopsy Report (Depo. Exhibit 520) (**Exh. AAA**) at CC-000030; Dr. Chenevert Depo. Tr (**Exh. XX**). at 43, ll. 7-8; Dr. Pietruszka Depo. Tr. (**Exh. YY**) at 30, ll. 1-4; 34, ll. 12-16.[11]   Other "significant conditions" identified in the Autopsy included "alcohol abuse" and Dr. Mary Ann Sens stated, "it is the opinion of the prosecutor that [Luke] Laducer died as a result of complications of chronic alcohol abuse. . ."   Autopsy Report at CC-000035 (**Exh. AAA**).  Plaintiff's experts Dr. Chenevert and Dr. Pietruszka agree that alcohol abuse caused Laducer's health problems that ultimately killed him.  Dr. Chenevert Depo. Tr. (**Exh. XX**) at 54, ll. 14-21; Dr. Pietruszka Depo. Tr. (**Exh. YY**) at 36, l. 17 – 37, l. 1.

One of the Plaintiffs, Laducer's sister Paulette Scheller, acknowledged she knew he would kill himself if he did not quit drinking and she told him so at some point in time:

> Q. Okay. Did you ever have a conversation with Luke where you said something like, "Luke, you've got to stop drinking. You're going to kill yourself"?
> A. I don't know if those were my exact words.
> Q. Did you ever --

---

[11] While Dr. Pietruszka testified he believed Laducer was undergoing symptoms of alcohol withdrawal at the Jail based on his high breath alcohol content, he admitted not all chronic alcoholics experience withdrawals and he knew of no facts that would indicate Jail staff knew or was informed Laducer was bleeding or that he was vomiting at any time on December 18th, prior to being discovered in his cell at approximately 5:15 pm.  Pietruszka Depo. Tr. (**Exh. YY**)at 41, l. 12 – 42, l. 9; 50, l. 10 – 51, l. 19.  Thus, Pietruszka's expert Report that indicates Laducer died in part from "alcohol withdrawal" has no factual foundational support at all.

A. Probably not put in those exact words.
Q. Did you ever have a conversation where you had words like that or with the same meaning with Luke?
A. Yes.

Paulette Scheller Depo. Tr. (***Exh. D***) at 84, ll. 15-23.   Following his death, the scene (including cell #109 and the hallway outside the cell) was locked down and treated essentially like a crime scene for investigation purposes.   Det. Gress Depo. Tr. (***Exh. BBB***)   at 5, l. 22 – 6, l. 3; Allen Depo. Tr. (***Exh. EE***) at 70, ll. 15-24.   Correctional staff called the Sheriff and Jail Administrator, both of whom immediately came to the Jail and neither of whom had been at the Jail when Laducer was discovered to be in distress.   Sheriff Jahner Depo. Tr. (***Exh. CCC***) at 21, l. 18 – 22, l. 13; Frobig Depo. Tr. (***Exh. J***) at 203, ll. 1-13.[12]   The in-custody death was quickly reported by the Sheriff's Department to the North Dakota Department of Corrections and Rehabilitation (DOCR) and the North Dakota Bureau of Criminal Investigation (BCI) as required by North Dakota law. Significant Incident Reporting (Depo. Exh. 17) (***Exh. DDD***); Sheriff Jahner Depo. Tr. (***Exh. CCC***) at 23, ll. 10-18.   Sheriff's Department staff assisted the BCI with downloading and preserving video evidence requested by the BCI and footage from two stationary cameras was obtained and preserved from 2:00 pm on December 18th until after Laducer was declared dead.   Frobig Depo. Tr. (***Exh. J***) at 198, l. 18 – 199, l. 12; 207, ll. 5-19; Detective Joe Gress Depo. Tr. (***Exh. BBB***) at 9, ll. 4-16; 10, ll. 3-9.[13]   Handheld video showing the life-saving efforts of correctional staff and first responders was also obtained and preserved.   *Id.*   Both the DOCR and BCI conducted their own independent investigations, and both agencies issued reports in which they essentially found

---

[12] Neither the Sheriff no Captain Frobig had any personal involvement with Laducer on December 18, 2020.  Sheriff Jahner Depo. Tr. (***Exh. CCC***) at 52, ll. 11-25; Frobig Depo. Tr. (***Exh. J***) at 194, ll. 6-12; 202, l. 13 - 203, l. 13.

[13] No cameras existed at the Jail in 2020 that could look directly into cell 109.  Fetting Depo. (***Exh. F***)  at 84, ll. 21-23.

no wrongdoing or policy violations concerning correctional officers' interactions with Laducer, and no deficiencies in the Jail's policies and procedures. DOCR Memorandum (***Exh. EEE***); BCI Report (Depo. Exh. 505) (***Exh. P***).

On December 22, 2020, Sheriff Jesse Jahner (and other County officials) held a telephone conference call with Laducer's family in order to officially express the Sheriff's Office's condolences for Luke's tragic death and to answer the family's questions to the extent such questions could be answered during the pendency of the BCI's investigation and prior to the completion of such investigation.  Telephone Audio Recording Tr. (Depo. Exh. 503) (***Exh. FFF***). Nearly two years later, some of the same family members on that call brought the instant lawsuit in which they asserted, against all known evidence, that the Jail correctional staff knew about Laducer's medical emergency and nevertheless allowed him to bleed to death in his cell without doing anything to help save his life.  *See generally*, Complaint.

## V.    ANALYSIS

### A.    <u>The Individual Cass County Defendants are Entitled to Judgment As a Matter of Law Because There Are No Facts from Which A Reasonable Jury Could Conclude Any Individual Cass County Defendant Knew About and Deliberately Disregarded Laducer's Serious or Obvious Medical Need</u>.

The standard for deliberate indifference is well-established:

> Deliberate indifference is equivalent to criminal-law recklessness, which is "more blameworthy than negligence," yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate. *See Farmer,* 511 U.S. at 835, 839–40, 114 S. Ct. 1970. An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate. *Lenz v. Wade,* 490 F.3d 991, 995 (8th Cir.2007). Deliberate indifference must be measured by the official's knowledge at the time in question, not by "hindsight's perfect vision." *Id.* at 993 n. 1 (quoting *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir.1998)).

