Jeff Dominic Price  JDP PC  |  SBN 165534
1100 Glendon Avenue, Suite 1700
Los Angeles, California 90024
jdp@jdpfirm.com
T. 310.451.2222

Attorney for the Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

ESTATE OF LUKE M. LADUCER, by and through the Executor, DIANA DECOTEAU, BROOKLYN LADUCER, BETTY LADUCER, MELVIN LADUCER, and R. A. L., a minor, L. G. L., a minor, and P. A. L., a minor, by and through their next friend and guardian ad litem, PAULETTE SCHELLER,

Plaintiffs,

vs.

COUNTY OF CASS et al.,

Defendants.

No. 3:22-cv-00208-PDW-ARS

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON CLAIM FOR RELIEF NO. 1 AS TO DEFENDANT CONRAD BINSFELD, R.N.

TRIAL DATE:      10/29/2024

To: The Honorable Peter D. Welte, Chief U.S. District Judge, and to the Defendants and their attorneys of record:

1

## Table of Contents

2

**Page**

3   Table of Authorities .................................................................................... ii

4   Memorandum of Points and Authorities ..................................................... 1

5   I.      Procedural Background ..................................................................... 1

6   II.     Undisputed Facts ............................................................................ 2

7   III.    Argument......................................................................................... 8

8           A.      Legal Standard.................................................................... 8

9           B.      Conditions of confinement claims for deliberate indifference to

10                  serious medical needs ........................................................ 10

11                  1.      Medical attention given to a prisoner ................. 10

12                  2.      Deliberate indifference to serious medical needs............ 11

13                  3.      Luke Laducer suffered from a serious medical need ...................... 11

14                          a. Medical evidence ..................................... 11

15                          b. Obviousness ............................................. 12

16                  4.      Defendant Binsfeld was deliberately indifferent ............................ 13

17                  5.      Substantial risk of future harm ........................... 17

18                          a. Alcohol withdrawal was inevitable ............................. 17

19                          b. Defendant Binsfeld was deliberately indifferent to a substantial

20                          risk of serious harm ........................................ 18

21                  6.      Complete denial of medical care ........................ 19

22                  7.      Right to medication ............................................. 19

23          C.      Binsfeld is not entitled to qualified immunity................................ 19

24          D.      Spoliation of evidence ........................................................ 21

25   Conclusion........................................................................................... 23

26

27

28

**Memorandum of Points and Authorities**

I.    Procedural Background

Luke Michael Laducer, a 41 year old Army veteran and father of four, called 911 on Friday, December 18, 2020, because he was suicidal and had drunk two half-gallons of vodka. Fargo Police Department officers responded to his apartment and transported him to Essentia Health Emergency Department, where he was seen by a physician who signed a Medical Clearance Form for Mr. Laducer to go to jail or detox at 2:56 a.m. The police officers placed Mr. Laducer under arrest for unauthorized use of a credit card and lodged him in the Cass County Jail ("CCJ") at approximately 3:08 a.m.

Soon thereafter Mr. Laducer's BAC (Breath Alcohol Content) was measured at 0.354. The Cass County Sheriff's Office Booking Deputy handling Luke Laducer's booking, Gary McCaul, decided not to begin the medical screening questionnaire, following standard CCJ procedure. There were no medical personnel on duty at that time. Mr. Laducer was escorted from the intake area of the jail to Booking Cell 109 for observation by Deputy McCaul and another deputy, who held on to Mr. Laducer's arm because he was having difficulty walking. They arrived at Cell 109 at approximately 3:15 a.m.

At 11:00 a.m. Court Transport Deputy Kathryn Allen entered Cell 109 to assist Mr. Laducer with court paperwork, woke Mr. Laducer up and spoke with him. Mr. Laducer was responsive and asked questions without difficulty and Deputy Allen observed Mr. Laducer sign his name three times on the paperwork. She left the cell when the court paperwork was completed and informed Booking officers that Mr. Laducer was awake and successfully interacted and filled out the paperwork.

Defendant Conrad Binsfeld, R.N., arrived on duty at CCJ at 7:30 a.m. on 12/18/2020 after the start of the day shift at 0700. He did not go to Booking until about 11:30 a.m.; at approximately 11:30 a.m. Defendant Binsfeld looked into Cell 109 and saw Mr. Laducer wake up a little bit. At 11:30 a.m. Mr. Laducer's BAC was measured at 0.175 and Mr. Binsfeld wrote down this number on Mr. Laducer's COVID-19 Screening Form at 11:35 a.m. Nurse Binsfeld never spoke to Mr. Laducer and never returned to Cell 109 that day. Defendant Binsfeld never started Mr. Laducer's

Medical Screening Questionnaire and Mr. Laducer's Medical Screening questions were never started by anyone at Cass County Jail on that day. Mr. Laducer died in Cell 109 of internal bleeding related to chronic alcohol abuse at 5:30 p.m. that day.

This case was filed on December 2, 2022. On February 22, 2023, the Court held a scheduling conference. The Court issued a Scheduling Order on that day.

Discovery closed on March 29, 2024. The Court issued an order extending the deadline for discovery depositions to April 5, 2024, and extending the deadline for rebuttal expert reports to April 11, 2024. The expert discovery deadline ultimately closed on April 30, 2024. The dispositive motion deadline was continued from May 10, 2024, to May 30, 2024. The Final Pretrial Conference is set for October 15, 2024, at 2:00 p.m. A Pretrial Conference is set for October 29, 2024, at 9:00 a.m. Trial by jury is set for October 29, 2024, at 9:30 a.m..

II.    Undisputed facts

[1.] On 04/11/2018, at 1650 hours, Luke Laducer ("Decedent"), was received into custody at Cass County Jail ("CCJ"). Cass County Jail Medical Records, CC-008899-008974 (Exhibit 130), Medical Screening Questionnaire and Intoxication Assessment Form ("CCJ Medical Screening Questionnaire"), April 11, 2018, Exhibit ("Exh") 130-72; Fargo Cass Public Health CCJ Intake Visit, April 12, 2018, Exh 130-11. [2.] On 04/12/2018, while incarcerated in CCJ, Mr. Laducer reported to Angela Bruns, LPN, that he had a history of alcohol withdrawal and that he had had a seizure in the past. Exh 130, Fargo Cass Public Health CCJ Intake Visit, April 12, 2018, Exh 130-11. [3.] On 05/26/2018, Mr. Laducer was incarcerated in CCJ and reported to Erica Truhlicka, LPN, having a history of seizures with alcohol withdrawal and that he had been drinking 1 liter of vodka daily for the past 45 days. Exh 130, Fargo Cass Public Health CCJ Progress Note, May 26, 2018, Exh 130-10. [4.] Mr. Laducer reported to Nurse Truhlicka that he had a seizure and was throwing up blood that morning but that he did not let the officers know of either event. Exh 130-10. [5.] On 05/26/2018, while incarcerated in CCJ, Mr. Laducer showed signs of tremors. Exh 130-10. [6.] At the time that the CCJ Medical Screening Questionnaire for Mr. Laducer was filled out on 05/26/2018, Mr. Laducer registered a Breath Alcohol Content level of 0.21. CCJ Medical Screening Questionnaire, May 26, 2018, Exh 130-74 . [7.] On 06/11/2020 at 9:29 p.m. Dr. Christopher E.

