IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | | |
|---|---|---|
| The Estate of Luke M. Laducer, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER ON MOTIONS** |
| | ) | |
| vs. | ) | |
| | ) | Case No. 3:22-cv-208 |
| Cass County, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Luke Laducer, a forty-one year old veteran, was arrested and transported to the Cass County Jail in Fargo, North Dakota, around 3:00 a.m. on December 18, 2020. He died in custody of a gastrointestinal bleed fourteen hours later. His estate and members of his family (collectively, the "Estate") sued nine defendants, including Cass County, Sheriff Jesse Jahner, Captain Andrew Frobig, and Nurse Conrad Binsfield.[1] Defendants move for summary judgment, and the Estate moves for partial summary judgment on its claim that Nurse Binsfield and Captain Frobig were deliberately indifferent to Laducer's medical needs. Because those officials did not ignore a serious medical need and the Estate's other claims fail as well, Defendants' motion for summary judgment is granted.

I.   **BACKGROUND**

On December 18, 2020, Luke Laducer called 911 at 2:23 a.m. Doc. 131-19, p. 3. He told the operator he had attempted suicide by drinking too much alcohol. Id. Officers from the Fargo

---

[1] The family member plaintiffs include Laducer's sister, Diana Decoteau; his daughter, Brooklyn Laducer; his mother, Betty Laducer; his father, Melvin Laducer; his minor son, R.A.L.; his minor son, L.G.L.; and his minor daughter, P.A.L. See Doc. 1 ¶¶ 3-9. His children bring their claims though their guardian ad litem and Laducer's sister, Paulette Scheller. Id. Defendants that were sued but dismissed include Essentia Health, Doctor Kurt Kaczander, and Nurse Nathaniel Swanson. See Doc. 101. The Estate also brought claims against "John Doe." Doc. 1 ¶ 18.

Police Department arrived at his residence minutes later and transported him to Essentia Health's emergency room. Doc. 132-8. Dr. Kurt Kaczander, an emergency room doctor, found Laducer "medically clear to go to jail/detox" but should return to the hospital if his "condition changes or a new medical concern develops." Doc. 132-18. The police officers then arrested Laducer on an unrelated, outstanding warrant and transported him to Cass County Jail.

Laducer arrived at 3:08 a.m. Security footage shows jail officials guiding Laducer as he entered the jail, though he was otherwise able to walk on his own. See Doc. 120.[2] When asked if Laducer had trouble walking, Deputy Gary McCaul, who worked at the jail's booking desk that morning, responded, "He was . . . walking mostly unassisted, but due to his intoxication level, we were walking with him. I believe one of the deputies had his arm, and we were just making sure that he wasn't falling." Doc. 131-8, p. 7. Laducer's breath alcohol content was 0.345. See Doc. 132-8, p. 3.

Jail officials delayed administering a medical screening questionnaire. The medical screening questionnaire is a three-page document with questions such as, "Does inmate have a history of withdrawal symptoms?" and "Is he/she severely confused, unconscious or lapsing into unconsciousness?" Doc. 132-10. Cass County's policy is that the questionnaire should be administered to "all inmates upon arrival," but a subsection provides that the form can be completed "no later than 24 hours" after arrival but "prior to an inmate being housed in the general

---

[2] Docket number 120 is a placeholder for a security camera recording, which is conventionally filed. Although the parties characterize Laducer's ability to walk differently, the footage resolves the factual dispute for purposes of summary judgment. See e.g., Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

population." Doc. 123-3, p. 6. After the medical screening questionnaire, inmates receive an "initial health appraisal." Doc. 123-3, p. 1. This includes a review of the inmate's height and weight, vital signs, and medical history, among other things. Id. Deputy McCaul explained jail officials delayed the questionnaire because Laducer's intoxication level "was very high" and "it didn't appear that we would get complete answers from him." Doc. 131-8, p. 6. Though the questionnaire was delayed, a Covid-19 form reported Laducer did not have a cough, sore throat, shortness of breath, or body aches. See Doc. 131-12.

Around 3:15 a.m., Laducer was escorted to Cell 109, directly across from the jail's booking desk. Jail officials brought him a sack lunch, a Gatorade, and a blanket. See Doc. 131-14, p. 1. Officer Jacob Maahs, one of the police officers with Laducer that morning, remembered it being a "very typical booking process." Doc. 120-2, p. 15. Deputy McCaul told an investigator that Laducer "just seemed like another person who was . . . intoxicated." Doc. 131-14, p. 3.