*Schaub*, 638 F.3d at 914–15 (citations and quotations in original).  To sustain their deliberate indifference claim against Cass County Defendants under 42 U.S.C. § 1983, Plaintiffs must

establish both objective and subjective components or prongs:  (1) that an individual Cass County Defendant knew there existed a "substantial risk of serious harm" to the inmate, the "objective component", and (2) an individual Cass County Defendant "[knew] of and disregard[ed] an excessive risk to inmate health or safety", the subjective component.  *Letterman v. Does*, 789 F.3d 856, 861–62 (8th Cir. 2015) (citing *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir.2006) and *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)).

> 1.    *It was unknown that Laducer was suffering from a serious medical need as the underlying GI bleed was latent, not diagnosed, and not obvious to a layperson.*

"A prisoner's Eighth Amendment rights are violated if prison officials exhibit deliberate indifference to the prisoner's serious medical needs." *Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999) (citations omitted). "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted). As shown in the undisputed material fact section above and discussed further below, none of the correctional staff or Jail nursing staff knew Laducer was bleeding internally or externally on December 18, 2020.  Such a fact was never observed by any correctional officer or by nursing staff and Laducer never reported such a fact to anyone.  Nor did anyone at the Jail observe that Laducer was suffering acute withdrawal symptoms at any time on December 18.  From the perspective of a layperson, Laducer would have presented just as he did to Jail staff, which was a person who had drank way too much alcohol, was hung over and not feeling well, and was "sleeping it off" at the Jail.  This was certainly not the kind of situation that would be "obvious" to the layperson.

Also, Laducer had not been diagnosed by any physician or other medical professional that he was having any emergent medical problem, including a GI bleed or alcohol withdrawal syndrome. Just the opposite: Dr. Kaczander at Essentia Hospital signed a Medical Clearance Form (**Exh. A**) advising in part: "Luke M Laducer was seen and evaluated at the Essentia Health Emergency Department on 12/18/2020 at 2:56 AM. At this time there is no evidence of an emergency medical condition and they [Laducer] are medically clear to go to jail/detox. [. . .]" All of the correctional officers who interacted with Laducer and Nurse Binsfeld knew Laducer had been medically cleared prior to arriving at the Jail. Given all of this, Plaintiffs cannot present any evidence anyone at the Jail knew Laducer had a serious medical need at any time prior to 5:15 pm.

To the extent this factor (serious medical need) is a purely objective one, Cass County Defendants concede the GI bleed that killed Laducer on December 18, 2020 would be an objectively serious one. However, Cass County Defendants do not concede withdrawal syndrome, which Laducer was not suffering from and which he did not die from, was an objectively serious medical need. The same analysis applies to suicide and suicidality, neither of which killed Laducer.

> 2.      *None of the Individual Cass County Defendants knew about Laducer's latent serious medical need (GI bleeding) or about any Alcohol Withdrawal Syndrome; Nor should they have known of any "obvious" medical issues based on the undisputed facts.*

A defendant cannot be found liable under the deliberate indifference standard unless the defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

> "Under this subjective prong, the evidence must show that the officers recognized that a substantial risk of harm existed and knew that their conduct was inappropriate in light of that risk." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir.2009) (emphasis in original). Plaintiffs must first demonstrate that defendants knew of the substantial risk of serious harm to the victim. *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir.1998). A party need not necessarily show that the actor actually knew of the substantial risk of harm to an inmate; the district court can infer knowledge

20

if the risk was obvious.  *See, e.g.*, *Farmer [v. Brennan]*, 511 U.S. at 842–43, 114
S.Ct. 1970[; . .] *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir.2000)[.]

*Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (citations in original)

For the same reasons as discussed above, none of the correctional staff at the Jail (including

Nurse Binsfeld) knew Laducer was undergoing a serious medical emergency or that he had a

serious medical need on December 18, 2020 at any time prior to about 5:15 pm when he was found

in distress in his cell.  Nor is there evidence to suggest they should have known of an "obvious"

risk.  As indicated above, out of all of the corrections and nursing staff on duty on December 18th,

only Cpl. Fidler indicated she knew Laducer from a past stay, and she mistakenly believed he had

been taken out for "DTs" (a mistake acknowledged by both Nurse Ward and Nurse Wright).  And

there is no evidence at all that Laducer suffered any bona fide delirium tremens or seizures on

December 18, 2020.

Cpl. Fidler and Deputy McCaul (neither are identified as Defendants) heard Laducer

yelling on and off throughout the day, which they reported and testified was not concerning but

rather was a demand for a breathalyzer so Laducer could move to housing where it was more

comfortable.  Neither reported or testified seeing any blood or signs of acute alcohol withdrawal

in their interactions with Laducer.  In the afternoon, Cpl. Anderson (also not a Defendant) reported

to the BCI that Laducer looked unwell, stated Laducer said he felt like he might throw up, and

Anderson may or may not have heard Laducer tell the State district court judge that he felt dizzy

and might pass out, at which time Laducer successfully attended the hearing from a laying position

on his bunk.  Cpl. Anderson likewise did not report any bleeding or acute withdrawal symptoms,

and he attributed Laducer's actions and demeanor to an inmate who had been highly intoxicated

the previous evening, was hungover, and just not feeling well.  In other words, he did not believe

any of this indicated a medical emergency or serious medical need by Laducer and none was reported to him.

For his part, Nurse Binsfeld saw Laducer through the cell's large glass window at about 11:30 as he was waking up; he knew Laducer had booked in with a high BAC (.354), and he knew his BAC had decreased to a .175 at 11:35 am. Nurse Binsfeld's testimony indicated such highly intoxicated individuals were a relatively common occurrence at the Jail and it was his practice to see them when they were a little more sober and usually (but not always) after the medical screening questionnaire had first been filled out with the inmate's involvement by Jail staff. In other words, intoxicated individuals like Laducer were not out of the ordinary and did not raise any red flags for Nurse Binsfeld just by virtue of the intoxication level alone. In relation to Sheriff Jahner and Captain Frobig (sued in their official *and individual* capacities), both testified they had no personal involvement whatsoever with Laducer, and thus they had no knowledge of his situation at all. *See infra.* at FN. 12.