Anderson signed a Medical Clearance Form for Mr. Laducer to go to jail/detox. Exh 130, Essentia Health Medical Clearance Form, Exh 130-68. **[8.]** On 06/11/2020 at 2150 hours a CCJ COVID-19 screening form was completed for Mr. Laducer. Exh 130, Cass County Jail COVID-19 Screening Questions, Exh 130-69.

**[9.]** Defendant Conrad Binsfeld began working as a Registered Nurse at CCJ in 2015, and worked at CCJ from 2015-2020. Deposition of Conrad Binsfeld, Exh 3, p. 14-15. **[10.]** On 12/18/2020, Luke Michael Laducer, called 911 at 2:23 a.m. to report that he was suicidal. North Dakota Bureau of Criminal Investigation ("BCI") Offense Report BCI20-00752/01 (without attachments) ¶¶ 19, 24, Exh 30. **[11.]** Luke Laducer told the dispatcher that he had drunk two half gallons of vodka. Fargo Police Department Supplemental Report of Officer Iverson, Exh 61-4. **[12.]** Officer Iverson and other FPD officers responded to Mr. Laducer's apartment, met with Mr. Laducer, who consented to being transported to Essentia Health, and transported Mr. Laducer to Essentia Health Emergency Department. Exh 61-4. **[13.]** The FPD officers arrived at Essentia Health with Mr. Laducer at 2:46 a.m. Fargo Police Department Call for Service Detail Report, Exh 29. **[14.]** At Essentia Health Mr. Laducer was cleared to go to jail/detox by Kurt Kaczander, D.O., at 2:56 a.m. Essentia Health Medical Clearance, Exh 310. **[15.]** The Medical Clearance Form, which was delivered to Cass County Sheriff's Office Booking officers at CCJ by FPD Officer Schmidt, stated that "[i]f at any point their condition changes or a new medical concern develops, they should be brought back to the Emergency Department immediately for further evaluation." FPD Supplemental Report of Officer Schmidt, Exh 61-6; Medical Clearance Form, Exh 310-1.

**[16.]** Luke Laducer was transported from Essentia Health to Cass County Jail and arrived at CCJ at 3:08 a.m. on 12/18/2020. FPD Call for Service Detail Report, Exh 29-2. **[17.]** While the FPD officers were present Cass County Jail officers administered a PBT at approximately 3:10 a.m. and measured Luke Laducer's BAC at 0.354. FPD Supplemental Report of Officer Iverson, Exh 61-4.

**[18.]** When Luke Laducer, who was known to be a chronic alcoholic, as documented in his jail medical records, arrived at the Cass County Jail on 12/18/2020 he was suffering from extreme intoxication, which presented a serious medical condition. Rule 26(a)(2)(B) report of Suzanne Ward, R.N., M.S., L.N.C.,  ¶¶ 21, 26, 153, Exh 40; Declaration of Martin Chenevert, M.D., p. 9,

Exh 41. **[19.]** On 12/18/2020, when Luke Laducer arrived at Cass County Jail, Deputy Gary McCaul was working as a Booking deputy and was one of the deputies processing Mr. Laducer into the Cass County Jail. Deposition of Gary McCaul, pp. 13:18, 16:14-17, 21:15-19, Exh 8. **[20.]** Deputy McCaul was the officer who was responsible for completing the intake medical screening form for Luke Laducer, but he decided not to start completing the medical screening questionnaire for Luke Laducer or ask medical screening questions of Luke Laducer, because of Luke Laducer's high BAC reading. McCaul Depo. pp. 23:25-24:8, Exh 8. **[21.]** This was standard Cass County Sheriff's Office procedure. McCaul Depo. p. 24:9-16, Exh 3. **[22.]** No one at Cass County Jail, including Defendant Binsfeld, ever began or completed the intake medical screening of Luke Laducer on December 18, 2020. Response of Sheriff Jesse Jahner to Requests for Admissions, Set 1, No. 6, Exh 33. **[23.]** On 12/18/2020 at about 3:15 a.m., Luke Laducer was escorted to Cell 109 in Booking; one of the deputies held Mr. Laducer's arm because he was too intoxicated to walk without assistance. BCI interview of Gary McCaul, Exh 21.

**[24.]** On Friday, December 18, 2020, during Luke Laducer's incarceration at CCJ, Conrad Binsfeld was the Booking nurse on duty. Deposition of Corporal William Drechsel 35:21-23, Exh 26. **[25.]** On 12/18/2020, Conrad Binsfeld started his shift at CCJ at 7:30 a.m. Deposition of Conrad Binsfeld 24:4-25:16, Exh 3. **[26.]** Conrad Binsfeld would start his shift by retrieving the medical screening forms from Booking to identify inmates who needed to be seen and then participate in the med pass; he participated in med pass on 12/18/2020. Deposition of Conrad Binsfeld 47:13-19, 57:9-17, Exh 3. **[27.]** On 12/18/2020, Conrad Binsfeld conducted and finished med pass before he arrived at the Booking area at about 11:30 a.m. Binsfeld BCI Statement p. 3, Exh 1-3; Deposition of Conrad Binsfeld 58:24-59:10, Exh 3.