Nurse Binsfield started his shift at 7:30 a.m. Doc. 131-3, p. 6. He was aware Laducer arrived earlier that day with a breath alcohol content above 0.3 and had been medically cleared at Essentia Health. Id. at 14, 18. Nurse Binsfield checked on Laducer during his mid-morning "med-pass" around 11:00 a.m., and Laducer appeared to "wake up a little bit." Id. at 19. Nurse Binsfield requested jail officials administer another breath test. Id. The test was administered at 11:35 a.m., and Laducer's breath alcohol content was 0.175. Id. at 22. That result was handwritten on his Covid-19 screening form. Doc. 131-12. Nurse Binsfield then asked a jail official "to get the medical screening questions done later that afternoon." Doc. 131-3, p. 19. His shift ended at 3:30 p.m.

Laducer made an appearance in state court using an iPad from Cell 109 around 2:50 p.m. Doc. 143-6, p. 6. He told the presiding judge he understood his rights, but then said "I'm going to

3

pass out. I'm going to pass out." Doc. 131-4, p. 1. Deputy Keith Anderson, who was with him during the remote appearance, told an investigator that Laducer's behavior "seemed pretty normal for someone who had, you know, . . . the [breath alcohol content] that he had." Doc. 126-1, p. 1. The presiding judge told Laducer that he could "lay down if that would be more comfortable for you." Doc. 131-4, p. 1. Laducer did, and the hearing continued. Laducer confirmed that he understood the charges, provided his cell phone number, and stated he had not yet applied for a public defender. Id. at 1-2.

Laducer had several interactions with jail officials the rest of the afternoon. Well-being checks occurred roughly every half-hour. See e.g., Doc. 131-11. Deputy Micheal George, for example, walked past Laducer's cell and looked inside at 3:51 p.m.[3] See Doc. 137, p. 12. He told an investigator he would ask, "Are you okay?" and Laducer would respond, "Yeah, Yeah." Doc. 126-7, p. 3. Others walked by Cell 109, including Deputy Blake Fidler, who, at 4:58 p.m., appeared to talk with Laducer. See Doc. 137, p. 12. When asked at a deposition if he saw anything of concern that afternoon, he responded, "I don't recall . . . anything that was concerning." Doc. 126-5, p. 11. Deputy Fidler testified Laducer occasionally yelled, including for a Breathalyzer; he speculated it was because he wanted "to move out of booking." Id. at 9. Corporal Samantha Fetting told an investigator she checked on Laducer because she knew his history of alcohol withdrawal. She asked him, "How are you feeling?" and Laducer responded, "I'm just a little hungover and I'm thirsty." See Doc. 140-6, p. 1. Deputy Samantha Vigstol, who worked in the booking area, told an investigator that Laducer "seemed fine" most of the day. Doc. 140-6, p. 2.

---

[3] Plaintiff's expert Edith Wright produced a detailed account of jail officials' interactions with Laducer throughout December 18, 2020, based on security footage. See Doc. 137, pp. 9-14. The parties do not dispute the accuracy of Wright's summary.

4

But at 5:15 p.m., Deputy Vigstol was asked give Laducer dinner. Id. She approached Laducer's cell and "could smell a foul smell." Id. She looked inside and saw him "lying face down." Id. She told her supervisor, Corporal Fetting, something was "weird." Id. Corporal Fetting "saw a little bit of fluid" around Laducer's mouth, "started yelling for the door to be opened," and upon entering Cell 109, found he was not breathing. See Doc. 131-15, p. 2 She told Deputy Vigstol to call 911. See Doc. 140-6, p. 2. Life-saving efforts began immediately: Corporal Sam Brekke arrived with an artificial manual breath unit at 5:17 p.m., but he was unsuccessful. Doc. 137, p. 13. Fire Rescue arrived at 5:23 p.m. EMS arrived at 5:28 p.m. Id. Life-saving efforts recommenced, but they were unsuccessful too. Efforts to save Laducer's life ended at 5:50 p.m. Id. at 14.

Laducer died of "diffuse hemorrhagic gastris and colitis." Doc. 131-2. Gastrointestinal bleeds, the Estate acknowledged, "can cause sudden death." Doc. 142, p. 13. Dr. Chenevert, one of its experts, said gastrointestinal bleeding causes death "as a result of severe anemia and cardiovascular collapse." Doc. 132-4, p. 11. Without sufficient blood volume to deliver oxygen and glucose to the heart and brain, "the heart rate initially increases" and then "blood pressure eventually drops, the skin becomes clammy, and the patient becomes critically ill." Id. Laducer's vital signs would have been abnormal in the hours before his death, though Dr. Pietruszka, the Estate's other expert, agreed gastrointestinal bleeds are "frequently occult, hidden, or stealthy." See Doc. 127, p. 17. Defendants' expert Dr. Gordon Leingang stated gastrointestinal bleeds occur "insidiously and then very acutely" and patients "who do not look ill" can quickly "succumb" to them. See Doc. 127-2, p. 6.