On the other hand, Plaintiffs and their experts direct the Court's attention not to any serious medical need that was *known* or obvious but rather to what the Cass County Defendants *should have known* and *should have done*. They do not present any evidence of what the Cass County Defendants did in fact know about a serious medical need on December 18, 2020 and they fail to present any evidence why there was an obvious risk. Examples of what Cass County Defendants allegedly *should have known* or *should have done* abound in the Rebuttal Report of Plaintiffs' nursing expert Suzanne Ward. For example, she stated during her deposition when asked about her report opinions that the Jail's custody policy (Policy 711 – Depo. Exh. 109, **Exh. K**) required Laducer to be sent straight back to Essentia Hospital when he had to be "assisted" into the Jail by correctional officers and when he blew a .354 BAC at the Jail, both of which happened mere

minutes after Laducer had already been medically cleared at Essentia Hospital; Nurse Ward stated

that is the way she "interprets" the Jail's custody policies.  Ward Depo. Tr. (***Exh. W***) at 102, l. 20

– 103, l. 25.  She also testified Cass County Defendants should have called the ER for guidance

when Laducer booked into the Jail after having been medically cleared to be at the Jail.  *Id.*

　　　　Such opinions are held by Nurse Ward despite the fact none of the Jail staff or nursing staff

testified or reported the mere high BAC at intake or being "assisted" by correctional officers into

booking was of concern to them.  Again, Nurse Binsfeld had dealt successfully with many such

inmates in the past, and he was involved with assisting another inmate that very day who was

identified as having withdrawal symptoms and then taken out of the Jail for care.  In point of fact,

as evidenced by his prior Jail medical record, Laducer had previously booked into the Jail in highly

intoxicated states and had no trouble despite reporting a history of seizures and DTs.  Jail Medical

Record (***Exh. V***) at CC-008970 (.269 BAC); CC-008972 (.21 BAC).  In relation to Laducer

walking "assisted", this is not evidence of an obvious risk either.  Deputy McCaul testified during

his deposition that, "[f]or the most part, yes. He was -- he was walking mostly unassisted, but due

to his intoxication level, we were walking with him. I believe one of the deputies had his arm, and

we were just making sure that he wasn't falling."  McCaul Depo. Tr. (Doc. 114-3) at 25, ll. 9-18.

The video evidence confirms beyond doubt Laducer's act of walking from the sally port to the

booking area, and then to cell #109 do not raise any evidence of an "obvious" risk.  On the contrary,

the videos from four different cameras confirm Laducer was walking under his own power. Videos

CC-000251, CC-000252, CC-000253, & CC-000254 (***Exhs. GGG-JJJ***) at timestamps 03:10:20;

03:10:45;  03:15:10;  03:15:24.  Nurse Ward's report and deposition testimony concerning

Laducer's high BAC at intake and allegedly not being able to walk unassisted do not raise evidence

that would indicate any Jail nursing or correctional staff knew of a serious medical need or should have known a risk of harm was obvious.

When pressed further on who knew what and when, Nurse Ward fell back on what she opines Nurse Binsfeld *should have known* and *should have done*, which was that he should have done the medical screening form himself when he realized correctional staff had not filled it out yet on the afternoon of December 18th; and she opines that he should have gone into Laducer's cell at 11:30 am to medically assess him when Laducer was waking up, because in her opinion, he could not make any valid observations about a possible medical need through the glass. Nurse Ward Depo. Tr. (***Exh. W***) at 118, l. 4 – 119, l. 24.  But Nurse Binsfeld never testified or reported he saw anything of concern when he observed Laducer through the glass at 11:30 am, which could constitute evidence of a known or obvious risk, and Nurse Ward admits that Nurse Binsfeld did not review Laducer's prior jail medical record and the correctional staff had no access to it either. *Id.* at 81, l. 21 – 82, l. 6.  In her Expert Rebuttal Report, Nurse Ward includes a section entitled "What Nurse Binsfeld and CCJ Booking Officers Knew", and in that section of the report she provides a bulleted list of dozens of items of what she thinks should have been done and what she thinks should have been known, but nowhere does she state any Jail staff (including Nurse Binsfeld) knew Laducer was suffering a GI bleed or why it should have been obvious that he was. Nor does she state who knew Laducer was undergoing acute alcohol withdrawal symptoms of any kind or why it should have been obvious to anyone that he was.  Nurse Ward Rebuttal Report (***Exh. KKK***) at 46-47.  And even if Nurse Ward had stated opinions to that effect, such opinions would not have had any factual support.

In relation to other individual Cass County Defendants Nurse Ward believes were deliberately indifferent, she could name only Nurse Binsfeld and she also testified "the

administration" were deliberately indifferent in her opinion, *id.* at 126, ll. 8-12.  Again, Sheriff Jahner and Captain Frobig had no involvement with Laducer's incarceration, so they cannot have disregarded any known risk or any obvious risk of harm to Laducer.