**[28.]** On 12/18/2020, Conrad Binsfeld was aware by about 11:00 a.m. that Luke Laducer had come into the jail at approximately 3:00 a.m. with a BAC over 0.3. Deposition of Conrad Binsfeld 69:25-70:05, Exh 3. **[29.]** At approximately 11:00 a.m. Cass County Sheriff's Office Court Transport Deputy Kathryn Allen entered Cell 109 to assist Mr. Laducer with court paperwork, woke Mr. Laducer up and spoke with him. CCSO Supplemental Report of Deputy Kathryn Allen, December 18, 2020, Exh 140-11. **[30.]** Mr. Laducer was responsive and asked questions without

difficulty and Deputy Allen observed Mr. Laducer sign his name three times on the paperwork; she left the cell when the court paperwork was completed and informed Booking that Mr. Laducer was awake and successfully interacted and filled out the paperwork. Exh 140-11. **[31.]** On 12/18/2020 at 11:30 a.m., Nurse Conrad Binsfeld knew that Luke Laducer had a BAC of .354 when he was received into Cass County Jail. Deposition of Conrad Binsfeld p. 72:19-24, Exh 3. **[32.]** On Friday, 12/18/2020, Nurse Conrad Binsfeld arrived in Booking around 11:30 a.m., when a deputy measured Luke Laducer's BAC at 0.175, but Nurse Binsfeld made no attempt to engage or assess Luke. Deposition of Conrad Binsfeld pp. 72:19-24, 73:19-74:1, Exh 3; BAC Note, CC-000055, Exh 14. **[33.]** Nurse Conrad Binsfeld followed the Cass County standard procedure of not doing an intake medical screening of inmates who were extremely intoxicated with high BACs. Deposition of Conrad Binsfeld p. 112:4-10, Exh 3. **[34.]** On 12/18/2020 at 11:30 a.m., Nurse Conrad Binsfeld knew there was not a medical screening form completed for Luke Laducer since he was received at the jail at 3:10 a.m.. Deposition of Conrad Binsfeld p. 69:11-15, Exh 3. **[35.]** On 12/18/2020, Conrad Binsfeld decided to wait until the point when Luke Laducer's BAC was around .1 to provide him with any medical care. Deposition of Conrad Binsfeld 72:25-73:11, Exh 3. **[36.]** On 12/18/2020 at 11:35 a.m. Conrad Binsfeld deliberately refused to commence Luke Laducer's medical screening (also referred to as intake screening) because Luke Laducer's BAC was .175. Exh 3 Deposition of Conrad Binsfeld 75:22-76:1, Exh 3; BAC Note CC-000055, Exh 14. **[37.]** After 11:35 a.m. Defendant Binsfeld never asked the Booking deputies or anyone else to get a new BAC on Luke Laducer. Deposition of Conrad Binsfeld 76:2-9, Exh 3.

**[38.]** Luke Laducer's medical records and Cass County Jail medical records indicated a history of chronic alcohol abuse and a history of alcohol withdrawal, including seizures from alcohol abuse. Exh 130-10, Exh 130-11, Exh 130-72. **[39.]** Nurse Binsfeld had access to Luke Laducer's jail medical records. Deposition of Conrad Binsfeld 86:13; 91:9-92:12, 93:17-19, Exh 3. **[40.]** Nurse Binsfeld knew that alcohol withdrawal can be fatal if not treated properly. Deposition of Conrad Binsfeld 87:1-3, Exh 3. **[41.]** While working at CCJ Conrad Binsfeld was governed by the standards set forth by the National Commission on Correctional Health Care (NCCHC). Agreement for Provision of Health Services for Cass County by Fargo Cass Public Health, Exh 303-2; FHC &

CCSO Purchased Services Agreement, Exh 301-1.

**[42.]** On 12/18/2020, Nurse Conrad Binsfeld never entered Cell 109 to evaluate Luke Laducer's condition. Deposition of Conrad Binsfeld 74:3-6, Exh 3; Binsfeld BCI Interview, Exh 1; Conrad Binsfeld's Answers to Plaintiff's 3rd Set of Requests for Admissions, No. 32; in fact, Defendant Binsfeld never even checked on Luke Laducer's status after the court appearance, which occurred at approximately 2:45 p.m., and had he checked, he would have learned that Luke Laducer was fully able to participate in the intake medical screening questionnaire because he had completed the court paperwork with Deputy Allen, who had notified Booking that he was cooperative and able to fill out the court paperwork. Deposition of Conrad Binsfeld 95:3-6, Exh 3; Supplemental Report of Cass County Deputy Kathryn Allen, Exh 140-11. **[43.]** On 12/18/2020, Defendant Conrad Binsfeld had no method to track whether Luke Laducer's medical screening would be performed and testified that Mr. Laducer would simply remain in Booking until he was medically screened and Defendant Binsfeld left his shift at 3:30 p.m. with the knowledge that no medical screening form was completed for Luke Laducer. Exh 3 Deposition of Conrad Binsfeld 95:7-14, 24:4-25:16, 113:18-114:01, Exh 3.

**[44.]** Conrad Binsfeld had a duty to ask inmates questions about medications listed on medical clearance forms. Deposition of Conrad Binsfeld 56:9-15, Exh 3. **[45.]** On 12/18/2020, Luke Laducer's Medical Clearance Form from Essentia Health listed medications Pantoprazole and Promethazine which were ordered for Luke to continue taking. Medical Clearance Form, Exh 131. **[46.]** Upon seeing a prescription of Promethazine, Conrad Binsfeld would be required to discuss the medication with the individual. Deposition of Conrad Binsfeld 66:25-67:09, Exh 3. **[47.]** Conrad Binsfeld did not testify that he saw the two medications on Mr. Laducer's medical clearance form on 12/18/2020. Deposition of Conrad Binsfeld 66:4-6, Exh 3. **[48.]** Defendant Binsfeld did not provide any medication to Luke Laducer on December 18, 2020. Deposition of Conrad Binsfeld 59:6-10, Exh 3.

**[49.]** On 12/18/2020, Cass County Jail officers were aware of Luke Laducer's history of extreme alcohol abuse and alcohol withdrawal, including DTs (Delirium Tremens). BCI interview of Fetting, p. 3, Exh 22-3 ("he had left our facility before because of [DTs]"); Cass County's

Answers to Plaintiff's 5th Set of Requests for Admissions, Nos. 72 and 74, Exh 35. **[50.]** During his court appearance on 12/18/2020, Luke stated, "I'm gonna pass out" at least twice. Transcript of Luke Laducer's 12/18/2020 Court Appearance, CC-000371, Exh 4.

**[51.]** Luke Laducer periodically yelled from his cell, which could be signs of distress, a patient hallucinating or an attempt to obtain assistance. BCI interview of Corporal Blake Fidler, Exh 23. **[52.]** No Cass County Jail medical personnel entered Cell 109 to evaluate Luke Laducer or to assess why he was yelling. Supplemental Report of Cass County Sheriff's Office Corporal William Drechsel, Exh 6. **[53.]** During his court appearance at approximately 2:45 p.m. on 12/18/2020, Luke Laducer said that he was going to pass out in the presence of the judge, at which point the judge allowed Luke to attend his court hearing while lying down, and he also told Cass County Sheriff's Office Court Transport Deputy Keith Anderson that he was not feeling well and that he felt like throwing up when he sat up. Transcript of BCI Interview of Deputy Keith Anderson BCI interview, CC-000273, pp. 5-7, 11, 13 and 15, Exh 5. **[54.]** Deputy Keith Anderson did not question Luke Laducer about potential high-risk symptoms, nor did he consult with medical staff at CCJ after hearing Luke's statements of feeling unwell. Transcript of BCI Interview of Deputy Keith Anderson BCI interview, CC-000273, pp. 5-7, 11, 13-15, Exh 5.