About two years after Laducer's death, the Estate sued Cass County, Sheriff Jahner, Captain Frobrig, and Nurse Binsfield. The Estate brought four constitutional claims and one state law claim: (1) deliberate indifference to a serious medical need in violation of the Fourteenth

Amendment, (2) state created danger in violation of the Fourteenth Amendment, (3) loss of parent-child relationship in violation of the First and Fourteenth Amendment, (4) municipal and supervisory liability, and (5) negligence and wrongful death in violation of state law. On September 10, 2024, the Court granted Defendants' summary judgment motion to dismiss the state law claim without prejudice because the Estate did not comply with certain procedural rules. So, only the constitutional claims remain.

## II.     LAW AND DISCUSSION

Defendants move for summary judgment on the remaining claims, and the Estate moves for summary judgment only on its claim of deliberate indifference. "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (citation omitted). Because the parties both move for summary judgment on the Estate's claim of deliberate indifference to a serious medical need, the Court begins there.

### A.     Deliberate Indifference

The Eighth Amendment's prohibition against cruel and unusual punishment "imposes duties" on prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Prison officials' "deliberate indifference to [the] serious medical needs of prisoners" violates those duties because it achieves only the "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104-5

(1976). But "[a]n accident," including an inadvertent failure to provide medical care, "is not . . . characterized as wanton infliction of unnecessary pain." Id. at 105. So, negligence does not "state a valid claim of medical mistreatment under the Eighth Amendment." Id. Pretrial detainees like Laducer are protected by the Fourteenth Amendment, not the Eighth, but the same standards apply. See Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014).

To establish a constitutional violation of deliberate indifference, Laducer must show (1) "that he suffered from an objectively serious medical need" and (2) "that the jail officials had actual knowledge of that need but deliberately disregarded it." Hancock v. Arnott, 39 F.4th 482, 486 (8th Cir. 2022). A medical need is "objectively serious" if it has been "diagnosed by a physician as requiring treatment" or is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." See Barton v. Taber, 820 F.3d 958, 964 (8th Cir. 2016) (internal quotation marks and citation omitted). Laducer did not have a diagnosed medical condition on December 18, 2020, so his need for medical attention must have been "obvious" to "a layperson." Grayson v. Ross, 454 F.3d 802, 809 (8th Cir. 2006). If it was, the Estate must show jail officials had "subjective knowledge" of that need for medical attention and consciously disregarded it. See Walton v. Dawson, 752 F.3d 1109, 1117 (8th Cir. 2014). This is a "mental state akin to criminal recklessness." Hancock, 39 F.4th at 488 (internal quotation marks and citation omitted).

For this reason, claims of deliberate indifference require "an individualized assessment." Id. at 1125. Because "collective knowledge cannot serve as the basis for a claim of deliberate indifference," each official "must be judged separately" based on what he or she knew. See Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008). For example, Captain Frobrig testified at a deposition that he had "no involvement" with Laducer on December 18th. See Doc. 121-2, p.

7

19. And though it brought a claim of deliberate indifference against Captain Frobig, the Estate produced no evidence he was aware of Laducer's medical needs.

Nurse Binsfield was more involved than Captain Frobig, but not by much. He worked from 7:30 a.m. to 3:30 p.m. He was aware Laducer was intoxicated and at risk of withdrawal, but intoxication and withdrawal are "an occasional reality of life" in a jail. See Jones v. Cnty. of Kent, 601 F. Supp. 3d 221, 247 (W.D. Mich. 2022). Symptoms of intoxication—"falling asleep in a patrol car" or "slurring . . . words"— are things the "police deal with every day." See Thompson v. King, 730 F.3d 742, 748 (8th Cir. 2013). Alcohol withdrawal, too, is "frequently seen and managed in prisons and jails." Starks v. St. Louis Cnty., No. 4:21-CV-435, 2024 WL 940410, at *9 (E.D. Mo. Mar. 5, 2024). These conditions do "not always require medical intervention," Jones, 601 F. Supp. 3d at 247, and so Laducer's intoxication and potential withdrawal is not an obvious need for medical attention on its own.

That said, risks associated with intoxication and withdrawal, "fall [ ] on a spectrum of severity." Id. Shaking, unresponsiveness, vomiting, or diarrhea, among other symptoms, may present an obvious need for medical attention. Id. In Barton, for example, the Eighth Circuit found an intoxicated inmate had an obvious need for medical attention when he "fell to the ground and was not responsive" at the scene, officers had "to check for a pulse," and, during booking, "fell off a bench onto the floor." 820 F.3d at 967. But in Grayson, another case involving an intoxicated inmate, the Eighth Circuit found a layperson would not believe a "calm, non-combative" inmate had an obvious need for medical attention even though he had taken methamphetamine. 454 F.3d at 810.