Plaintiffs' other jail nursing expert, Nurse Wright, had similar opinions about what Nurse Binsfeld should have known and should have done on December 18, 2020.  In her deposition, she admitted she did not know if Nurse Binsfeld actually accessed Laducer's prior Jail medical record or not ("I don't have anything to say that he actually accessed it; he had access to it.") and she did not know if anyone reported to Nurse Binsfeld about Laducer having any urgent medical issue at the Jail ("I don't know that they reported anything to him.").  Wright Depo. Tr.  (***Exh. GG***) at 103, l. 16 – 106, l. 4.  Like Nurse Ward, Nurse Wright testified Nurse Binsfeld should have conducted the medical screening form himself and he should have seen Laducer immediately, which she based on her interpretation of the Jail's custody policies; she had these opinions about what she believed should have happened because Laducer allegedly had "high risk medical and mental health conditions" and "known history of alcohol withdrawal".  *Id.* at 109, l. 11 – 110, l. 3. But again, she did not know if any Jail staff member or nursing staff member actually had such knowledge.  *Id.* Nurse Wright admitted Nurse Binsfeld did not access Laducer's prior Jail medical record on December 18, 2020 ("He had access to it.  Whether he knew or not, I can't say.").  *Id.* at 110, l. 4 – 111, l. 9.  She had similar opinions to Nurse Ward's about Laducer's suicidality and a history of gastric bleeds, both of which she said someone at the Jail should have known about; but she also conceded she did not know if anyone at the Jail actually knew about those issues or not, and she further did not know if the Jail staff or Nurse Binsfeld had access to the Essentia medical records.  *Id.* at 113, l. 25 – 114, l. 7.  In relation to all of the individual Cass County Defendants Nurse Wright believed were deliberately indifferent, she identified no individual

correctional officer other than Nurse Binsfeld and essentially stated anyone and everyone "assigned to" Laducer:

> Q  You say that Cass County Sheriff's Office employees were deliberately indifferent to Mr. Laducer's known high risk medical and mental health conditions. Which employees are you talking about there?
> A  All of them. I am talking about all of the employees, meaning, the officers, the staff employed by the jail, meaning the healthcare staff that was there because anybody assigned to him, that means Mr. Binsfeld.

Wright Depo. Tr. (***Exh. W***) at 101, ll. 5-25.

In addition to Plaintiffs' jail nursing experts not being able to point to any facts that would suggest any of the Cass County Defendants knew about Laducer's serious medical need or should have known of an obvious risk, all of the medical doctors that have authored expert reports in this case agree that GI bleeds like Laducer experienced at the Jail can be "occult" (a/k/a hidden and undetected) and can come on quite suddenly, just as happened to Laducer.  In his Rebuttal Report Defendants' Board Certified Emergency Medicine Dr. Leingang states:

> [. . .] It [the GI bleeding] was insipient or early, and smoldering. He was NOT defecating blood. He was NOT vomiting blood. He was NOT bleeding from esophageal varices. [] Mr. Laducer was already on a cascade of occult badness. [] His cardiomyopathy, multi-vessel-coronary-artery disease, (including the fabled LAD "widow maker") all conspired to kill Mr. Laducer quickly in my opinion. One malady contributing to another, and all caused by the actions of Mr. Laducer. [. . . .]
> . . . Right up to the minute Mr. Laducer started dying abruptly, he looked pretty good, and this is unfortunately what befalls these individuals when their heavily damaged bodies suddenly give out without advanced warning.

Dr. Leingang Rebuttal Report (***Exh. ZZ***) at Pages 6 & 11.  Plaintiff's expert, also Board Certified Emergency Medicine, Dr. Chenevert, agrees GI bleeds are oftentimes hidden, not readily discoverable, and are not associated with belly pain.  Chenevert Depo. Tr. (***Exh. XX***) at 104, ll. 8-17.  Plaintiff's pathology expert Dr. Pietruszka agreed GI bleeds are "frequently occult, hidden or stealthy" and testified Laducer's GI bleed was an "upper bleed" that will kill you quicker than a

"lower bleed."   Pietruszka Depo. Tr. (***Exh. YY***) at 59, ll. 7-22. All of this medical testimony

confirms the GI bleed was not and could not have been obvious, whether to Jail staff or to Laducer

himself.

In addition to the GI bleed issue being unknown to Jail staff (and unknowable due to its

occult characteristics), all of the expert physicians agree withdrawal in and of itself is seldom

serious or deadly, and that Laducer was not undergoing any symptoms of acute alcohol withdrawal

while at the Jail on December 18th.  Dr. Leingang states in his rebuttal report:

> Withdrawals in a patient like Luke Laducer can indeed be successfully addressed
> and alleviated within the window of opportunity, which again only occurs after or
> upon a return to sobriety and very rarely, if at all, before. In other words, it would
> be highly improbable for Mr. Laducer to have begun experiencing appreciable
> withdrawal symptoms to the point of medicating him, for example, in the 12 hours
> or so that he was lodging in the jail. In fact, there is not a shred of evidence to
> suggest he was having any withdrawal symptoms at all at any time while at the Jail.
> [. . .]
> As Jail RN Conrad Binsfeld testified at this deposition, this process is indeed
> followed with some frequency at the Cass County Jail. It is common for patients to
> be seen, sobered up, then discharged with instructions for follow-up or with a
> prescription to treat withdrawal in the Jail, with only minimal fanfare and they do
> just fine. Withdrawal syndrome is discomforting but should not be equated
> summarily with delirium tremens, a condition Mr. Laducer likewise never exhibited
> at the Jail on December 18. All of Plaintiffs' consultants' focus spent in their reports
> on "withdrawal syndrome" being ignored or neglected is unsupported by the
> medical literature and is contrary to common sense, is counterfactual, is
> disingenuous, and is simply more piling on in my view.

Dr. Leingang Rebuttal Report (***Exh. ZZ***) at 8.

Dr. Chenevert testified alcohol withdrawal is a fairly common problem he has successfully

treated many times, and that statistically it is not that dangerous when detected and treated (1% or

so risk of being fatal).  Dr. Chenevert Depo. Tr. (***Exh. XX***) at 35, l. 9 – 36, l. 11.  Dr. Chenevert

denied Laducer died from withdrawal syndrome when directly asked that question.  ("Q Do you

believe that withdrawals killed Luke Laducer or was a contributing factor in his death?  A I believe

it was the GI bleed.").  *Id.* at 97, ll. 8-10.  For his part, Dr. Pietruszka admitted treating patients for

alcohol withdrawal is not and has not really been part of his practice, but he nonetheless testified there was a "high risk" of "serious complication" from withdrawal with Laducer's situation and it was a "dangerous decision" to maintain him at the Jail even though he had been medically cleared at Essentia.  Dr. Pietruszka Depo. Tr. (***Exh. YY***) at 22, l. 23 – 23, l. 6; 53, l. 23 – 54, l. 7.  When pressed on what specific withdrawal symptoms Dr. Pietruszka knew Laducer had while at the Jail, he was only able to come up with "nausea and vomiting" as well as "bleeding" from the GI bleed, but he then admitted bleeding is not a classic withdrawal symptom and he did not know if anyone reported Laducer exhibiting any such symptoms.  Dr. Pietruszka Depo. Tr. at 50, l. 10 – 51, l. 19.