**[55.]** Luke Laducer suffered from hemorrhagic gastritis, liver steatosis and alcoholic cardiomyopathy, which can cause sudden death. Autopsy Report, p. 7, Exh 2. **[56.]** On 12/18/2020, at approximately 5:30 p.m., Luke Laducer died of complications of chronic alcohol abuse. Autopsy Report, p. 7, Exh 2. Declaration of Martin Chenevert, M.D. ("Chenevert Decl."), pp. 3, 9, Exh 41. **[57.]** In a patient who dies from gastrointestinal hemorrhage, death occurs as a result of severe anemia and cardiovascular collapse; there is simply not enough blood volume to deliver oxygen and glucose to the heart and brain and as the volume of blood in the circulation decreases, the heart rate initially increases, in order to compensate. If the bleeding continues, the blood pressure eventually drops, the skin becomes clammy, and the patient becomes critically ill. This process does not occur instantaneously. Rather, the elevation in heart rate and the drop in blood pressure take place over a period of multiple hours. Chenevert Decl. p. 11, Exh 41. **[58.]** Failure to complete a medical screening on an intoxicated person is medically dangerous. Chenevert Decl. p. 11, Exh 41. **[59.]** On

12/18/2020, Luke Laducer's vital signs would likely have been abnormal and would have initiated a transport back to the hospital. Chenevert Decl. p. 11, Exh 41. **[60.]** Had Luke Laducer received a proper medical screening during his jail intake process or at any time during his incarceration, his critical condition would have been discovered and he could have been returned to the emergency room for further treatment and he would be alive today. Chenevert Decl. p. 4, Exh 41.

**[61.]** The Cass County Custody Manual, Policy 501.2, states, "all arrestees shall be screened prior to booking to ensure the arrestee is medically acceptable for admission and that all arrest or commitment paperwork is present to qualify the arrestee for booking." Exh 109-180.

**[62.]** The Cass County Policy Manual, Policy 711.2, requires that "a medical screening be performed on all inmates upon arrival at the intake area to ensure that existing, emergent and urgent health care, dental or mental health needs are identified, risks are assessed and inmates with contagious and communicable diseases are properly classified and housed for their health and the health of the general population." Exh 109-351. **[63.]** No one at Cass County Jail, including Defendant Binsfeld, took Luke Laducer's vital signs during his roughly 14.5 hours at Cass County Jail. Chenevert Decl. at p. 9, Exh 41.

**[64.]** Cass County destroyed the video footage of the Booking area of the jail from 4:00 a.m. – 2:00 p.m. 12/18/2020. Response of Sheriff Jesse Jahner to Requests for Admissions, Set 1, Nos. 1-3, Exh 33-4; BCI Report ¶ 20, p. 14, Exhibit 30-14.

**[65.]** Defendant Binsfeld did not perform a medical screening of Luke Laducer on 12/18/2020. Response of Sheriff Jesse Jahner to Requests for Admissions, Set 1, No. 6, Exh 33-5.

**[66.]** Defendant Binsfeld was governed by the policies of the Cass County Sheriff's Office when working at the Cass County Jail. Response of Defendant Conrad Binsfeld to Requests for Admissions, Sets 1 and 2, No. 18, Exh 31.

**[67.]** Defendant Binsfeld was required to follow the policies of the Cass County Sheriff's Office when working at the Cass County Jail. Response of Defendant Conrad Binsfeld to Requests for Admissions, Sets 1 and 2, No. 19, Exh 31.

**[68.]** On December 18, 2020, Defendant Binsfeld was not familiar with all of the policies of the Cass County Sheriff's Office. Response of Defendant Conrad Binsfeld to Requests for

Admissions, Sets 1 and 2, No. 20, Exh 31.

**[69.]** Defendant Binsfeld could not state that on December 18, 2020, he was familiar with the CCSO written policies pertaining to the medical screening of inmates brought to the Cass County Jail. Response of Defendant Conrad Binsfeld to Requests for Admissions, Set 3, No. 21, Exh 31.

**[70.]** Defendant Binsfeld was acting under color of law and was thus a state actor on December 18, 2020. Response of Sheriff Jesse Jahner to Requests for Admissions, Set 1, No. 19, Exh 33-7.

III.    Argument

 A.    Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016) (quoting *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 611 (8th Cir. 2014)).

"At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*

*v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "However, if a plaintiff cannot support each element of its claim, summary judgment must be granted, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial." *Cousineau v. Norstan, Inc.*, No. 00-1113 DSD/JGL, 2001 WL 1640118, at *3 (D. Minn. July 26, 2001), *aff'd*, 322 F.3d 493 (8th Cir. 2003) (citing Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548). Rule 56 requires a proper summary judgment motion to be opposed by the kinds of evidentiary materials listed in Rule 56(c), such as depositions, documents, affidavits or declarations, stipulations, admissions, and interrogatory answers. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

B.      Conditions of confinement claims for deliberate indifference to medical needs

1.      Medical attention given to a prisoner

In *Weaver v. Clarke*, 45 F.3d 1253 (8th Cir. 1995), the Eighth Circuit stated:

> The Eighth Amendment places a duty on prison officials to provide humane conditions of confinement. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). One condition of confinement is the medical attention given to a prisoner. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991). In this context, a prison official violates the Eighth Amendment by being deliberately indifferent *either* to a prisoner's *existing* serious medical needs *or* to conditions posing a substantial risk of serious *future* harm. *Compare Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (existing medical needs) *with Helling,* 509 U.S. at 35, (risk of future harm to health).

*Id.* at 1255, citing *Helling v. McKinney,* 509 U.S. 25 (1995) (emphasis in original) (cleaned up). Though Mr. Laducer was a pretrial detainee and pretrial detainees "are entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment," *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004), under existing Eighth Circuit precedent the Eighth Amendment standard applies. *See Whitney v. City of St. Louis*, 887 F.3d 857, 860 (8th Cir. 2018). Regardless of whether the purely objective standard recognized in *Kingsley v. Hendrickson,* 576 U.S. 389 (2015), should apply in this case, *see, e.g., Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023), plaintiffs are entitled to summary judgment against Defendant Binsfeld under the Eighth Amendment standard.

The first claim for relief in the Complaint in this case asserts a claim based on the constitutional right to humane conditions of confinement under the Fourth and Fourteenth

Amendments, and, thus, under the Eighth Amendment. *See* Complaint, ECF No. 1, ¶¶ 109-111, 114.2 and 114.3. The first claim for relief asserts both a claim for deliberate indifference to the decedent's serious medical needs and a claim for deliberate indifference to conditions posing a substantial risk of serious future harm to decedent.