It is the symptoms that accompany intoxication and withdrawal that can result in an obvious need for medical attention, and Nurse Binsfield was not informed Laducer had those

symptoms because no jail official observed them. According to Officer Maahs, Laducer had "very typical booking process." Doc. 120-2, p. 15. Deputy McCaul said Laducer "just seemed like another person" who was intoxicated. Doc. 131-4. And well-being checks, which occurred roughly every half-hour, consistently reported that he was well. See Doc. 131-11. The Estate compares Laducer to the inmate in Barton, but it works better as a contrast. In Barton, the inmate "fell to the ground and was not responsive" and was "unable to answer questions." 820 F.3d at 967. Laducer was able to walk on his own, answered questions during his remote court appearance, and engaged with jail officials throughout the morning and afternoon of December 18th. Laducer, of course, had an obvious need for medical attention later that day—but by then, Nurse Binsfield's shift had ended.

The Estate argues Nurse Binsfield was deliberately indifferent because he did not administer the medical screening questionnaire. Cass County's policy is ambiguous: it provides that the questionnaire should be administered "upon arrival," though jail officials have twenty-four hours to complete the form. See Doc. 123-3, p. 6. Laducer was held for fourteen hours, so it is unclear whether the policy was violated.

But the intricacies of Cass County's policy are beside the point. Even if Nurse Binsfield "failed to follow [jail] policy," that does not mean he violated Laducer's constitutional rights. See Jones, 601 F. Supp. 3d at 247. And while the Estate's experts conclude Nurse Binsfield violated his constitutional rights for that reason, "courts do not permit experts to . . . render [ ] opinions on matters such as 'deliberate indifference.'" Wilson v. Douglas Cnty., 2005 WL 3019486, at *1 (D. Neb. Nov. 10, 2005). The Eighth Circuit has held "[t]here is no clearly established right to a general medical screening when admitted to a detention center." Fourte v. Faulkner Cnty., Ark., 746 F.3d 384, 388 (8th Cir. 2014). Instead, "admittees have the same right as inmates: not to have known,

9

objectively serious medical needs disregarded." Id. And for reasons stated above, Laducer did not have an obvious need for medical attention until after Nurse Binsfield had left for the day.[4]

Nurse Binsfield left Cass County Jail at 3:30 p.m., and Laducer did not demonstrate a serious medical need until sometime after 5:00 p.m. Once it was obvious Laducer needed medical attention, other jail officials undertook life-saving efforts. And while they were not successful, they were not indifferent. Nurse Binsfield and Captain Frobrig were not deliberately indifferent to Laducer's medical needs, and the latter half of their qualified immunity defense—"whether it would be clear to a reasonable officer that his conduct was unlawful"—need not be considered. See Grayson, 454 F.3d at 809. Defendants' motion for summary judgment on deliberate indifference to a serious medical need is granted.

### B. Remaining Constitutional Claims

The Estate brings three other constitutional claims: state created danger in violation of the Fourteenth Amendment, loss of parent-child relationship in violation of the First and Fourteenth Amendment, and municipal and supervisory liability. Each claim relies on a jail official being deliberately indifferent to Laducer's medical needs. See Doc. 1 ¶¶ 118-155. And because no jail official violated Laducer's constitutional rights, summary judgment will be granted on these claims as well.

---

[4] The Estate argues in the alternative that if Nurse Binsfield did not ignore an "existing" serious medical need, he ignored a "substantial risk of serious future harm," but this fails for the same reason its claim of an existing medical need failed. See Weaver v. Clarke, 45 F.3d 1253, 1255 (8th Cir. 1995) (explaining claim of deliberate indifference to future harm). In short, Laducer did not have an obvious need for medical attention and was monitored by jail officials throughout December 18th. The Estate also briefly argues Laducer was denied medical care, medication, and that Defendants intentionally destroyed evidence (Doc. 130, pp. 20-25), but there is insufficient support in the record for these claims.

### III.   CONCLUSION

The Estate has argued Laducer's serious medical needs were his intoxication and alcohol withdrawal—not the gastrointestinal bleed that killed him. The experts in this case acknowledged gastrointestinal bleeds can be difficult to detect by a layperson, and jail officials did not have sufficient reason to believe Laducer had a serious medical need before 5:00 p.m. on December 18th. By that time, Nurse Binsfield and Captain Frobig had left for the day. When it became obvious Laducer needed medical attention, other jail official tried to save his life. Lastly, Nurse Binsfield's failure to conduct a medical screening may have violated county policy, but it did not violate the Constitution. For those reasons, Defendants' motion for summary judgment (Doc. 118) is **GRANTED**, and the Estate's motion for summary judgment (Doc. 129) is **DENIED**.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this 21st day of October, 2024.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court