As shown in the undisputed facts, no one reported that Laducer had vomited at any time at the Jail prior to his medical emergency sometime after 5:00 pm, and the only indication of nausea was during his court hearing where he indicated in the hearing of Cpl. Anderson that he felt like he might throw up.  The CIWA-AR scale (Depo. Exh. 199) (***Exh. FF***) shows mere nausea without vomiting as low on the observation scale (scoring between a 1 and a 3), and the CIWA Score Triage Indications for Cass County Jail Staff does not suggest any medical emergency where the total score is "Less than 10".  CIWA-AR (Depo. Exh. 199), ***Exh. FF***.  In fact for scores of "Less than 10" the CIWA form states, "Provide continued monitoring and evaluation every 4 hours, provide updates to medical staff. . ." *Id.*  The CIWA form's instructions do not require inmates with scores of less than 10 to be taken out of the Jail for emergency treatment, and Laducer was monitored by correctional staff essentially every half hour after he attend the remote court hearing. Even if it is assumed Laducer's nausea rises to the level of a withdrawal symptom, all of the evidence shows he was treated according to the policies and procedures in place at the Jail, and there was no intentional disregard of a serious or obvious risk.

The undisputed material facts confirm Plaintiffs' cannot provide any showing that any individual Cass County Defendant knew Laducer was experiencing a GI bleed or that he was having any appreciable symptoms of alcohol withdrawal, and there is no evidence to suggest there was an obvious risk of harm to Laducer.

        3.      *There is no evidence to suggest that any individual Cass County Defendant deliberately, and not negligently, disregarded a serious medical need.*

"Deliberate indifference is 'akin to criminal recklessness,' something more than mere negligence; a plaintiff must show that a prison official 'actually knew that the inmate faced a substantial risk of serious harm' and did not respond reasonably to that risk." *A.H. v. St. Louis Cty, Mo.*, 891 F.3d 721, 726 (8th Cir. 2018) (quoting *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)). Because there is no evidence of knowledge of a serious medical need by Laducer and no evidence of an obvious risk of harm, there can likewise be no "unreasonable lack of response to" or "disregard of" a known risk. In other words, there is no evidence any individual Cass County Defendant intentionally disregarded Laducer's hidden GI bleed or any serious withdrawal symptoms he may have experienced during his brief incarceration.

As shown above, all of the correctional staff that performed well-being checks and interacted with Laducer throughout December 18, 2020 approximately every half hour for 14 hours were actively looking for any indications of concern with Laducer, including for signs of withdrawal from alcohol, as all of them were trained to do. Cpl. Fetting and Deputy McCaul specifically reported they were on the lookout for such symptoms with Laducer and would have reported anything concerning they may have seen. He was also frequently provided food and fluids and he was asked how he was doing several times by Deputy George and others. None of this continual monitoring and personal interaction that took place for nearly 14 hours is suggestive in any way at all of an intentional or even reckless disregard for a risk of withdrawal symptoms or

disregard for an internal GI bleed which no one knew about, and which Laducer never self-reported. In fact, just the opposite of intentional disregard is on display in this case; all correctional officers and Nurse Binsfeld are shown to have been legitimately concerned about monitoring Laducer and they vigilantly observed him for signs of trouble. At about 11:30 am, Nurse Binsfeld requested correctional staff to fill out the medical screening questionnaire in the afternoon and to get an updated BAC, and asked them to keep an eye on Laducer, which they did. The fact another inmate in booking was identified that same day – through the same sequence of well-being checks used on Laducer – as having withdrawal problems and was taken out of the Jail for treatment elsewhere, further confirms Jail's correctional and nursing staff were doing their jobs correctly and as they were trained. Plaintiffs can point to no competent and admissible evidence that any individual Cass County Defendant (including Nurse Binsfeld) intentionally or recklessly disregarded a known risk or obvious risk to Laducer.

Plaintiffs are also unable to make any showing that Laducer's right to medical care was violated by any individual Cass County Defendant. While Plaintiffs' experts have made the argument Laducer should have been "sent packing" back to the Essentia ER when he blew a .354 and that he should have been seen and treated by Nurse Binsfeld at least as of 11:30 am, or perhaps in the afternoon, on December 18, no such right to immediate treatment by Jail nursing staff is contained in North Dakota law or in the Jail's custody manual. On the contrary, the custody policies that Plaintiffs' experts claim were violated allowed Laducer to be booked into the Jail with his medical clearance first having been obtained at Essentia, allowed Jail staff up to "24 hours after the arrival of an inmate" to fill out the medical screening questionnaire, and allowed Jail nursing

staff up to "48 hours of an inmate's arrival at the jail" to perform the initial health appraisal.

Custody Manual (Depo. Exh. 109) (***Exh. K***) at Policies 708.3, 711.3, & 711.4.[14]   The policies state:

> Except where otherwise expressly stated, the provisions of this manual shall be considered guidelines. It is recognized, however, that work in the custody environment is not always predictable, and circumstances may arise that warrant departure from these guidelines. It is the intent of this manual to be viewed from an objective standard, taking into consideration the sound discretion entrusted to members of this office under the circumstances reasonably known to them at the time of any incident.

Custody Manual (***Exh. K***) Policy 103.1 at CC-000926. Nor does the mere violation of any of the Jail's policies and procedures, even if assumed to be true for the purposes of this motion, amount to a substantive violation of Laducer's Constitutional rights.  The Courts have cautioned that this is not the law.  *Bailey v. Schmidt*, 239 F. App'x 306, 308 (8th Cir. 2007) ("Further, the sheriff's or his subordinates' alleged violation of jail policies does not result in section 1983 liability.") (citing *Gardner v. Howard*, 109 F.3d 427, 430–31 (8th Cir.1997)).