### 2.   Deliberate indifference to serious medical needs

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (cleaned up) (citation omitted). The plaintiff must show (1) "an objectively serious medical need," and (2) "that the defendant knew of and disregarded that need." *Redmond v. Kosinski*, 999 F.3d 1116, 1120 (8th Cir. 2021).

To constitute an objectively serious medical need or a deprivation of that need, "the need or the deprivation alleged must be either obvious to the layperson or supported by medical evidence . . . ." *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995).

### 3.   Luke Laducer suffered from a serious medical need

An objectively serious medical need may be established if it was either "supported by medical evidence, such as a physician's diagnosis," or was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017).

The serious medical need in this case was both supported by medical evidence and was so obvious that even a layperson would easily recognize the necessity for medical attention.

#### a.   Medical evidence

Luke Laducer was brought to the Cass County Jail with a Medical Clearance Form. *See* Exhibit 310. The Medical Clearance Form signed by Dr. Kaczander stated that "[a]t this time there is no evidence of an emergency medical condition and they are medically clear to go to jail/detox." The form also stated: "If at any point their condition changes or a new medical concern develops, they should be brought back to the Emergency Department immediately for further evaluation."

Luke Laducer's condition changed on several occasions during his stay at Cass County Jail on December 18, 2020. But no one, including Defendant Binsfeld, returned Mr. Laducer to Essentia

11  Memorandum of points and authorities for Rule 56  motion against Def. Conrad Binsfeld, R.N.

Health Emergency Department, or even provided him with any medical care. In fact, no one, including Defendant Binsfeld, even conducted an intake medical screening of Mr. Laducer.

### b.   Obviousness

The Eighth Circuit has made clear that "an officer does not lose the protections of qualified immunity merely because he does not react to all symptoms that accompany intoxication." *Thompson v. King*, 730 F.3d 742, 748 (8th Cir. 2018). For example, in *Grayson v. Ross*, 454 F.3d 802 (8th Cir. 2006), the Eighth Circuit found that an intoxicated arrestee did not present an objectively serious medical need, despite clear methamphetamine intoxication. The court reasoned: "Confronted with a calm, non-combative person sitting on a bench answering questions, a layperson would not leap to the conclusion that Grayson needed medical attention, even if he were aware that Grayson had taken methamphetamine." *Id.* at 810.

In contrast, the Eighth Circuit has found an objectively serious medical need where an intoxicated arrestee "could not answer questions and could not remain seated without falling over." *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016) ("*Barton I*"). In *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) ("*Barton II*"), the Eighth Circuit affirmed the denial of qualified immunity, and pointed to certain facts, some of which are present here, from which a jury could find that the arrestee was experiencing a medical need so obvious that even a layperson could recognize it:

> As recounted above, Barton had been in a car accident. He could not follow simple instructions or answer basic questions; he was unable to stand without assistance and fell during the booking procedure. Although Barton had a .115 blood alcohol concentration, he reportedly was so heavily intoxicated that Wright could not recall whether he had "ever r[u]n into somebody that was in [Barton's] particular shape," and he "d[id]n't know that any of [his] officers had either." In light of the evidence of Barton's recent car accident, his severe intoxication, and his drug ingestion, we conclude that a jury could find that Barton was experiencing a medical need so obvious that a layperson would recognize that he needed prompt medical attention.

908 F.3d at 1124. Here, when he was admitted to Cass County Jail Luke Laducer was extremely highly intoxicated — his BAC was measured at 0.354. Booking Deputy Gary McCaul stated that Luke Laducer was so intoxicated that he had "some issues with walking" and that a deputy "helped him to his feet" before they escorted him to a cell in Booking. BCI Interview of Gary McCaul, December 29, 2020, pp. 4-5. As they walked the other deputy was holding Luke Laducer's arm and

Deputy McCaul was walking behind him "to make sure he didn't topple over backwards." *Id.* at p. 5. Deputy McCaul also testified that Luke Laducer was placed in Cell 109 for observation because of his extremely high level of intoxication and that he was too intoxicated to be asked medical screening questions. *Id.* at p. 9. As in *Barton I*, Luke Laducer "could not walk on his own" and "could not answer questions." In this case, the Court should find that Luke Laducer's condition was so obvious that even a layperson would easily recognize the necessity for medical attention.

### 4.    Defendant Binsfeld was deliberately indifferent

The subjective component of the deprivation of the claim based on inadequate medical care requires more than negligence or medical malpractice. *Dulany v. Carnahan*, 132 F.2d 1234, 1239 (8th Cir. 1997). Rather, deliberate indifference requires "a mental state akin to criminal recklessness." *Barton I*, 820 F.3d at 965 (internal quotation marks and citations omitted). "Such a mental state can be inferred from facts that demonstrate" the response to the medical need was "obviously inadequate." *Id.* It may be demonstrated by prison officials who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoners' serious medical needs. *Estelle*, 429 U.S. at 104-05. Circumstantial evidence may be used to establish the subjective mental state, and "a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the [medical need] was obvious." *Vaughn v. Gray*, 557 F.3d 904, 908–09 (8th Cir. 2009) (alteration in original) (internal quotation omitted). In *Redmond v. Kosinski*, 999 F.3d 1116 (8th Cir. 2021), the Eighth Circuit held that deliberate indifference is:

> Grossly incompetent or inadequate care "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." [] But "medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference."

*Id.* at 1120 (citation omitted). Defendant Binsfeld's conduct in this case evidenced a refusal to provide essential care to Luke Laducer. Additionally, his treatment so deviated from the standard of care as to evidence deliberate indifference to Luke Laducer's serious medical needs. Nurse Binsfeld was actually required to perform a receiving medical screening, and he was not permitted by

nursing standards to delegate the ultimate responsibility for the medical screening to correctional officers. Defendant Binsfeld was responsible by the standard of care for assuring that the medical screening was commenced and completed. Defendant Binsfeld did not follow through on his duty and responsibility to assure that the Mr. Laducer's medical screening was commenced and completed. Defendant Binsfeld did not comply with and did not perform his duties and responsibilities in accordance with law, policy, or standards. FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward, R.N., M.S., L.N.C., dated April 11, 2024 ("Rule 26(a)(2)(B) Report of Suzanne Ward"), ¶ 79, Exh 40. Nurse Binsfeld was required to assess Mr. Laducer at the time of admission. Nurse Binsfeld was required to perform a medical and suicide screening at the time of intake or when Mr. Laducer was able to respond which was clearly demonstrated to be by 11:00 a.m. Nurse Binsfeld *failed* to perform any evaluation, assessment, monitoring, nursing observation, care, or treatment of Mr. Laducer on December 18 and did not cause, direct, or ensure that any required evaluation, monitoring, care, or treatment was ever performed or provided. FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 134, Exh 40. Defendant Binsfeld's acts also deviated so extremely from the standard of care as to amount to deliberate indifference to Mr. Laducer's serious medical needs. *Id.* at ¶ 83, Exh 40.