Moreover, Jail staff and Nurse Binsfeld provided reasonable explanations – that comply with the letter and spirit of the various policy provisions – for why the decision was made to defer Laducer's medical intake process and all of those who testified or gave reports to the BCI confirmed Laducer was being routinely monitored for signs and symptoms of withdrawal and he would have received appropriate care and attention had he exhibited any such signs or symptoms or simply asked for help.  The undisputed evidence confirms the Jail's correctional and nursing staff followed the Jail's Detoxification and Withdrawal Policy,[15] and followed the directives

---

[14] Policy 711.4 provides that "Inmates with these medical conditions [including BAC at or above .30] are not suitable for admission to the facility until medically cleared by a qualified healthcare professional.  This office requires medical clearance from an outside entity when such inmates are identified.  The Jail Administrator is responsible for notifying local police agencies and medical facilities of the jail admission refusal policy and the required documentation."  This policy was fulfilled and followed exactly in Laducer's case on December 18, 2020.

[15] Policy 716 provides in part:

contained in the CIWA form. There is no competent, admissible evidence to indicate any of the Jail's policies were violated with respect to Laducer's incarceration on December 18th, and the policy violations Plaintiffs will almost certainly point out in their responsive briefing do not amount to a Section 1983 violation. Plaintiffs are unable to show any evidence from which a reasonable jury could conclude Laducer's substantive right to medical care was violated by any of the individual Cass County Defendants.

Because there is no genuine dispute as to the Jail nursing and correctional staff's lack of knowledge of a serious medical need and lack of knowledge of an obvious risk of harm to Laducer, and because there is no evidence of any conscious disregard of any such serious or obvious medical need, the individual Cass County Defendants (including Sheriff Jahner, Captain Frobig, Nurse Binsfeld, John Doe, and the "10 Unknown Named Defendants") are entitled to judgment as a matter of law on Plaintiffs' deliberate indifference claims.

**B.** **The Individual Cass County Defendants are Entitled to Qualified Immunity from Plaintiffs' Section 1983 Claims Because their Actions were Objectively and Subjectively Reasonable, and they Were Not On Notice their Actions Violated the Constitutional Rights of Laducer.**

In order "[t]o state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The defense of qualified immunity is available to government employees only

---

Staff should remain alert to signs of drug and alcohol overdose and withdrawal. These symptoms include, but are not limited to, sweating, nausea, abdominal cramps, anxiety, agitation, tremors, hallucinations, rapid breathing and generalized aches and pains. Any staff member who suspects that an inmate may be suffering from overdose or experiencing withdrawal symptoms shall promptly notify the Shift Supervisor, who shall ensure that a qualified health care professional is promptly notified.

Custody Manual (*Exh. K*), Policy 716.3 (CC-001278-79)

when they are sued in their individual capacities.  *Rumery v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  Qualified immunity protects these state actors from civil liability when they perform discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

A two-step test is required to determine whether qualified immunity applies. *Mitchell v. Shearrer*, 729 F.3d 1070, 1074 (8th Cir. 2013).  The test requires a determination of: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If both prongs are met qualified immunity does not apply.  *See id.*  However, if the plaintiff does not establish these prongs the defendant is entitled to summary judgment. *See Turney v. Waterbury*, 375 F.3d 756, 760 (8th Cir. 2004).  The court may use its discretion to decide which of the two prongs to address first.  *Id.*; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A right is clearly established if: (1) "its contours are sufficiently clear" that a reasonable officer would understand that what he or she is doing violates that right; and (2) when "existing precedent have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). In other words, a court will look at whether the law in place at the time of the conduct put the officer "on notice" that his conduct was not objectively reasonable. Officers will not be immune "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action." *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  If the challenged actions are ones a reasonable officer could have believed were lawful, the claims should be dismissed on summary judgment. *Anderson v. Creighton*, 483 U.S. 635, 640

n.2 (1987). The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986).

>   1.   *The undisputed facts show Plaintiffs cannot make out a violation of Laducer's constitutional or statutory rights as all of the challenged conduct was objectively reasonable.*

As discussed at length above in the summary judgment analysis, Plaintiffs' claims against the individual Cass County Defendants are based wholly on hindsight and are not based on what correctional and nursing staff knew at the time in question. By all measures, the undisputed facts show none of the individual Cass County Defendants violated or believed they were violating Laducer's statutory or constitutional rights. The undisputed facts indicate all of the Jail's correctional and nursing staff acted conscientiously, and as they were trained to act with the situation presented to them when Laducer was booked into the Jail. Certainly, all of the undisputed evidence shows correctional and nursing staff (including Nurse Binsfeld) did not subjectively believe they were violating Laducer's rights or committing unlawful actions, but just as importantly, a reasonable correctional officer or nurse in their situation would have likewise believed there was no constitutional violation or other violation of law. Because Plaintiffs' cannot make the required showing of a constitutional or statutory right, the individual Cass County Defendants are entitled to qualified immunity from suit.