Nurse Binsfeld worked for Cass County Public Health - Correctional Health for 5 years. It is reasonable to expect that he knew what jail policy, jail standards, and NCCHC standards required in terms of inmate assessments, who should complete them, and what the timeframes were for completion. Nurse Binsfeld testified his experience included positions as a Licensed Practical Nurse (LPN), an Emergency Medical Technician (EMT), and a medic in the National Guard. It is reasonable to believe that Nurse Binsfeld would have understood the differences between a health screening and a health appraisal and know that an intake screening for Mr. Laducer was required. It is also reasonable to believe that Nurse Binsfeld was educated, trained, and had nursing experience that informed him about patient assessments, identifying serious medical needs, and recognizing changes in a patient's condition. FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 136, Exh 40.

Defendant Binsfeld was employed by Fargo Cass Public Health, which provided medical care to Cass County Jail by contract. Exh 303. Pursuant to the contract nursing services provided at the jail was to be guided by the National Commission on Correctional Health Care standards. Exh 303-2. Defendant Binsfeld was also required to follow Cass County Sheriff's Office policies, as set forth in the Cass County Custody Manual (referred to as "CCJ" policies). NCCHC Standard J-E-02 governs intake medical screening.

CCJ Policy 711.2 required that "a medical screening be performed on all inmates *upon arrival at the intake area* to ensure that existing, emergent, and urgent health care, dental, or mental health needs are identified, risks are assessed...." (emphasis supplied). Exh 109-351. NCCHC Standard J-E-02 required that the receiving screening (also called intake screening) take place "as soon as possible upon acceptance into custody." The NCCHC standards require that the intake screening take place, promptly, without delay, but no later than a two-to-four-hour time frame after admission. FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 43, Exh 40.

Nurse Binsfeld was required by NCCHC standards to perform an intake medical screening of Mr. Luke Laducer but failed to conduct any nursing screening or assessment as required by the North Dakota Nurse Practice Act, American Nurses Association standards for assessment, National Commission on Correctional Health Care (NCCHC) standards for receiving screening, CCJ policy 711, and the American Correctional Association (ACA) Standard 1-CORE-4C-09. Defendant Binsfeld intentionally denied and delayed Mr. Laducer's access to medical care and failed to provide any medical to him whatsoever. FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 6, Exh 40.

Defendant Binsfeld was the only staff member in CCJ Booking who could access Mr. Laducer's prior jail medical record but he failed to do so. CCJ Policy 711.3.1 stated the medical screening inquiry was to include review of an inmate's prior jail medical record and history including substance abuse withdrawal and suicidal ideation. Information in Mr. Laducer's medical record was significant for documentation of his history of alcohol withdrawal and seizures. Defendant Binsfeld testified he did not review Mr. Laducer's history because he did not have a medical screening from the Booking Unit officers. Defendant Binsfeld was himself required and

responsible to perform an intake screening and assessment of Mr. Laducer. *See* FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 7, Exh 40.

Defendant Binsfeld failed and refused to take action to identify or meet Mr. Laducer's serious emergent conditions (alcohol withdrawal and gastrointestinal bleeding) and accompanying medical needs or provide medical interventions including medical and suicide screening, medical assessment, CIWA-Ar evaluations, vital signs, medication, purposeful monitoring, and return to a hospital emergency department for care and treatment that could not be provided at the jail to address and meet his obvious medical needs. FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 10, Exh 40.

Mr. Laducer was denied treatment because, according to the defendants, he was "too intoxicated", and his Breath Alcohol Content (BAC) did not dip to a level of .08 to .10 by the time Defendant Binsfeld went home for the day, at 3:30 p.m. It was arbitrarily determined that Mr. Laducer was unable to comprehend or answer the medical screening questions despite never being evaluated for either ability by any CCJ staff. Deputy Kathryn Allen stated that at approximately 11:00 a.m. she entered Cell 109 to assist Mr. Laducer with court paperwork, woke Mr. Laducer up and spoke with him. CCSO Supplemental Report of Deputy Kathryn Allen, December 18, 2020, Exh 140-11. She also stated that Mr. Laducer was responsive and asked questions without difficulty and that she left the cell when the court paperwork was completed and informed Booking that Mr. Laducer was awake and successfully interacted and filled out the paperwork. **[29.][30.]** But no one checked Mr. Laducer's BAC after 11:30 a.m. and no one attempted to perform the medical screening of Mr. Laducer at any time during his 14 hours at Cass County Jail on 12/18/2020. CCJ staff and Defendant Binsfeld reported Mr. Laducer did not request medical attention, however he yelled that he wanted a Breathalyzer done (Blake Fidler Supplement statement) and repeatedly yelled out throughout the day according to Officer Fidler but Officer Fidler stated he was "busy with other tasks" and did not respond to Mr. Laducer's calls. No one responded to Mr. Laducer, who stated twice - on the record - during a court hearing that he  was "going to pass out." Mr. Laducer showed evidence of confusion and altered mental status when he asked for water multiple times throughout the day despite being told he had water in his cell and having access to water and

bottled Gatorade all around him (Officer Miguel Tolentino, CC-000020). FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 118, Exh 40.

Mr. Laducer was suffering from alcohol intoxication and suicidal ideation at the time of his death and would be alive today if he had received proper medical treatment. Dr. Martin Chenevert stated that if Mr. Laducer's GI Bleed had been detected at any time prior to his death he could have been treated and would likely be alive today. Chenevert Decl. p. 12, Exh 41.

Luke Laducer's death was caused by his being deprived of any medical care on 12/18/2020.

### 5.   Substantial risk of future harm

Alternatively and additionally, on the basis of the undisputed facts plaintiffs are entitled to summary judgment against Defendant Binsfeld for deliberate indifference to the substantial risk of serious future harm, that resulted in the death of Luke Laducer on December 18, 2020, in the Cass County Jail. In *Helling* the Supreme Court held that the Eighth Amendment "protects against future harm to inmates" and protects against conditions that "pose an unreasonable risk of serious damage to . . . future health." *Helling*, 509 U.S. at 33, 35.

Luke Laducer was recorded to be a chronic alcoholic who was known to have suffered from seizures and delirium tremens from chronic alcohol abuse in the recent past. His Cass County Jail medical records reflect this. *See, e.g.,* Exhibit 130-10, 11. Former Cass County Sheriff's Office Corporal Samantha Fetting stated in her BCI Interview that she knew from her experience in Cass County jail that Luke Laducer was a person who had suffered from Delirium Tremens in the past.