>   2.   *Laducer had no clearly established right to the care Plaintiffs claim he should have received at the Jail on December 18, 2020.*

There is no controlling or compelling case law approximating the circumstances present in the instant case that would have put the individual Cass County Defendants on notice their conduct violated Laducer's constitutional rights. In other words, as of December 18, 2020, there is no case law with sufficiently clear contours that provided notice to the individual Cass County Defendants

that their actions violated a right, and certainly no "existing precedent [which has] placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

The case law in the Eighth Circuit is clear. If the symptoms presented by an inmate are not easily recognizable medical issues, the Eighth Circuit has held that the serious medical need is not obvious to a layperson and thus no constitutional violation occurred. *See Jones v. Minn. Dep't of Corrections*, 512 F.3d 478, 482-83 (8th Cir. 2008) (no obvious medical need where inmate was unable to stand or walk under her own power, was "google-eyed" and unresponsive, rolling on the ground while grunting and groaning, bleeding from the mouth, smelled of urine, and breathing rapidly); *Grayson v. Ross*, 454 F.3d 802, 809-10 (8th Cir. 2006) (same where detainee was found in a creek, soaking wet; was combative; gave nonsense answers to questions; began screaming while in the holding cell; and officers were aware that detainee had taken meth). "[A]n officer does not lose the protections of qualified immunity merely because he does not react to all symptoms that accompany intoxication." *Thompson v. King*, 730 F.3d 742, 748 (8th Cir. 2013); *see also Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016) ("[M]ost individuals arrested on intoxication-related charges are not in obvious need of prompt medical care. . . ."); *Martinez v. Beggs*, 563 F.3d 1082, 1090 (10th Cir. 2009) ("The officers subjectively knew that [the inmate] was intoxicated, but there is no evidence to show that anyone would have known that [the inmate] would face an imminent heart attack or death, much less that the individual county defendants subjectively knew that [the inmate] was at risk of heart attack or death."). When jail officials have no background knowledge regarding an inmate's medical condition and the inmate presents symptoms which are not easily recognizable medical issues, the inmate's serious medical need cannot be considered so

obvious that a layperson would have should have recognized it. *Jones v. Minn. Dep't of Corrections*, 512 F.3d 478, 482-83 (8th Cir. 2008).[16]

Plaintiffs are unable to prove a constitutional violation or a clearly established right, and thus the individual Cass County Defendants are entitled to qualified immunity from suit.

### C.    Plaintiffs' *Monell* Claims Fail for Lack of Constitutional Violation by any Individual Cass County Defendant.

"[A] municipality cannot be held liable under Section 1983 if its employees did not commit a constitutional violation." *Glover v. Rodriguez*, No. 22-CV-1454 (NEB/TNL), 2024 WL 689752, at *3 (D. Minn. Jan. 26, 2024).  To the extent the Court grants summary judgment to the individual Cass County Defendants – whether because of qualified immunity or because Plaintiffs will be unable to prove all of the essential elements of their deliberate indifference claim based on the undisputed facts – Plaintiffs cannot sustain their *Monell* claims against the County or against the Cass County Sheriff's Office's policy makers (Sheriff Jahner and Captain Frobig).  Therefore, those claims are subject to judgment as a matter of law.

### D.    Alternatively, Plaintiffs' *Monell* Claims Fail Because the Undisputed Facts Show Plaintiffs Cannot Prove up the Essential Elements of Such Claims.

In their Complaint, Plaintiffs assert claims (Count Four) against Cass County, Sheriff Jahner, and Captain Frobig arising out of alleged inadequate and unconstitutional customs, policies, practices, and/or procedures.

---

[16] Further, "if medical professionals fail[] to grasp the seriousness of [an imate's] condition, prison staff without medical training [cannot] [be] expected to do so." *Rusness v. Becker Cty., Minn.*, 31 F.4th 606, 616 (8th Cir. 2022); *Roberts v. Kopel*, 917 F.3d 1039, 1043 (8th Cir. 2019) ("It is well-established that, '[i]f trained health care officials could not find a serious medical need in these circumstances, then we decline to hold that a reasonable lay person should have done so.'") (quotation and citations omitted).

A governmental entity may only be held liable for constitutional violations resulting from a policy or custom of the entity.  *See Turney v. Waterbury*, 375 F.3d 756, 761-62 (8th Cir. 2004); *Liebe v. Norton*, 157 F.3d 574, 578-79 (8th Cir. 1998).  The policy or custom needs to be the "moving force" behind the violation.  *See Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985). A plaintiff may show a governmental entity's deliberate indifference through lack of training or inadequate training brought on by inadequate policies or customs.  *See Harvey v. Cty. of Ward*, 352 F.Supp.2d 1003, 1012 (D.N.D. 2005). The U.S. Supreme Court has held, "Only where a [governmental entity's] failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a [governmental entity] "policy or custom" that is actionable under § 1983." *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  To establish deliberate indifference by a governmental entity a plaintiff must show: (1) that the policy or custom existed; (2) that the policy or custom was causally related to the plaintiff's injury; and (3) that the policy itself was unconstitutional. *See Patzner*, 779 F.2d at 1367.

As shown in the undisputed fact section, Plaintiffs lawsuit allegations related to an alleged unconstitutional policy or custom, and related to the alleged failure to train are categorically false and have no evidentiary support.  As testified to at length by Captain Frobig in his fact depositions concerning staff training, all of the Jail's staff on duty on December 18, 2020, were appropriately trained, which included training on well-being checks and looking for withdrawal symptoms. Frobig Depo. (***Exh. I***) at 51, l. 1 – 55, l. 15; 140, l. 5 – 145, l. 12.  Also, as testified to at length by Captain Frobig in his fact depositions, and as the "corporate" designee of Cass County, all the Jail's actions of requiring advanced medical clearance of highly intoxicated individuals at outside facilities (Essentia and Sanford), and the Jail's actions of not forcing such inmates to go back to

the ER once they arrived at the Jail and are breath tested at over a .30 BAC, was not unlawful, unconstitutional, and was fully in compliance with the Jail custody manual and with controlling North Dakota law.  Custody Manual (***Exh. K***) at Policy 711.4, CC-001262-3; Frobig Depo. Tr. (***Exh. J***) at 163, l. 9 – 164, l. 15; Cass County Rule 30(b)(6) Frobig Depo. Tr. (***Exh. H***) at 20, l. 24 – 23, l. 7.