### a.   Alcohol withdrawal was inevitable

Mr. Laducer had a history of acute alcohol withdrawal and it is very likely he would not have "complained" about symptoms he had experienced before, not recognizing the seriousness of his condition or the need for medical care. The course of Mr. Laducer's medical demise illustrates why a medical screening was required to be performed upon intake by CCJ staff or by Nurse Binsfeld rather than expecting Mr. Laducer to meet arbitrary (and unknown to him) BAC levels, complain of withdrawal symptoms, or request to see medical for a serious medical need he may not have recognized or deemed urgent or emergent. FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 149, Exh 40. Alcohol withdrawal was inevitable for Mr. Laducer and Defendant Binsfeld

knew so. Declaration of Suzanne L. Ward ¶ 11, Exh 45. "[I]f a response to a known risk is obviously inadequate, this may lead to an inference that the officer 'recognized the inappropriateness of his conduct.'" *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013).

Nurse Binsfeld was required by law to identify changes in Mr. Laducer's health status and comprehend clinical implications of Mr. Laducer's signs and symptoms as part of *expected*, *unexpected*, and emergent client situations (North Dakota Standards of Practice for Registered Nurses). In order to identify changes in Mr. Laducer's health status, Nurse Binsfeld would have had to perform an initial health screening exam to establish a baseline condition by which he could compare assessment information with future findings and identify changes. As a registered nurse Nurse Binsfeld was required to "*prioritize data collection* [i.e., a medical screening] *based not only on the healthcare consumer's immediate condition, but also on the anticipated needs of the healthcare consumer or situation."* (Nursing Scope and Standards of Practice, Standard 1. Assessment). A registered nurse is trained and expected to assess a patient (such as Mr. Laducer) with knowledge that health conditions change and can worsen to an emergent status quickly or over a period of time. A registered nurse is expected to anticipate health complications and is trained to know what to look for. Expecting complications of acute alcohol withdrawal such as seizures, DTs, or GI Bleeding would be within the realm of nursing knowledge and training. Nursing assessment is the mechanism by which a registered nurse is able to identify impending health complications. FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 150, Exh 40.

> b. **Defendant Binsfeld was deliberately indifferent to a substantial risk of future harm**

Nurse Binsfeld, as a trained medical professional, was trained and experienced to perform the CIWA-Ar and was trained to identify changes in patient condition via performance of a nursing assessment. Nurse Binsfeld failed to follow organization policy, procedures, laws or standards related to the treatment of Mr. Laducer. Had Nurse Binsfeld adhered to nursing practice standards, identification of the degree of risk to Luke Laducer would have directed him to transfer Luke Laducer back to the hospital for emergency care for a BAC too high for his safe management in the jail setting, for signs and symptoms of acute alcohol withdrawal requiring medication management

that the jail did not provide, and for changes in his condition that were present due to GI bleeding (even though they did not have a diagnosis at the time of GI Bleed or were not specifically told "he is bleeding"). FRCP 26(a)(2)(B) Expert Report of Suzanne L. Ward ¶ 130, Exh 40.

### 6.    Complete denial of medical care

In *Cheeks v. Belmar*, 80 F.4th 872 (8th Cir. 2023), the Eighth Circuit held that "where no medical aid was provided, there is no need to provide evidence demonstrating the detrimental effect of the lack of aid." *Id.* at 879. In this case, Defendant Binsfeld denied medical care altogether.

### 7.    Right to medication

Regarding the right to medication, the Supreme Court has recognized that the constitutional obligation to provide medical care to detainees may be violated when officials "intentionally deny or delay access to medical care or intentionally interfere with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (cleaned up); *see also Dadd v. Anoka Cnty.*, 827 F.3d 749, 757 (8th Cir. 2016) (noting that right of detainee who arrived at jail with prescription medication to receive such medication was clearly established); *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) (stating that "the knowing failure to administer prescribed medicine can itself constitute deliberate indifference."). In general, the right of a detainee to receive medication as prescribed was clearly established as of December 18, 2020. *Ivey*, 968 F.3d at 849.

The Essentia Health Medical Clearance Form, Exhibit 310, that the Fargo Police officers transferred to the Cass County Jail Booking officers stated that Luke Laducer was to continue taking Pantoprazole and Promethazine. Exh 310-6. Defendant Binsfeld never provided Luke Laducer with this medication, or with any medication. Thus, the undisputed facts demonstrate that plaintiffs are also entitled to summary judgment against Defendant Binsfeld for deliberate indifference for depriving Luke Laducer of medication.

### C.    Binsfeld is not entitled to qualified immunity

The Eighth Circuit has held that it was "clearly established by 2008 that a pretrial detainee has a due process right to be free from deliberately indifferent denials of emergency medical care." *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017) (citing *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016)). The court has also held that, as of 2011, "a reasonable officer ... would have

recognized that failing to seek medical care for an intoxicated arrestee who exhibits symptoms substantially more severe than ordinary intoxication violates the arrestee's constitutional rights, all the more so when the surrounding circumstances indicate that a medical emergency exists." *Barton v. Taber*, 820 F.3d 958, 967 (8th Cir. 2016) ("*Barton I*").

As in *Barton I* and *Barton II* Luke Laducer was unable to complete the intake medical screening at the time he was admitted to the Cass County Jail on Friday, December 18, 2020, he had difficulty walking, which led the Cass County Jail Booking deputies to escort him to Cell 109, with one of the deputies holding his arm, and he was placed in an observation cell because of his extreme level of intoxication. *See also Grote v. Kenton County, Kentucky*, 85 F.4th 397, 406 (6th Cir. 2023) (elevated blood-alcohol content and history of withdrawal seizures constitutes objectively serious medical need).Defendant Binsfeld is not entitled to qualified immunity.

It has been clearly established since 1995 that a prison official violates the Eighth Amendment by being deliberately indifferent to conditions posing a substantial risk of serious future harm. *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995). The type of proof necessary to prove a particular type of conditions of confinement claim depends on the harm that the inmate alleges. *Id.* In this case plaintiffs have shown both that Defendant Binsfeld was deliberately indifferent to the decedent's existing serious medical needs and that he was deliberately indifferent to the risk of harm to decedent's future health, resulting in his death. The undisputed facts show that Defendant Binsfeld, a registered nurse, knew that Luke Laducer came into the Cass County Jail with an extremely high level of intoxication and Defendant Binsfeld knew that alcohol withdrawal could be fatal if not treated properly. Defendant Binsfeld had access to Luke Laducer's Cass County jail medical records, which recorded that Luke Laducer was a chronic alcoholic who had suffered from alcohol withdrawal and seizures in the past.