Cass County Defendants' jail policies and procedures expert agreed the decision not to send Laducer back to the Essentia ER after he registered a .354 BAC was not contrary to the Jail's policies as he had seen no indication Laducer's condition had changed and the policy expressly allowed for it.  Eiser Depo. Tr. (***Exh. MMM***) at 62, l. 23 – 64, l. 22.  Contrary to Plaintiff's totally counterfactual assertions, Eiser also testified it was reasonable and within the letter of the Jail's polices to delay filling out the medical screening questionnaire for a highly intoxicated inmate like Laducer.  Jeff Eiser Depo. Tr. (***Exh. MMM***) at 104, ll. 3-22 (testifying the policy allowed 24 hours for completion of medical screening form and this is typical and standard policy in jails).  Eiser's report also states it was reasonable and appropriate for Jail staff to rely on the medical clearance form that had been obtained from Essentia when it made the operational decision to delay the medical screening form.  Eiser Report (***Exh. LLL***) at 22.  He also confirms the Jail's policies and its training of correctional staff were fully in compliance with North Dakota law and with national regulatory standards and guidelines.  *Id.* at 24 *et seq.*  Neither Nurse Wright nor Nurse Ward has opined that any of the Jail's policies and procedures, or its unofficial customs, was unconstitutional, or there was any failure to train staff.  *See generally*, Nurse Ward Rebuttal Report (***Exh. KKK***); Nurse Wright Report (***Exh. S***).  In fact, Nurse Wright testified the Jail's medical policies and procedures "are almost verbatim for NCCHC when it comes to healthcare."  Nurse Wright Depo. (***Exh. GG***) at 42, l. 12 – 43, l. 7.  Nurse Wright relies on the authoritative guidelines

put out by the National Commission on Correctional Health Care (NCCHC). *Id.* at 37, ll. 9-13. Plaintiffs, whether through their experts or otherwise, have not attempted to make the evidentiary showing that would be required to support a *Monell* claim.

As is clear from the undisputed facts in this case, Plaintiffs cannot make the required showing there was any unconstitutional policy or custom, or failure to train or supervise, at the Cass County Jail, such that it was the moving force behind or the cause of Laducer's death. Cass County, Sheriff Jahner, and Captain Frobig are thus entitled to judgment as a matter of law.

E. **Assuming the Court Dismisses the Federal Question Claims, The Court Should Abstain from Exercising Supplemental Jurisdiction over Plaintiffs' Purely State Law Wrongful Death Claims.**

To the extent the Court grants summary judgment on the federal question claims, the Court should abstain from exercising its jurisdiction over the State law claims. Federal courts have broad discretion "whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction[.]" *Hunter v. Page Cnty., Iowa*, No. 23-1405, 2024 WL 2232323, at *11 (8th Cir. May 17, 2024) (citation omitted).[17]

F. **Alternatively, Plaintiffs' State Law Claims Should Be Dismissed As a Matter of Law and the Unknown Defendants Dismissed.**

To the extent the Court decides to exercise jurisdiction over Plaintiffs' State law claims, those claims nevertheless fail as a matter of law – for all of the reasons and due to the undisputed material facts discussed herein above – because Plaintiffs have not generated any clear and

---

[17] "When a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually will point toward declining to exercise jurisdiction over the remaining state law claims." *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1016-17 (8th Cir. 2015) (quoting *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 792 (8th Cir. 2006)); *see also Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990) ("We stress the need to exercise judicial restraint and avoid state law issues wherever possible. We also recognize within principles of federalism the necessity to provide great deference and comity to state court forums to decide issues involving state law questions.").

convincing evidence any of the Cass County Defendants actions were "reckless, grossly negligent, willful or wanton."  N.D.C.C. § 32-12.1-04(3).  Recklessness is defined under North Dakota law as engaging in "conduct in conscious and clearly unjustifiable disregard of a substantial likelihood of the existence of the relevant facts or risks, such disregard involving a gross deviation from acceptable standards of conduct."  N.D.C.C. § 12.1-02-02(1)(c).  Gross negligence is defined as ". . . to all intents and purposes, no care at all." *Bjerke v. Heartso*, 183 N.W.2d 496, 501 (N.D. 1971).  Additionally, the North Dakota Supreme Court defined the term willful or wanton conduct as ". . . extreme recklessness or foolhardiness; recklessly disregardful of the rights or safety of others or of consequences."  *Nelson v. Gillette*, 571 N.W.2d 332 (internal citations omitted).  This evidentiary standard simply cannot be met based on the undisputed material facts, and Plaintiffs' remaining State law claims are therefore subject to judgment as a matter of law.

Plaintiffs have never identified "John Doe" or the "10 Unknown Named Defendants" they have named in their Complaint.  Wiederholt Affidavit, ¶5.[18]

## VI.    CONCLUSION

For the foregoing reasons, all of Plaintiffs' lawsuit claims against Cass County Defendants should be dismissed, with prejudice.

///

//

//

---

[18] It is too late for Plaintiffs to amend their Complaint to name any of these unknown individuals and the Court should dismiss them with prejudice. *Brown v. City of Bloomington*, 280 F. Supp.2d at 892 (dismissing claims against unidentified John Doe officers after close of discovery as unidentified officers had not been served); N.D.C.C. § 32-12.1-10(1) (3 year statute of limitations applies to claims against ND political subdivisions and their employees).

Dated this 30th day of May, 2024.

BAKKE GRINOLDS WIEDERHOLT

By: _/s/ Bradley N. Wiederholt_
                Bradley N. Wiederholt (#06354)
                Grant T. Bakke (#09106)
                Special Assistant State's Attorneys for Cass County
                300 West Century Avenue
                P.O. Box 4247
                Bismarck, ND 58502-4247
                (701) 751-8188
                bwiederholt@bgwattorneys.com
                gbakke@bgwattorneys.com

                Attorneys for Defendants, County of Cass; Jesse Jahner, Cass County Sheriff; Captain Andrew Frobig; and Conrad Binsfeld, R.N.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF CASS COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was on the 30th day of May, 2024 filed electronically with the Clerk of Court through ECF.

ATTORNEYS FOR PLAINTIFF:

Jeff Dominic Price
JDP PC
1100 Glendon Avenue, Suite 1700
Los Angeles, California 90024
jdp@jdpfirm.com

                By: _/s/ Bradley N. Wiederholt_
                     BRADLEY N. WIEDERHOLT