*Dadd* makes "[i]t ... clear that [(1)] a pretrial detainee has a constitutional right to adequate medical care while in custody," 827 F.3d at 756, and that (2) "constitutional liability may follow" "[w]hen an official denies a person treatment that has been ordered or medication that has been prescribed," *id.* at 757. In *Dadd*, the pretrial detainee "arrived at the jail with instructions from his doctor in the form of a Vicodin prescription, and the deputies and the jail nurse ignored his

complaints of pain and requests for treatment. When [the pretrial detainee] was prescribed additional medication by a jail doctor, he did not receive it." *Id.* at 757. We held that "the defendants had fair warning about the unconstitutionality of a failure to provide pain medication for serious dental conditions." *Id.* Thus, the pretrial detainee's "right to adequate treatment was clearly established, and the district court properly denied the defendants qualified immunity." *Id.* Binsfeld had "fair warning" that misadministering prescriptions or failing to provide Luke Laducer with his prescribed medication violated his constitutional rights, *Dadd*, 827 F.3d at 757.

### D.      Spoliation of evidence

Despite a directive by North Dakota Bureau of Criminal Investigation to preserve for purposes of criminal investigation a portion of video of Laducer's pre-trial detention, Cass County Sheriff's Office ("CCSO") took no action to preserve video for purposes of a broader and reasonably foreseeable potential for civil litigation. Responses to Request for Admission to Def. Jesse Jahner, Set 1, Request for Admission Nos. 1-3, Exh 33.  Rather, CCSO decided to allow nearly all the video to be overwritten. Despite that litigation was reasonably foreseeable, Jail Administrator Andrew Frobig took no steps to preserve the highly relevant, objective evidence of what happened to Luke Laducer. Laducer is dead and cannot speak for himself – CCSO's spoliation deprived him of the only neutral witness in the case.

CCJ's surveillance system captured video of Laducer for the entirety of his time in the observation cell — Cell 109.  The system trains a camera on the booking area and provided a video record of the interactions of Laducer and correctional officers in the booking area for the duration of Laducer's custody on Friday, December 18, 2020. With respect to Laducer's cell, CCSO chose not to preserve any video from Laducer's arrival at approximately 3:10 a.m. on December 18, 2020, until the time of his death later that day at 5:20 p.m. The video is easy to retrieve and preserve, but CCJ's video "rolls over" and records over itself after 10-14 days.

Among many different sanctions, the court may give a jury instruction on the "spoliation inference," which permits the jury to assume the destroyed evidence would have been unfavorable to the offending party. *Taylor v. Null*, 2019 WL 4673426, *4 (E.D. MO., 2019) (*citing* Fed. R. Civ. P. 37(b)(2).  For an adverse inference instruction to be warranted, a district court must make two

findings: 1) intentional destruction indicating a desire to suppress the truth; and 2) prejudice to the opposing party. *Taylor*, 2019 WL 4673426, *4.

District courts enjoy substantial discretion in determining intentional destruction.  "District courts have inherent authority to impose sanctions when a party destroys evidence that it knows or should know is relevant to potential litigation and thereby prejudices its potential adversary." *Taylor*, 2019 WL 4673426, *4; *see Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739 (8th Cir. 2004).

"[I]ntent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v Union Pacific R.R.*, 373 F.3d 896 (8th Cir. 2004).

Prelitigation destruction of evidence pursuant to a routine retention policy can establish an intent to destroy evidence when a defendant "ha[s] general knowledge that such recordings would be important to any litigation in which an accident resulted in death or injury." *Taylor*, 2019 WL 4673426, *4, 6, *discussing Stevenson*, 354 F.3d at 747-8.

The Eastern District of Missouri reached such conclusion in *Taylor*, after a prison destroyed video footage of an alleged excessive force incident pursuant to its routine retention policy. *Taylor*, 2019 WL 4673426, *6.  The court reasoned that "Defendants had general knowledge that the security footage of the alleged excessive use of force against Plaintiff would be important to any litigation that would *potentially* ensue." *Id.* (emphasis added).  The court found that "the destruction of the [video recording] in this combination of circumstances, though done pursuant to a routine policy, creates a sufficiently strong inference of an intent to destroy it for purpose of suppressing evidence" to warrant an adverse inference instruction. *Id.*

When recordings are destroyed, courts routinely find prejudice because no comparable evidence exists. *Stevenson*, 354 F.3d at 748; *Taylor*, 2019 WL 4673427 at *7.  Plaintiff need not prove that the destroyed evidence contained a "smoking gun," because "the very fact that it is the only recording [of the events at issue] renders its loss prejudicial." *Hall v Ramsey County*, 2013 WL 12141435, *2 (D. Minn., Apr. 8, 2013), *citing E-Trade Secs. LLC v. Deutsche Bank AG*, 230 F.R.D.

22  Memorandum of points and authorities for Rule 56  motion against Def. Conrad Binsfeld, R.N.

582, 587 (D. Minn, Apr. 18, 2005).

Without the actual video, Plaintiff only has Defendant CCJ's Answers to Requests for Admissions and other responses to discovery requests as to what transpired for a period of approximately 10 hours: "All digital video recordings not preserved by the BCI on December 18th were overwritten within approximately 10-14 days following the date the video was recorded by the surveillance recording system." Responses to Requests for Admissions to Def. Jahner, Set 1, Request for Admission No. 1. Defendants answer that BCI "preserved" video is a thinly veiled attempt to impute to BCI the unrelated decision to destroy or overwrite the despoiled portion of the video. The preservation or despoliation of the video was entirely within Defendant CCJ's control. If anything, BCI's request to preserve portions of the video and CCJ's attempt to deflect to NDBCI the decision to despoil remaining video serves to establish that civil litigation was reasonably foreseeable and that CCJ knew or should have known that such evidence would be relevant to civil litigation as well.

"The loss of the only existing contemporaneous recording of the events in question prejudices Plaintiff." Taylor, 2019 WL 4673426, *7. The video recorded the very events that Plaintiff claims constituted "deliberate indifference." Plaintiffs request that the Court consider the spoliation of the jail video when weighing the evidence against the defendants, including Defendant Binsfeld, even though he was not instrumental in the spoliation of the video because he could have taken steps to preserve the video and it would be inequitable for him to profit from the destruction of evidence.

## Conclusion

For the reasons stated above, the Court should grant summary judgment in favor of plaintiffs on Claim for Relief No. 1 against Defendant Conrad Binsfeld.

DATED: May   30  , 2024                          Jeff Dominic Price, JDP PC

                                    By   _____
                                         Jeff Dominic Price, Esq.
                                         Attorney for the Plaintiff

23  Memorandum of points and authorities for Rule 56  motion against Def. Conrad Binsfeld, R.N.